UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>　　　　　Plaintiff,<br>v.<br>IIPAY NATION OF SANTA YSABEL, also known as SANTA YSABEL BAND OF DIEGUENO MISSION INDIANS, et al.,<br><br>　　　　　Defendants. | Case No.14cv2724 AJB (NLS)<br><br>ORDER DENYING DEFENDANTS' RULE 12(b)(1) MOTION TO DISMISS<br><br>(Doc. No. 15) |

      The Court is presented with a motion to dismiss for lack of subject matter jurisdiction, brought by Defendants, including Iipay Nation of Santa Ysabel ("the Tribe"). The matter was fully briefed by the parties and the matter was submitted. Having fully and carefully considered the arguments presented, the Court **DENIES** the motion.

## I.    BACKGROUND

      The Court fully discussed the background of this action in the temporary restraining order, and thus presents an abbreviated version here. (*See* TRO, Doc. No. 11.) In relevant part, Plaintiff ("the State") initiated this action against the Tribe and other defendants who are agencies or officials of the Tribe. (Compl. ¶ 5, Doc. No. 1.) The complaint alleges (1) breach of compact, and (2) unlawful internet gambling under the Unlawful Internet

Gambling Enforcement Act ("UIGEA") (*id.* ¶¶ 40-51), and seeks injunctive and declaratory relief (*id.* at 13-14). The breach of compact claim relates to the Tribal-State Compact entered into by the parties in 2003. (*See* Compact, Doc. No. 1-2.) At the heart of the dispute is an electronic bingo-type game being offered by the Tribe. In July 2014, the State wrote the Tribe about a recent article on the Tribe's intent to offer "real money online poker," asked about the Tribe's plans to provide internet bingo and poker, and requested to meet and confer. (Chelette Decl. Ex.1, Doc. No. 6.) The Tribe responded that it "does not offer bingo through Santa Ysabel Interactive, or have any plans to do so in the near future." (*Id.*) The Tribe also noted that even if it did, bingo in an interactive environment would be a Class II game,[1] and thus would not violate the Compact. (*Id.*) Finally, the Tribe asserted that it had "no intention of discussing any federal statutes, including the Indian Gaming Regulatory Act or the Unlawful Internet Gaming Enforcement Act with any State of California government officials" and that it felt that the State was "exceeding [its] scope and authority by requesting a discussion with [the Tribe] concerning the application and relevance of federal law." (*Id.*) As for the state gambling laws, the Tribe said that without citation to specific California statutes, it "would be unable to provide the State with meaningful dialogue with which to resolve potential issues." (*Id.*)

On November 3, 2014, the Tribe began to offer its electronic bingo-type game. The game was offered for real money play and the Tribe contended the play was limited to adult residents of California while they are located within California. (Chelette Decl. ¶ 3, Doc. No. 6.) Soon thereafter, the State filed the present action[2] and moved for a temporary restraining order. The Court heard argument regarding the temporary restraining order and granted the motion. (*See* TRO.) Defendants now move to dismiss pursuant to Federal Rule of Civil

---

[1] The Indian Gaming Regulatory Act ("IGRA") classifies Indian gaming into three different categories—Class I, Class II, or Class III, with each category subject to different regulation.

[2] The United States filed a related case against the Tribe and some of the Defendants, seeking to enjoin the gaming at issue here. *See United States v. Iipay Nation of Santa Ysabel*, No. 14cv2855 AJB (NLS) (S.D. Cal. filed Dec. 3, 2014).

Procedure 12(b)(1), citing tribal sovereign immunity and failure to comply with procedural requirements. (Defs.' Mot. 2, Doc. No. 15.)

## II. LEGAL STANDARD

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may raise the defense by motion that the court lacks jurisdiction over the subject matter of a claim. Fed. R. Civ. P. 12(b)(1). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009).

## III. COMPACT PROVISIONS

A number of Compact provisions are important to the resolution of this motion. Section 9 of the Compact contains the limited waiver of sovereign immunity and dispute resolution provisions. (*See* Compact § 9.0.) That portion of the Compact provides in part:

> Sec. 9.4 Limited Waiver of Sovereign Immunity.
> (a) In the event that a dispute is to be resolved in federal court or a state court of competent jurisdiction as provided in this Section 9.0, the State and the Santa Ysabel Tribe expressly consent to be sued therein and waive any immunity therefrom that they may have provided that:
> (1) The dispute is limited solely to issues arising under this Gaming Compact;
> (2) Neither side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought); and
> (3) No person or entity other than the Santa Ysabel Tribe and the State is party to the action, unless failure to join a third party would deprive the court of jurisdiction; provided that nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Santa Ysabel Tribe or the State with respect to any third party.
> . . .
> (c) The waivers and consents provided for under this Section 9.0 shall extend to civil actions authorized by this Compact, including, but not limited to, actions to compel arbitration, any arbitration proceeding herein, any action to confirm or enforce any judgment or arbitration award as provided herein, and any appellate proceedings emanating from a matter in which an immunity waiver has been granted. Except as stated herein or elsewhere in this Compact, no other waivers or consents to be sued, either express or implied, are granted by either party.

(*Id.* § 9.4.)

Regarding Class III gaming, which is alleged here, the Compact provides that the Tribe is "permitted to engage in only the Class III Gaming Activities expressly referred to in Section 4.0 and shall not engage in Class III gaming that is not expressly authorized in that Section." (*Id.* § 3.0.) In Section 4, the Compact discusses permitted Class III gaming and lists gaming devices, as any banking or percentage game, and "[a]ny devices or games that are authorized under state law to the California State Lottery, provided that the Santa Ysabel Tribe will not offer such games through use of the Internet unless others in the state are permitted to do so under state and federal law." (*Id.* § 4.1(a)-(c).) The Compact also provides that no one under the age of twenty-one years be present in the room where Class III gaming activities are conducted. (*Id.* § 6.3.)

## IV.   DISCUSSION

Defendants argue that dismissal is appropriate for two reasons: (1) the Court lacks subject matter jurisdiction due to tribal sovereign immunity, and (2) even if jurisdiction is proper, the action is barred because the State failed to comply with the mandatory terms of the Compact. (Defs.' Mem. 7, 13, Doc. No. 15-1.)

### A.   Sovereign Immunity

The Court briefly discussed sovereign immunity in its previous order. (*See* TRO 4-7.) Now, with the issue fully briefed, the Court revisits the topic. The complaint cites original jurisdiction under 28 U.S.C. §1331 because the action raises questions of federal statutes and federal common law; 25 U.S.C. § 2710(d)(7)(A)(ii) because the action is initiated to enjoin conduct related to Class III gaming; and 31 U.S.C. § 5365(a) because the State seeks to restrain alleged violations of UIGEA. (Compl. ¶ 2.) Defendants' motion highlights that, although Defendants assert the disputed gaming is exclusively on Indian lands, the State "took great pains to allege the disputed bingo is not entirely on Indian lands." (Defs.' Mem. 1.)

The Tribe, as a federally-recognized tribal government, is a domestic dependent nation. *Michigan v. Bay Mills Indian Cmty*, 134 S. Ct. 2024, 2030 (2014). As domestic dependant nations, Indian tribes "exercise inherent sovereign authority over their members and

territories" and therefore are immune to suits against them unless they clearly waive their immunity or Congress abrogates it. *Okla. Tax. Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991); *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008) ("Tribal sovereign immunity protects Indian tribes from suit absent express authorization by Congress or clear waiver by the tribe.").

IGRA provides in part that United States district courts have jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). A recent Supreme Court of the United States opinion held that federal causes of action brought pursuant to § 2710(d)(7)(A)(ii) of IGRA to enjoin Class III gaming activity must allege and ultimately establish that the gaming "is located on Indian lands." 25 U.S.C. § 2710(d)(7)(A)(ii); *see Bay Mills*, 134 S. Ct. at 2032. The State also invokes UIGEA, which provides that, "[i]n addition to any other remedy under current law, the district courts of the United States shall have original and exclusive jurisdiction to prevent and restrain restricted transactions" and discusses proceedings instituted by the federal government and state attorney general regarding transactions initiated, received, or otherwise made on Indian lands. 31 U.S.C. § 5365(a)-(b).

In support of their argument regarding sovereign immunity, Defendants rely heavily on two recent IGRA decisions: *Bay Mills* and *Hobia*. In *Bay Mills*, the Bay Mills Indian Community, a federally recognized Indian tribe, had opened a casino 125 miles from the reservation. *Bay Mills*, 134 S. Ct. at 2029. Michigan filed a federal action against the tribe, seeking to enjoin the tribe's operation of the Class III gaming facility. *Id.* The district court issued an injunction, which the Sixth Circuit vacated. The Supreme Court affirmed the Sixth Circuit's decision. In its analysis, the Supreme Court discussed that IGRA partially abrogates tribal sovereign immunity in § 2701(d)(7)(A)(ii) by authorizing a state to sue a tribe to enjoin Class III gaming on Indian lands and conducted in violation of a tribal-state compact. *Id.* at 2032. The Court emphasized, however, that a state's "suit to enjoin gaming activity *on* Indian lands . . . falls within § 2701(d)(7)(A)(ii); a similar suit to stop gaming activity *off* Indian lands

does not." *Id*. Notably, the *Bay Mills* compact did not contain a waiver of immunity. *Id.* at 2035. Instead of providing judicial remedies, the *Bay Mills* compact sent disputes to arbitration and "expressly retain[ed] each party's sovereign immunity." *Id.* The Supreme Court fully discussed the lack of waiver, providing in part:

> Finally, if a State really wants to sue a tribe for gaming outside Indian lands, the State need only bargain for a waiver of immunity. Under IGRA, a State and tribe negotiating a compact "may include . . . remedies for breach of contract," 25 U.S.C. § 2710(d)(3)(C)(v)—including a provision allowing the State to bring an action against the tribe in the circumstances presented here. States have more than enough leverage to obtain such terms because a tribe cannot conduct class III gaming on its lands without a compact, *see* § 2710(d)(1)(c), and cannot sue to enforce a State's duty to negotiate a compact in good faith, *see Seminole Tribe*, 517 U.S., at 47 (holding a State immune from such suits).

*Id.* (emphasis added; omission in original). The Supreme Court concluded its waiver discussion by noting that, had Michigan bargained for a waiver of immunity "the limitation Congress placed on IGRA's abrogation of tribal immunity—whether or not anomalous as an abstract matter—would have made no earthly difference." *Id.* at 2035.

Defendants also rely on a recent Tenth Circuit case, *Oklahoma v. Hobia*, 775 F.3d 1204, 1205 (10th Cir. 2014). The *Hobia* defendants had begun constructing and planned to operate a casino as a Class III gaming facility. *Id.* at 1027. The property on which the gaming facility was being built was more than 70 miles from the tribe's headquarters and was not held in trust by the United States for the tribe. *Id.* Discussing *Bay Mills*, the Tenth Circuit held the complaint failed on its face to state a valid claim under IGRA. *Id.* at 1213. Regarding waiver, *Hobia* noted the compact at issue "strictly limit[ed]" the remedies available and referred disagreements to arbitration. *Id.* at 1214. The Tenth Circuit also emphasized *Bay Mills*' directive that "if a State really wants to sue a tribe for gaming outside Indian lands, the State need only bargain for a waiver of immunity." *Id.* at 1212 (citing *Bay Mills*, 134 S. Ct. at 2035). The *Hobia* court noted the similarities between the remedies available in *Bay Mills* and *Hobia*, contending "the State of Oklahoma could have insisted on a compact that allowed it to sue the Tribe or tribal officials in federal court for violations of the compact, but it failed to do so." 775 F.3d at 1214 n.4.

1       Defendants cite *Bay Mills* and *Hobia* heavily, but fail to fully acknowledge the
2 important differences between those cases and the instant matter. Both cases cited involved
3 facilities being built miles off Indian lands. In contrast, the State does not dispute that gaming
4 activities, that is "the stuff involved in playing class III games," occurs on Indian lands. *See*
5 *Bay Mills*, 134 S. Ct. at 2032; (Pl.'s Mem. 6, Doc. No. 18). The allegations in the complaint
6 discuss that the servers are located on Indian lands (Compl. ¶ 34), that "some portion, if not
7 all, of the Internet gambling occurs on Indian lands" (*id.*), and also discuss that persons off
8 Indian lands can open accounts and participate in the internet gambling (*id.* ¶ 35). The bettors
9 could, at times, also be on Indian lands. It is undisputed that at least a portion of the gaming
10 activity is occurring on Indian lands.[3] (Compl. ¶ 34 (alleging the servers and "other equipment
11 integral to[] the Tribe's [i]nternet gambling are located on the Tribe's Indian lands").) In light
12 of all of this, the present action does seek to enjoin gaming on Indian lands. The Court is
13 unconvinced that IGRA prevents suit to enjoin the unlawful gaming *on* Indian lands just
14 because a defendant may be offering the same allegedly unlawful activity *off* Indian lands, or
15 because some part of the gaming activity could occur off Indian lands.

16       Also important, the Compact includes a broad waiver, repeatedly contemplates federal
17 court litigation, and specifically proscribes Internet gaming. (*See* Compact §§ 4.1(a)-(c), 9.0,
18 9.4, 11.2; *see also id.* § 3.0.) *Bay Mills* provides that if a state "wants to sue a tribe for gaming
19 outside Indian lands, the State need only bargain for a waiver of immunity." *Bay Mills*, 134
20 S. Ct. at 2035. The Supreme Court continued, "Under IGRA, a State and tribe negotiating a
21 compact 'may include . . . remedies for breach of contract,' 25 U.S.C.
22 § 2710(d)(3)(C)(v)—***including a provision allowing the State to bring an action against the***
23 ***tribe in the circumstances presented here***." *Id.* (emphasis added). The Supreme Court also
24 noted that Michigan had failed to bargain for judicial remedies. *Id*. In the event Michigan had
25 insisted on a different deal, "the limitation Congress placed on IGRA's abrogation of tribal
26 immunity—whether or not anomalous as an abstract matter—would have made no earthly

---

[3] The gaming system is advertised as "ensur[ing] all game play takes place on Tribal lands, under the jurisdiction of the Tribal government." (Dhillon Decl. Ex. A, Doc. No. 9.)

difference." *Id.* This is an important difference. The parties to this Compact set forth a dispute resolution process that includes federal litigation and specifically discusses the parties' respective abilities to pursue an action. (*See, e.g.*, Compact §§ 9.0, 9.4.) This seems exactly the type of situation the Compact drafters contemplated to be resolved in federal court. The Court will not disrupt this language or agreement.

### B.    Procedural Requirements

Defendants also assert that, even if the State were to stipulate to the disputed gaming being entirely on tribal lands, the claims would still be barred for failure to comply with the Compact's procedural requirements. (Defs.' Mem. 13.) Defendants discuss section 9.1, pertaining to meet and confer efforts, as well as section 11.2.1.(b), regarding the timing of the federal litigation.

#### 1.    Section 9

Section 9.1 provides that "without prejudice to the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the parties hereby establish a threshold requirement that disputes . . . first be subjected to a process of meeting and conferring in good faith." (Compact § 9.1.) The provision continues that the parties "shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth, with specificity, the issues to be resolved." (*Id.* § 9.1(a).) The section continues, "The parties shall meet and confer in a good faith attempt to resolve the dispute through negotiation not later than ten (10) days after receipt of the notice, unless both parties agree in writing to an extension of time." (*Id.* § 9.1(b).) If the dispute is not resolved within thirty calendar days after the first meeting, the parties may proceed with arbitration, although arbitration is not required. (*Id.* § 9.1(c).) Unresolved disagreements may be resolved in federal court. (*Id.* § 9.1(d).) Section 9 also emphasizes that it "may not be construed to waive, limit, or restrict any remedy that is otherwise available to either party, nor may this Section [9] be construed to preclude, limit, or restrict the ability of th parties to pursue, by mutual agreement, any other method of dispute resolution[.]" (*Id.* § 9.3.)

As is relevant to the meet and confer argument, the State wrote the Tribe in July 2014 about the Tribe's plans to provide internet bingo and poker and requested to meet and confer. (Chelette Decl. Ex.1.) As discussed earlier in this Order, the Tribe responded by discussing poker and bingo, asserting regarding the latter that it "does not offer bingo through Santa Ysabel Interactive, or have any plans to do so in the near future." (*Id.*) The Tribe asserted that it had "no intention of discussing any federal statutes, including [IGRA or UIGEA] with [the State]."(*Id.*) Months later, Defendants began offering the bingo-type game, and the State followed by bringing this action.

Defendants argue that the State failed to meet and confer, and instead accuse the State of "rely[ing] on one typo in the letter in order to twist the letter into an interpretation that runs counter to" the context of the letter. (Defs.' Mem. 14, Doc. No. 15-1.) The Court disagrees with Defendant's characterization, and further disagrees that the meet and confer requirement was not pursued. A purpose of a meet and confer requirement is to resolve issues without the need for further action. The State's letter here discussed both poker and bingo. The focus of the State's letter was on poker, but the Tribe clearly understood that both poker and bingo were disputed—or would be, depending on what course of actions Defendants chose. The Court also disagrees with Defendants that the State's discussion of the Tribe's "plan to offer Internet bingo" lacks specificity. (Chelette Decl. Ex. 1.) Naming the type of game and manner it which it will be offered is a far cry from a vague allegation. The Tribe responded to the State's letter, including clarifying its position on bingo and discussing IGRA, UIGEA, and California law. (*Id.*) The Tribe continued by providing its position on Class III gaming, including poker and bingo. (*Id.*) Notably, the meet and confer requirement is "without prejudice to the right of either party to seek injunctive relief." (Compact § 9.1.) Moreover, it is clear the parties still do not agree regarding the internet bingo. That was fully established during the briefing and argument of the TRO motion, and continues to be apparent in this briefing. (*See* Defs.' Mem. 8 n.4 (discussing Defendants' contention that the gaming at issue is Class II gaming consistent with applicable law).) Accordingly, the State's obligation in the meet and confer process was satisfied.

9

14cv2724

### 2. Section 11

In addition to objecting to the meet and confer efforts, Defendants rely on section 11.2.1 of the Compact to assert the State failed to provide a sixty-day opportunity to cure any breach. Section 11 handles the effective date and term of the Compact. Under the "Term of Compact; Termination" portion, the Compact provides:

> (b) Either party may bring an action in federal court, after providing a sixty (60) day written notice of an opportunity to cure any alleged breach of this Compact, for a declaration that the other party has materially breached this Compact. Upon issuance of such a declaration, the complaining party may unilaterally terminate this Compact upon service of written notice on the other party. In the event the federal court determines that it lacks jurisdiction over any such action, the action may be brought in the superior court for the county in which Santa Ysabel Tribe's Gaming Facility is located. The parties expressly waive their immunity to suit for purposes of an action under this subdivision, subject to the qualifications stated in Section 9.4(a).

(Compact § 11.2.1(b).)

The State responds that the sixty-day notice provision relates to termination based on section 11.2's heading, does not govern injunctive relief, and that the filing and serving of the complaint, now more than sixty days ago, has provided the necessary notice to seek declaratory relief. (Pl.'s Mem. 14-15.) In the complaint, the State provided that, pursuant to section 11.2.1(c),[4] the State was providing notice and an opportunity to cure, and would be entitled to a declaration of breach if Defendants had not cured the breach within sixty days. (Compl. ¶ 45.) The State emphasizes section 9.1, which contemplates immediate injunctive relief, stating: "Therefore, without prejudice to the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the parties hereby establish a threshold requirement that disputes . . . first be subjected to a process of meeting and conferring." (Compact § 9.1.)

---

[4] From the Court's reading, there is no section 11.2.1(c) and instead 11.2.1(b) is the pertinent section. Defendants do not address this. The State notes the error. (Pl.'s Mem. 14.)

As an initial matter, Defendants do not provide the Court with authority that the State's failure to comply with conditions precedent in the Compact would deprive the Court of jurisdiction. Even so, the Court will continue its analysis.

The Compact discusses injunctive relief when the circumstances warrant an immediate remedy. As such, to the extent that section 11 bears on the issue at hand, it is only in terms of declaratory relief. Defendants appear to read section 11 as barring any sort of declaratory action without sixty days' notice. The State responds that it provided sixty days' notice in the complaint. (*See* Compl. ¶ 45.) Defendants' memorandum on this motion acknowledges the complaint's attempt to provide the sixty-day notice under section 11. (Defs.' Mem. 4-5.) The Court notes that the Compact outlines a specific dispute resolution procedure in section 9, and discusses waiver of immunity at various points. (*See, e.g.*, Compact §§ 9.4, 11.2.1.) In the sovereign immunity portion, the Compact provides that neither side is to seek any claim for monetary damages. (*Id.* § 9.4(a)(2).) From the Court's reading of the Compact, the dispute resolution provisions apply to disputes generally—if the party wishes to resolve an issue, they look to section 9.0. In contrast, section 11 contains the procedure a party must follow in order to terminate the Compact, and is not a general dispute resolution provision. This is apparent from the sixty-day requirement's placement, set under the "Term of Compact; Termination" subheading. (*Id.* § 11.2.) As such, the Court is unconvinced the provision is applicable unless the complaining party is seeking to terminate the Compact.

Even if the sixty-day requirement applies to declaratory relief outside of circumstances in which termination is sought, the Court is still unconvinced that the State failed to fulfil its obligation. The Compact notes that, "[e]ither party may bring an action in federal court, after providing a sixty (60) day written notice of an opportunity to cure." (Compact § 11.2.1(b).) The Compact also provides for injunctive relief (as well as a separate dispute resolution process set forth in section 9), which places a party in a quandary if they have the need to seek injunctive relief, but must wait for sixty days to seek declaratory relief. Although, as the Court noted, it is unconvinced the sixty-day notice applies to declaratory relief outside of termination, broadly reading the sixty-day requirement would place a complaining party in a

strange position. As a result, the State set forth its notice (and thus started the sixty days) in the complaint. This is appropriate under the circumstances. The Compact provides the notice, in the unique circumstance that injunctive relief is sought, but a declaration is also sought—after the sixty days' notice. The notice in the complaint provides that, "If the Tribe does not cure within sixty days, the State is entitled to a declaration that the Tribe has materially breached the Compact." (Compl. § 45.) Thus, to the extent Defendants assert no declaratory relief could be sought until after they had sixty days to cure the breach, their concerns can be assuaged because the State was initially seeking only injunctive relief and specifically discussed the sixty-day safe harbor period of section 11 in the Complaint. In sum, the Court is unconvinced that this action is barred based on any lack of compliance with the Compact's procedures.

## V.  CONCLUSION

Having fully and carefully reviewed the arguments of the parties and the materials presented, the Court **DENIES** Defendants' motion to dismiss.

**IT IS SO ORDERED.**

DATED:  May 22, 2015

_____
Hon. Anthony J. Battaglia
U.S. District Judge