1  LAURA E. DUFFY
   United States Attorney
2  GLEN F. DORGAN (CBN 160502)
   Assistant United States Attorney
3  Office of the U.S. Attorney
   880 Front Street, Room 6293
4  San Diego, California 92101
   Tel: (619) 546-7665  Fax:  (619) 546-7751
5  Email:  glen.dorgan@usdoj.gov

6  Attorneys for Plaintiff UNITED STATES

7

8              IN THE UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11 STATE OF CALIFORNIA,                CASE NO.  3:14-cv-02724-AJB-NLS

12                    Plaintiff,       CASE NO.  3:14-cv-02855-AJB-NLS

13 v.                                  **PLAINTIFF UNITED STATES'**
                                       **MEMORANDUM OF POINTS AND**
14 IIPAY NATION, *et al.*,             **AUTHORITIES IN SUPPORT OF**
                                       **MOTION FOR SUMMARY JUDGMENT**
15                    Defendants.
                                       **[FRCP RULE 56, 65]**
16
   UNITED STATES OF AMERICA,
17
                     Plaintiff,        Date:    June 27, 2016
18                                     Time:   3:00 p.m.
   v.                                  Courtroom:  3B
19                                     Hon. Anthony J. Battaglia
   IIPAY NATION, *et al.*,
20
                     Defendants.
21

22

23

24 ///

25 ///

26 ///

27 ///

28 //

1

# TABLE OF CONTENTS

2  I.      INTRODUCTION                                                              1

3  II.     FACTUAL BACKGROUND                                                        2

4          A.    Overview of DRB and its Components                                  2

5          B.    Patron Interaction with DRB                                         3

6          C.    DRB Operations in November and December 2014                        5

7  III.    LEGAL STANDARD                                                            5

8          A.    Standard for Permanent Injunction                                   5

9          B.    Standard for Summary Judgment                                       6

10 IV.     UIGEA's STATUTORY CONDITIONS                                              6

11 V.      ANALYSIS                                                                  7

12         A.    DRB Patrons Place Bets or Wagers                                    7
                 1.    The DRB Server Is the "Proxy Player."                         9
13               2.    Assuming Chelette Is an Agent, The Patron Remains the
                       Bettor                                                       10
14
           B.    DRB Patrons Place Their Bets or Wagers Using the Internet          11
15               1.    VPNAPS Is an Encryption Application                          12
                 2.    UIGEA Establishes a Low Burden                               13
16
           C.    The Bets and Wagers Placed by DRB's Patrons Are Unlawful.          14
17               1.    DRB is a Lottery Prohibited by Criminal Law                  14
                 2.    DRB is a Percentage Game Prohibited by Criminal Law          15
18               3.    DRB Bets are Unlawful Under California Civil Law             16

19         D.    UIGEA Applies to the Tribal Defendants.                            18
                 1.    The Tribal Defendants are "Persons"                          18
20               2.    The Tribal Defendants are Engaged in a Gambling Business.    19

21         E.    The Tribal Defendants Accept Restricted Transactions.             20

22         F.    Injunctive Relief Is Necessary to Prevent Continuing Violations.   22

23         G.    UIGEA Does Not Affect IGRA In This Case.                           23

24 VI.     CONCLUSION                                                               24

25

26

27

28

i

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE**

*AT&T Corp. v. Coeur D'Alene Tribe*, 45 F. Supp. 2d 995 (D.Idaho 1998), rev'd on other grounds, 295 F.3d 899 (9th Cir. 2002) .................................. 23

*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986) ................................ 6

*Bon Air Hotel, Inc. v. Time, Inc.*, 376 F.2d 118 (5th Cir. 1967) ................ 13

*Bryant v. Mead*, 1 Cal. 441 (1851) ................................................................ 17

*Burlington Northern R. Co. v. Blair*, 957 F.2d 599 (8th Cir. 1992) ........... 6

*Carrier v. Brannan*, 3 Cal. 328 (1853) ....................................................... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................ 6

*Chubb Custom Insurance Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013) ............................................................... 16, 19

*Cohen v. United States*, 378 F.2d 751 (9th Cir. 1967) .............................. 22

*Dixon v. United States*, 548 U.S. 1 (2006) ................................................. 21

*Inyo County, Cal v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701 (2003) ........................................................... 18

*Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462 (1999) ............................ 17

*Lavick v. Nitzberg*, 83 Cal. App. 2d 381 (1948) ....................................... 17

*Meyer v. Portfolio Recovery Associates, LLC*, 2011 WL 11712610 (S.D. Cal., Sept. 14, 2011) ............................... 6, 22

*Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014) ......... 23

*Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102 (8th Cir. 1999) ....... 23

*People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (2015) ........................... 16

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ......................................... 18

*SEC v. Spence & Green Chemical Co.*, 612 F.2d 896 (5th Cir. 1980) ....... 6

*Trailer Train Co. v. State Board of Equalization*, 697 F.2d 860 (9th Cir. 1983), cert. denied, 464 U.S. 846 (1983) ......................................................... 5

*Sullivan v. Fox*, 189 Cal. App. 3d 673 (1987) ........................................... 15

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001) ....................... 10-11, 16-17

# TABLE OF AUTHORITIES (Continued)

**CASES**                                                                           **PAGE**

*United States v. Cooper Corp.* 312 U.S. 600 (1941) ................................... 18

*United States v. Crowder*, 656 F.3d 870 (9th Cir. 2011) ........................... 21

*United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014) ............................... 22

*United States v. Scavo*, 593 F.2d 837 (8th Cir. 1979) .............................. 20

*Western Telcon, Inc. v. California State Lottery*, 13 Cal. 4th 475 (1996) ............... 15

**FEDERAL STATUTES**

1 U.S.C. § 1    .......................................................................... 19

18 U.S.C. § 1084 ................................................................ 11, 17

25 U.S.C. §§ 2701 *et seq.* ......................................................... 2

25 U.S.C. § 2703 ............................................................... 2, 23

25 U.S.C. § 2710 ......................................................... 2, 18-19, 23

31 U.S.C. §§ 5361 *et seq.* ......................................................... 1

31 U.S.C. § 5361 ................................................................ 1

31 U.S.C. § 5362 ....................................................6-8, 10-11, 14, 18-19

31 U.S.C. § 5363 ............................................................ 1, 6-7, 18, 20

31 U.S.C. § 5365 ..........................................................1, 5-7, 19-20, 23-24

31 U.S.C. § 5366 ................................................................ 20

**RULES**

Fed. R. Civ. P. 56 .............................................................. 6

**STATE STATUTES**

Cal. Bus. & Prof. Code §§ 19800 *et seq.* ........................................... 17

Cal. Bus. & Prof. Code § 19805 ................................................ 17, 22

Cal. Bus. & Prof. Code § 19826 ................................................... 22

Cal. Bus. & Prof. Code § 19827 ................................................... 22

Cal. Bus. & Prof. Code § 19941 ................................................... 17

iii

# TABLE OF AUTHORITIES (Continued)

**STATE STATUTES**                                                                               **PAGE**

Cal. Civ. Code § 1607 ................................................................................17

Cal. Civ. Code § 1667 ................................................................................17

Cal. Const., Art. IV, § 19 ..........................................................................15

Cal. Penal Code § 319 ..........................................................................14-15

Cal. Penal Code §§ 320 *et seq.* ...............................................................15

Cal. Penal Code § 320 ...............................................................................15

Cal. Penal Code § 321 ...............................................................................15

Cal. Penal Code § 322 ...............................................................................15

Cal. Penal Code § 325 ...............................................................................15

Cal. Penal Code § 326.5 ..............................................................................2

Cal. Penal Code § 330 ..........................................................................15-16

Cal. Penal Code § 330b .............................................................................16

Cal. Penal Code § 337j ..............................................................................17

**SECONDARY AUTHORITIES**

Black's Law Dictionary (10th ed. 2014) .............................................16-19

Restatement (Third) of Agency, § 6.01 ....................................................10

iv

## I.  **INTRODUCTION**

This is an action for injunctive relief brought under the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-5367.  The Defendants are IIPAY NATION OF SANTA YSABEL ("Iipay") and two of its tribal corporations, SANTA YSABEL TRIBAL DEVELOPMENT CORPORATION, and SANTA YSABEL INTERACTIVE, INC. (collectively "the Tribal Defendants").

In November 2014, the Tribal Defendants launched Desert Rose Bingo ("DRB"), an Internet-based gaming venture.  To participate in DRB, patrons simply log on to www.desertrosebingo.com using a web-enabled computer, tablet or cell phone; register and provide credit card information to fund an account; and commence gambling.

To the Tribal Defendants, DRB is "the future" of gambling and they are poised to deliver the Internet-based gaming "*Anytime & Anywhere*™" to "a whole new generation of enthusiasts."  *See* Press Release, Ex. "13."[1]  To Congress, however, Internet gambling is "a growing cause of debt collection problems for insured depository institutions and the consumer credit industry."  31 U.S.C. § 5361(a)(3).  Accordingly, Congress enacted UIGEA as a "[n]ew mechanism" for enforcing gambling laws.  31 U.S.C. § 5361(a)(4).

UIGEA authorizes injunctive relief to prevent gambling businesses from accepting payments, including credit card proceeds, from patrons who place on-line bets within a state that outlaws gambling.  31 U.S.C. §§ 5363, 5365.  In support of this motion, the United States presents undisputed evidence that (1) patrons of DRB place their bets off Iipay's Indian lands and within California, where such activity is unlawful; (2) the patrons place their bets over the Internet; (3) the Tribal Defendants knowingly accept the proceeds of the unlawful Internet gambling; and (4) absent injunctive relief, the Tribal Defendants will continue operating their unlawful gambling venture.  Based on this evidence, the United States is entitled to judgment as a matter of law.

---

[1] All exhibits are attached to the Declaration of Glen F. Dorgan ("Dorgan Decl."), except as otherwise indicated.

## II.    FACTUAL BACKGROUND

Before launching DRB, Iipay owned a brick-and-mortar casino that housed slot machines, card games and bingo.  *See* Separate Statement of Undisputed Material Facts ("SSUMF") Nos. 1-3.  Although this gaming would ordinarily be illegal in California, Iipay—like many Indian Tribes throughout the United States—was authorized to operate its casino in accordance with the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq*., because all of the gaming activities occurred within the boundaries of its Indian lands.  *See, e.g.,* 25 U.S.C. §§ 2703(7)(A)(i), 2710(a)(2) (bingo and similar gaming "on Indian lands" is "within the jurisdiction of the Indian tribes").  However, Iipay was unable to attract enough visiting patrons and was forced to close the casino.

In 2013, facing the imminent closure of its casino, Iipay began exploring other gaming options.  As an initial step, Iipay chartered Santa Ysabel Interactive, Inc. ("SYI")[2] and tasked its President, David Chelette, with the job of developing "interactive gaming" options.  SSUMF Nos. 10-11.  SYI then turned to Great Luck, LLC ("Great Luck"), an interactive gaming company, and entered into a license agreement to use Great Luck's gaming technology.  *See* SSUMF No. 38; Press Release, Ex. "13."  With this technology in place, SYI launched DRB on November 3, 2014.  SSUMF No. 16.

### A.    Overview of DRB and its Components

DRB is a game of chance that replicates certain aspects of the game of bingo.  SSUMF Nos. 14, 22.  In a traditional bingo game, players holding pre-printed bingo cards mark or "daub" the numbers on their cards as they are randomly drawn by the bingo caller, and the winner is the first player to achieve a specified pattern and yell "Bingo!"  *Cf.* Cal. Pen. Code § 326.5(o) (defining charitable bingo).  By comparison, DRB is computerized.  Once a minimum number of patrons log on to the DRB website and purchase their bingo cards, the DRB computers complete the remaining steps by calling

---

[2] SYI is wholly owned by another tribal corporation, Santa Ysabel Tribal Development Corporation, which in turn is wholly owned by Iipay.  SSUMF Nos. 7-8.

1    out the ball draw, daubing the corresponding numbers on the patrons' cards, determining

2    when the winning pattern is achieved, and declaring a winner.  SSUMF No. 44.

3        The DRB computers consist of several servers located in the otherwise-abandoned

4    Iipay casino.   SSUMF No. 23, 33.   The "Math Server" operates a random number

5    generator to create the bingo cards and the ball draw; the "Database Cluster" tracks the

6    gambling transactions; the "Game Server" processes the games; and the "Web Server"

7    connects to the Internet to interface with patrons and vendors.  SSUMF Nos. 25-28, 32.

8        SYI's third-party vendors include vPayment, a payment processing company;

9    iDology, an identity verification company (commonly called a "Know Your Customer"

10   or "KYC" provider); and Loc-Aid, a "geolocation" service provider.  SSUMF Nos. 35-

11   37.  Each of these companies use their own Internet-connected servers, located off Iipay's

12   Indian lands, to provide their DRB-support services.  SSUMF Nos. 29-31, 34.

13       **B.     Patron Interaction with DRB**

14       Because SYI does not make DRB gaming terminals available to the public on

15   Iipay's lands, patrons interested in gambling through DRB must do so off Iipay's lands

16   using their own web-enabled personal computer, tablet or cell phone.  SSUMF No. 15.

17       A patron visiting www.desertrosebingo.com for the first time is greeted with an

18   invitation to register.  SSUMF No. 46.  To complete the registration, a patron must input

19   personal information (e.g., name, date of birth, residence address), select a username and

20   password, and await receipt of a confirming email.  SSUMF No. 47.

21       During the registration process, iDology verifies that the patron has supplied

22   accurate personal information and is at least 18 years of age.  SSUMF No. 48.  When a

23   registered patron inputs a username and password to log on to the DRB website, Loc-Aid

24   checks the Internet Protocol ("IP") address of the patron's computer, phone or tablet to

25   verify that the patron is physically located within the State of California.  SSUMF Nos.

26   31, 37, 49-50.  Once logged on to DRB, a patron may navigate to the "Add Funds" tab,

27   access a link to vPayment, and fund an online account (not to exceed $9,000.00) using

28   credit cards or other similar forms of payment.  SSUMF Nos. 51-53.  Accordingly, while

anyone over the age of 18 within the United States may register, only California residents may log on, fund an account and gamble.  SSUMF Nos. 48, 50.

To commence gambling, a patron need only navigate to the "Bingo" tab, select a bingo card denomination (from $0.01 to $1.00), select the number of cards to be played (not to exceed 500), and click "Submit Request!"  SSUMF Nos. 54-56; *see* Screenshots, Ex. "18," TD000346-347.  When a patron clicks "Submit Request!", the patron's online account balance is immediately debited the cost of the purchased card(s), and a pop-up window appears confirming, "Your Request Form has been submitted successfully and has been accepted by Desert Rose Bingo."  SSUMF No. 57; Screenshots, Ex. "18," TD000348; *see* House Rules, Ex. "19," TD000209 (the transaction is deemed "final").

Once a wager is submitted, it is assigned a "Request ID" number and displayed under the "Requested" subtab of the "Bingo" page, where it will remain queued until a minimum number of patrons (ranging from 2 to 5) purchase cards for the same game.  SSUMF Nos. 59-62; *see* Screenshots, Ex. "18," TD000349.  After a minimum number of patrons have joined the game, a timer under the "Requested" subtab will commence a 60 second countdown.  When the timer reaches "0:00," the wager is logged by "Request ID" under the "Completed Requests" subtab.  SSUMF Nos. 63-65; *see* Screenshots, Ex. "18," TD000349-351.  At this point, a patron may click an icon to start a short video that displays a facsimile of the patron's bingo card and graphics depicting the ball draw, the card daubing and the announcement of a winner.  SSUMF No. 66; *see* Screenshots, Ex. "18," TD000351-352, 366-370.

Regardless whether participating patrons actively monitor the status of a game or watch the gameplay video, the DRB servers automatically award a prize to the winning patron by crediting the patron's account a sum calculated based on a percentage of the pay-in amount for the game, with a set percentage retained by SYI.  SSUMF No. 67; *see* DRB FAQ, Ex. "20" ("If an Account Holder logs out of the site for any reason, the games that you authorized the system to play on your behalf will continue to play out . . . .").

///

Attached as Exhibit "12" to the accompanying Declaration of Glen F. Dorgan is a video capture of a DRB game that occurred on November 14, 2014.  SSUMF No. 68. The video illustrates several stages of gameplay from the patron's perspective, including (1) logging in (0:00 to 0:28); (2) selecting the card denomination (0:28 to 0:36); (3) selecting the number of cards and clicking "Submit Request!" (0:36 to 0:52); (4) monitoring the game timer in the "Requested" subtab (0:52 to 1:46); and (5) accessing the video depiction of the game in the "Completed Requests" subtab (1:46 to 3:20).  *Id.*

## C.   DRB Operations in November and December 2014

SYI operated DRB from November 3 through December 12, 2014, the date of entry of the State of California's temporary restraining order.  SSUMF No. 16.  During this 40-day period, approximately 74 individual patrons registered on the website. SSUMF No. 18; *see* Spreadsheet, Ex. "21," TD000373.  The vast bulk of these registered patrons deposited funds online using the vPayment service.  *See, e.g.,* Spreadsheet, Ex. "22," TD000390 ($90.00 deposit by "Raamadog"); SSUMF No. 19.  The patrons then used their online accounts to fund over three hundred separate bingo games.  *See* Spreadsheet, Ex. "22," TD000378-419 (listing over 300 individual bingo "win[s]").  In doing so, the DRB patrons paid valuable consideration to SYI for the opportunity to win monetary prizes to be distributed purely by lot or chance.  SSUMF No. 22.

Because these Internet-based wagers were initiated by patrons located off Iipay's Indian lands, *see* SSUMF No. "21," and in a manner that is unlawful in the State of California, the United States is entitled to injunctive relief under UIGEA.

## III.   LEGAL STANDARDS

### A.   Standard for Permanent Injunction

UIGEA expressly authorizes injunctive relief.  31 U.S.C. § 5365(b)(1), (3)(A)(i). Accordingly, the United States is not required to address traditional equitable principles, including the balance of equities, in order to secure relief.  *See Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983), *cert. denied,* 464 U.S. 846 (1983) ("The standard requirements for equitable relief need not be satisfied when an injunction

is sought to prevent the violation of a federal statute which specifically provides for injunctive relief"). Instead, "[t]he party requesting an injunction must demonstrate that the statutory conditions have been met and must demonstrate a likelihood of future violations before an injunction will issue." *Meyer v. Portfolio Recovery Associates, LLC*, 2011 WL 11712610, *7 (S.D. Cal., Sept. 14, 2011) (footnoted citations omitted); *see Burlington Northern R. Co. v. Bair*, 957 F.2d 599, 602 (8th Cir. 1992) ("The proper role of the courts is simply to determine whether a violation of the statute has or is about to occur") (citations omitted).

### B.    Standard for Summary Judgment

A motion for summary judgment must be granted if the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citations omitted). The party seeking summary judgment has the initial responsibility to demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. The nonmoving party must then present evidence from which a reasonable jury could find in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 256 (1986). To defeat summary judgment, the nonmoving party may not rest upon the allegations or denials in that party's pleadings, but instead "must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 256.

Permanent injunctions may be granted on summary judgment, given a proper record. *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 903 (5th Cir. 1980).

## IV.    UIGEA's STATUTORY CONDITIONS

UIGEA authorizes the United States to institute proceedings to prevent or restrain a "restricted transaction" that "has been or will be" received on Indian lands. 31 U.S.C. § 5365(b)(3)(A)(i). A "restricted transaction" is defined simply as a transfer of funds that is prohibited by Section 5363 of the Act. 31 U.S.C. § 5362(7). Section 5363 in turn states, "No person engaged in the business of betting or wagering may knowingly accept" credit card proceeds, electronic fund transfers, checks or similar forms of payment "in

connection with the participation of another person in unlawful Internet gambling." 31 U.S.C. § 5363. A person is engaged in "unlawful Internet gambling" if such person "plac[es] . . . a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful" under the laws of the State in which the bet is "initiated" or "otherwise made." 31 U.S.C. § 5362(10)(A).

In addition to these elements, UIGEA contains a "rule of construction" that states, "No provision of [31 U.S.C. § 5365] shall be construed as altering, superseding, or otherwise affecting the application of [IGRA]." 31 U.S.C. § 5365(b)(3)(B).

Based on the foregoing, the United States submits undisputed evidence (detailed below in Sections V.A. through G.) that: (1) DRB patrons place "bet[s] or wager[s]" as that term is defined by UIGEA; (2) the means by which DRB patrons place their bets or wagers involves the Internet; (3) when DRB patrons place their bets or wagers, they are located off Iipay Indian lands and within the State of California, where such gambling activity is unlawful; (4) the Tribal Defendants are "person[s] engaged in the business of betting or wagering;" (5) the Tribal Defendants accept restricted transactions in connection with the DRB patrons' unlawful gambling; (6) the Tribal Defendants will continue to violate UIGEA absent injunctive relief; and (7) the application of UIGEA in this case does not alter, supersede or otherwise affect IGRA. The United States, therefore, is entitled to judgment as a matter of law.

## V.   ANALYSIS

### A.   DRB Patrons Place Bets or Wagers.

UIGEA defines the term "bet or wager" to include any of the following:

(A) . . . the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome;

(B) . . . the purchase of a chance or opportunity to win a lottery or other prize (which opportunity to win is predominantly subject to chance);

* * *

(D) . . . any instructions or information pertaining to the establishment or movement of funds by the bettor or customer in, to, or from an account with the business of betting or wagering . . . .

31 U.S.C. § 5362(1).[3]

It is undisputed that DRB is a game of chance.  SSUMF No. 22.  Accordingly, when DRB patrons log on to the website, select their cards and click "Submit Request!", thereby automatically debiting their online account, their activity falls within the scope of each of the three UIGEA definitions of the term "bet or wager."  Specifically, the patrons are "staking or risking" their online funds "upon an agreement" with SYI that they "will receive something of value in the event" their card is the winning card, *see* 31 U.S.C. § 5362(1)(A); they are purchasing "a chance or opportunity to win a . . . prize," *see* 31 U.S.C. § 5362(1)(B); and they are communicating "instructions or information pertaining to the . . . movement of funds," *see* 31 U.S.C. § 5362(1)(D).  SSUMF Nos. 54-57.

The Tribal Defendants nevertheless argue that DRB patrons who engage in the above-described conduct—funding an account, selecting a card, and clicking "Submit Request!"—are merely "engag[ing] their proxy agent," who in turn "conducts proxy play of the bingo games on the [their] behalf."  Rule 26(f) Report [Doc. #31], 6:17-7:9.  Indeed, the Tribal Defendants seek to reinforce this concept at each stage of a patron's online gaming experience.  When a patron selects a card price, the online instructions state, "Select a denomination (i.e., price of the card) which you would like a proxy to purchase and play on your behalf."  *See* Screenshot, Ex. "18," TD000346.  The online instructions associated with the "Submit Request!" icon state, "You are . . . authorizing a proxy to make [a] purchase and play Class II Bingo games on your behalf."  *See* Screenshot, Ex. "18," TD000347.  After clicking "Submit Request!", and while waiting for the minimum number of patrons to join the game, the online message states "waiting for more proxies."  *See* Screenshot, Ex. "18," TD000349.  And, when a game is replayed

---

[3] A fourth definition of "bet or wager" at 31 U.S.C. § 5362(1)(C) concerns sports gambling and is inapplicable here.  Also inapplicable are the exceptions set out at 31 U.S.C. § 5362(1)(E), which concern securities, insurance and fantasy sports contests.

for a winning patron, the graphics video ends with a pop-up message that states, "The proxy of [the patron's username] has won!"  *See* Screenshot, Ex. "18," TD000370.  These repeated references, however, are without any basis in fact.

### 1.    **The DRB Server Is the "Proxy Player."**

Because DRB operations are automated and computerized, SYI retains only a handful of employees.  SSUMF Nos. 39-45.  At the center of the operation is David Chelette, SYI's President, who, for purposes of DRB, is given the additional title of "Patron's Legally Designated Agent" and the responsibility of "ensuring" that the "Proxy Player Aids of DRB Gaming" perform the following functions:

- Proxy Player follows directions from patrons to purchase bingo cards on account holder's behalf, monitor game play and outcome, ensure uninterrupted activity of the system

- Proxy Player identifies automated alerts and trouble signals from the system and conducts appropriate notifications to ensure corrective or preventative action is taken

- Proxy Player ensures that playback mode is available to all patrons

- Proxy Player ensures that account holder's account is credited all wins and debited all losses, as appropriate

- Proxy Player monitors the visual representation of the bingo card, the bingo ball draw, and the daubing or covering of the corresponding numbers on the digital bingo card when matched with the drawn ball numbers

SSUMF No. 41; *see* Job Descriptions, Ex. "16," TD0000297.

However, the term "Proxy Player" as it appears in Mr. Chelette's formal job description is merely a reference to the software components and automated processes of the Game Server.  SSUMF NO. 27.  Accordingly, to carry out his job responsibilities, Mr. Chelette is not actively processing patron requests to purchase bingo cards; he is not actively conducting the ball draw, daubing the cards, or declaring a winner; and he is not actively crediting wins and debiting losses.  SSUMF No. 44.  Instead, to do his job, Mr. Chelette need only be "present" at SYI's offices on Iipay Indian lands to "monitor" the operation of the Game Server and the other related DRB servers.  SSUMF No. 45.

///

By his own admission, Mr. Chelette's limited responsibilities mean he can serve as the "Patron's Legally Designated Agent" for hundreds if not thousands of patrons on any given day.  *See* Transcript of Deposition of David Chelette ("Chelette Depo."), Ex. "3," 260:2-9.  Yet, DRB is designed to run "24/7," and Mr. Chelette cannot be present at SYI's offices at all times.  *See id.*, 260:14-24.  For this reason, the offices are always manned by at least one "proxy monitor."  SSUMF No. 43.  When Mr. Chelette is absent from the office, he delegates the title of "Patron's Legally Designated Agent" to a proxy monitor, and that individual assumes responsibility for being "present" and "monitoring." SSUMF Nos. 42-45.  At no time, however, are the proxy monitors actively engaged in purchasing cards, commencing the ball draw, daubing the cards, declaring a winner, or accounting for wins and losses.  SSUMF Nos. 44-45.

Given the foregoing, and contrary to the Tribal Defendants' assertions, Mr. Chelette and his team of proxy monitors are not participants in "live bingo game action," nor are they "engage[d] . . . to play" on the patrons' behalf.  *See* Press Release, Ex. "13;" House Rules, Ex. "19," p 1 (TD000209).  Instead, they are little more than passive observers of the automated and computerized gaming.

## 2.     Assuming Chelette Is an Agent, The Patron Remains the Bettor.

Even assuming an agency relationship exists between DRB patrons and Mr. Chelette (or his designees), any such relationship would not divest the patrons of their status as gamblers.  For example, if the patrons (as principals) authorize Mr. Chelette (as the agent), to place a bet (i.e., enter into a gambling contract) with SYI, the parties to the resulting contract are the patrons and SYI.  *See* Restatement (Third) of Agency, § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, . . . the principal and the third party are parties to the contract").  Because the patrons are contracting parties, it follows that they are also the bettors. Stated another way using UIGEA's statutory terms, bets or wagers are "place[d]," "transmit[ted]," "initiated" or "otherwise made" by the patrons and "received" by SYI, notwithstanding an intermediary agent.  *See* 31 U.S.C. § 5362(10)(A); *cf. United States v.*

*Cohen*, 260 F.3d 68, 74-75 (2d Cir. 2001) (for purposes of the Wire Act, a bet is transmitted when a person in one location uses the Internet to "signal" an interest in placing a bet, and a person in a separate location "signals" that the bet is accepted). [4]

This conclusion is consistent with the undeniable fact that Mr. Chelette and his designees are not staking or risking anything of their own, nor are they placing themselves in a position to win a prize. *See* Chelette Depo., Ex. "3," 255:8-23. At most, they are merely assisting in placing the patrons' money at risk so that the patrons might, subject to chance, win a prize. No amount of semantic gymnastics by the Tribal Defendants, therefore, can alter a DRB patron's status as a bettor.

### B.    DRB Patrons Place Their Bets or Wagers Using the Internet.

To fall within UIGEA, DRB patrons must place their bets in a manner that uses the Internet. 31 U.S.C. § 5362(10)(A). The term "Internet" is defined as "the international computer network of interoperable packed switched data networks." 31 U.S.C. § 5362(5); *see* SSUMF No. 28. Stated another way, the Internet is a public network of routers and hard wires that allow computers in different locations to communicate through "packet switching." Declaration of Dr. Srinivasan Jagannathan ("Jagannathan Decl."), ¶ 14; Transcript of Deposition of Donavan Durbin ("Durbin Depo."), Ex. "8," 25:15-28:4. "Packet switching" is a digital network communications method whereby transmitted data is grouped into packets composed of a header and a payload. Jagannathan Decl., ¶ 14. Information in the header is used by networking hardware to direct the packet to its destination address (or "IP address") where the payload is extracted and used by application software. *Id*.; *see* Durbin Depo., Ex. "8," 26:18-22.

It is undisputed that the Internet is a necessary component of the DRB. SSUMF Nos. 23, 32. As noted above, patrons are required to use a web-enabled device (personal

---

[4] Before the enactment of UIGEA, the Wire Act was the primary federal statute regulating Internet gaming. The Wire Act, however, is limited to sports-related gambling and provides: "Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission . . . of bets or wagers . . on any sporting event . . . shall be fined . . . or imprisoned . . . ." 18 U.S.C. § 1084(a).

1    computer, tablet or phone) to access the website, and the components of DRB include a

2    "Web Server" that is dedicated to communicating, over the Internet, with the DRB

3    patrons and SYI's vendors.   SSUMF Nos. 15, 24-25.   Moreover, SYI's geolocation

4    service provider, Loc-Aid, will not permit a patron to log on to the system unless it is

5    able to confirm, based on the IP address of the patron's device, that the patron is

6    physically located in California.   SSUMF Nos. 31-32, 37, 50; *see also* SSUMF Nos. 29-

7    32, 35-36 (vPayment and iDology also provide services over the Internet).   It follows,

8    therefore, that the means by which patrons place their bets (by logging on to DRB,

9    funding an account, selecting cards and clicking "Submit Request!") involves the

10   Internet.   SSUMF No. "58;" *see* Jagannathan Decl., ¶¶ 14-31.

11           Nevertheless, the Tribal Defendants argue that patrons "can only establish and

12   fund their accounts with Desert Rose Bingo and engage their proxy agent after being

13   granted access" to a specialized technology called "VPNAPS," which they contend

14   creates a "secured and restricted" communications link that is isolated from the Internet.

15   Rule 26(f) Report [Doc. #31], 5:19-27; *see* Answer [Doc. #33], ¶ 2 (denying that

16   VPNAPS is "accessible to the public on the Internet").   As with the alleged "proxy play,"

17   however, the Tribal Defendants' contentions are misleading.

18                    **1.       VPNAPS Is an Encryption Application**.

19           While the Tribal Defendants describe VPNAPS as a "unique" and "innovative,"

20   *see* Press Release, Ex. "13," Donavan Durbin—SYI's Chief Technology Officer and Rule

21   30(b)(6) witness—admits that VPNAPS is nothing more than encryption software.

22   Durbin Depo., Ex. "8," 59:1-5, 78:5-19; *see* SSUMF No. 12.

23           Given the public accessibility of the Internet, there is always a risk that

24   communications can be accessed (i.e., hacked) by unintended third-parties.   *See*

25   Jagannathan Decl., ¶ 24.   To protect against hacking, businesses often protect their

26   communications using (i) a "secure socket layer" (characterized by web addresses

27   starting with the prefix "https" to indicate an added layer of encryption); and/or (ii) a

28   "virtual private network" (software technology that encapsulates packet data into another

encrypted packet).  Durbin Depo., Ex. "8," 31:22-34:4; *see* Jagannathan Decl., ¶¶ 25-28 ("This protocol is commonly used to access bank web sites, Internet email servers, and the like").  In both cases, the infrastructure of the Internet remains the vehicle by which the communications are transferred.  *Id*.; *see* 33:14-15 (Agreeing that "[i]t's not like there's another wire out there").

SYI uses both SSL and VPN technology for DRB.  Durbin Depo., Ex. "8," 60:4-12.  The use of this technology, however, does not eliminate the Internet as a necessary component of the DRB gaming system.  SSUMF Nos. 23-32, 58; *see* Durbin Depo., Ex. "8," 51:10-23; *see also* Jagannathan Decl., ¶¶ 29-31.  As Mr. Durbin explains, "We're doing it exactly how your bank does it."  *Id*., 57:15-22.

### 2.   **UIGEA Establishes a Low Burden**.

While Mr. Durbin admits that VPNAPS is a form of encryption software, he is unable to answer certain questions about the design and application of VPNAPS, because the software is Great Luck's "proprietary technology" and he is "not exactly sure how [it] works."  Durbin Depo., Ex. "8," 58:5-25.

> Q.    Do you know if the VPN that was developed by the contractor hired by Great Luck that was used for DRB still generally operates by taking packet data and encrypting it?
>
> A.    Yes.
>
> Q.    So beyond that you don't know how it differs from other VPNs?
>
> A.    That's correct.

Durbin Depo., Ex. "8," 59:1-8.

Given Mr. Durbin's limited expertise, the Tribal Defendants may seek to introduce testimony from some other witness in an attempt to explain how VPNAPS "isolates DRB from the Internet." [5]  Any such effort, however, must necessarily fail for two reasons.

///

---

[5]  The United States would, of course, object to any such testimony.   SYI had an obligation to produce a witness who was able to testify fully as to the matters designated. *See Bon Air Hotel, Inc. v. Time, Inc.*, 376 F.2d 118, 121 (5th Cir. 1967).

First, the United States has a low burden in establishing that DRB operates over the Internet. Perhaps anticipating that web-based gambling enterprises might attempt to circumvent UIGEA by raising computer-technical arguments, Congress defined "unlawful Internet gambling" in a manner that requires only that the United States prove that bets or wagers are placed by "any means which involves the use, *at least in part*, of the Internet." 31 U.S.C. § 5362(10)(A) (emphasis added).

Second, no manner of technical explanation of VPNAPS can change the undisputed fact that DRB does not operate unless the patrons and SYI are both plugged in to the Internet. SSUMF Nos. 15, 23-25, 32.

> Q.     You were the one that found a suitable location to place the servers and you were the one that plugged the wires into the back of it?
>
> A.     That's correct.
>
> Q.     And you were the one that connected it to a router to communicate with your own Internet service provider?
>
> A.     That's correct.
>
> Q.     Because of the proprietary nature of VPNAPS did you do that any differently than you would do it if there were no VPNAPS?
>
> A.     No.

Durbin Depo., Ex. "8," 81:23-82:9.

### C.     The Bets and Wagers Placed by DRB's Patrons Are Unlawful.

When DRB patrons place their bets, they are physically located off Iipay Indian lands and within the State of California. SSUMF Nos. 15, 21, 50. As such, the DRB patrons' wagers are "unlawful" because (1) DRB is a form of "lottery" prohibited by California's Constitution and criminal statutes; (2) DRB is a "percentage game" prohibited by California's criminal statutes; and/or (3) California's civil laws prohibit the enforcement of gambling contracts due to their "unlawfulness."

#### 1.     DRB is a Lottery Prohibited by Criminal Law.

A "lottery" is "any scheme for the disposal or distribution of property by chance . . . whether called a lottery . . . or by whatever name the same may be known." *See* Cal.

Pen. Code § 319.  The California Constitution has "prohibited lotteries since the state's admission."  *Western Telcon, Inc. v. California State Lottery*, 13 Cal.4th 475, 481 (1996); Cal. Const., Art. IV, § 19(a) ("The Legislature has no power to authorize lotteries, and shall prohibit the sale of lottery tickets in the State").[6]  Additionally, California criminal statutes "broadly prohibit the operation of lotteries."  *Western Telcon, Inc.*, 13 Cal.4th at 481, citing Cal. Penal Code §§ 320-329; *see, e.g.,* Cal. Pen. Code §§ 320 ("Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor"), 321 ("Every person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any . . . chance . . . is guilty of a misdemeanor"); 322 ("Every person who aids or assists . . . any lottery . . . is guilty of a misdemeanor"); 325 ("All moneys and property offered for . . . distribution in violation of any of [sections 320 through 329] are forfeited to the state . . . .").

Here, it is undisputed that DRB is a scheme for the disposal or distribution of property by chance, *see* SSUMF No. 22, and, as such, constitutes a form of lottery subject to California's criminal statutes.  Accordingly, when patrons in California participate in the DRB lottery by placing their bets and wagers, their activity is "unlawful."

### 2.  <u>DRB is a Percentage Game Prohibited by Criminal Law</u>.

A "percentage game" is "any game of chance from which the house collects money calculated as a portion of wagers made or sums won in play, exclusive of fees for use of space and facilities."  *Sullivan v. Fox*, 189 Cal.App.3d 673, 679 (1987).  Under California criminal law, "every person who plays or bets at or against" any "percentage game played with . . . any device, for money . . . is guilty of a misdemeanor."  Cal. Penal Code § 330; *see Sullivan*, 189 Cal.App.3d at 680.

///

---

[6] The California Constitution has been amended to allow exceptions for "charitable" lotteries, gaming conducted "on Indian lands" pursuant to a compact, and the California State Lottery.  Cal. Const., Art. IV, § 19(c), (d), (f). These exceptions, however, are inapplicable here.

A "device" is any "machine" that, "as a result of the insertion of any piece of money or coin or other object, *or by any means*, the machine or device is caused to operate" in such a manner as to afford the user an opportunity, subject to chance, at "receiv[ing] any piece of money." Cal. Penal Code § 330b(d) (emphasis added). The statutory phrase "any other means" is construed broadly to include the "insertion of a PIN, account number, or magnetic card, or by any other means." *People ex rel. Green v. Grewal*, 61 Cal.4th 544, 559-563 (2015) (held an Internet café terminal used for sweepstakes gaming is a "device" prohibited by law "[e]ven though a coin, money or object (e.g., a token) was not inserted into a slot").

It is undisputed that SYI collects money through DRB in a manner that is calculated based on a portion of all wagers. SSUMF No. 67. As such, DRB is a "percentage game" within the meaning of California's criminal statutes. Additionally, the computers, phones and tablets used by DRB patrons to place their wagers—and the DRB computers that process those wagers—constitute "devices," because the machines are "caused to operate" when patrons input their username and password and click "Submit Request!" SSUMF Nos. 23-27, 44, 46-57. Because betting on a percentage game using a "device" is a misdemeanor in California, patrons are engaged in "unlawful" conduct within the meaning of UIGEA when they place their DRB wagers. *See* Cal. Pen. Code § 330; *see also* Cal. Pen. Code § 330b(a) (it is unlawful for DRB patrons to even possess a gambling "device").

### 3. DRB Bets are Unlawful Under California Civil Law.

While UIGEA does not define "unlawful," the term is commonly understood to mean "criminally punishable" or, more broadly, "not authorized by law." *See* Black's Law Dictionary (10th ed. 2014) ("unlawful" defined); *see also Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) (words of a statute "will be interpreted as taking their ordinary, contemporary, common meaning") (internal quotes and citations omitted). Accordingly, to meet its burden, the United States need not focus on criminal statutes, but may instead rely on applicable civil laws. *Cf. United States v.*

*Cohen*, 260 F.3d 68, 73-74 (2d Cir. 2001) (held the absence of criminal penalties do not render gambling "legal" for purposes of 18 U.S.C. § 1084(b)—the Wire Act's safe-harbor provision which permits the transmission of information regarding bets between states where betting is "legal"— if the activity is not otherwise authorized by law).

California has "a strong, broad, and long-standing public policy against judicial resolution of civil disputes arising out of gambling contracts or transactions." *Kelly v. First Astri Corp.*, 72 Cal.App.4th 462, 477 (1999). This policy traces back to two early California Supreme Court cases, *Bryant* and *Carrier. Id.* at 478; *see Bryant v. Mead*, 1 Cal. 441 (1851) ("Wagers . . . tend to excite a breach of the peace"); *Carrier v. Brannan*, 3 Cal. 328 (1853) ("[T]he practice of gaming is vicious and immoral in its nature").

In 1885, the rule of *Bryant* and *Carrier* was "restated" by the California Legislature with the enactment of Civil Code §§ 1607 and 1667. *Kelly*, 72 Cal.App.4th at 479. Civil Code § 1607 provides, "The consideration for a contract must be lawful within the meaning of Section 1667," and Civil Code § 1667 defines "unlawfulness" to include "1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or, 3. Otherwise contrary to good morals."

Pursuant to these civil provisions, betting remains an "unlawful" act in California "notwithstanding . . . public acceptance of some forms of gambling both in California and on California Indian lands." *Kelly*, 72 Cal.App.4th at 484, 489, citing *Lavick v. Nitzberg*, 83 Cal.App.2d 381, 383-384 (1948). Even assuming, therefore, that the criminal laws cited above in Section V.C.1-2 are somehow inapplicable here, patrons nevertheless place "unlawful" bets within the scope of UIGEA when they gamble on the DRB website.[7]

---

[7] If the Tribal Defendants were somehow able to distinguish these criminal and civil laws and establish that DRB is a permitted form of gaming in California, they would face another hurdle. In California, all permissible gambling is subject to regulation under the Gambling Control Act, California Business & Professions Code §§ 19800 *et seq*. Among other restrictions, the Gambling Control Act prohibits any person "under 21 years of age" from placing bets or wagers on a controlled game. Cal. Bus. & Prof. Code § 19941(a)(1), (c); *see* Cal. Bus. & Prof. Code § 19805(g), Cal. Penal Code § 337j (defining a "controlled game" as a permissible form of gambling). It is undisputed that the Tribal Defendants allow DRB patrons under 21 years of age to gamble. SSUMF No. 48.

**D.   UIGEA Applies to the Tribal Defendants.**

Given the evidence and well-settled rules of statutory construction, there can be no dispute that the Tribal Defendants are "person[s] engaged in the business of betting or wagering" within the meaning of 31 U.S.C. § 5363 and therefore subject to UIGEA.

**1.   The Tribal Defendants are "Persons".**

Iipay is a sovereign Indian tribe, and Iipay considers TDC and SYI to be "arms" of the sovereign.   SSUMF Nos. 1, 7-8; *see* Motion to Dismiss [Doc. #15], 8:2-8. Nevertheless, the use of the word "person" in a statute does not create any "hard and fast rule of exclusion" of a sovereign.  *United States v. Cooper Corp.*, 312 U.S. 600, 604-05 (1941).   Instead, the determination of whether a sovereign is a "person" turns on the "legislative environment" in which the word appears, as opposed to a "bare analysis of the word" itself.  *Inyo County, Cal v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701, 711 (2003) (internal citations omitted).

The "legislative environment" in this case includes related provisions within UIGEA that would be rendered meaningless if the term "person" is interpreted narrowly to exclude Indian tribes.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (A court must interpret a statute "to give effect, if possible, to every word Congress used").

For example, UIGEA excludes "intratribal transactions" from the definition of "unlawful Internet gambling."  31 U.S.C. § 5362(10)(C).  An "intratribal transaction" is any wager that is "initiated and received . . . exclusively . . . within the Indian lands of a single Indian tribe," provided, among other things, the "method by which the bet or wager is initiated and received . . . is expressly authorized by and complies with" the "tribal ordinance."  *Id.* [8]  By necessity, the gaming contemplated by this exception is operated by an Indian tribe itself, either directly or through a gaming corporation.  *See* 25

---

[8] This exception is inapplicable here, because, among other reasons, (i) DRB wagers are not initiated and received exclusively on Iipay's lands; and (ii) Iipay's ordinance does not expressly authorize Internet gaming.   SSUMF Nos. 4, 21; *see* 31 U.S.C. § 5362(10)(C)(ii).

U.S.C. § 2710(b)(2)(A) (under IGRA, Indian tribes "will have sole proprietary interest and responsibility for the conduct of any gaming activity" on Indian lands). Narrowly construing the term "person" to exclude Indian tribes would render the UIGEA provision regarding "intratribal transactions" meaningless. *See also* 31 U.S.C. §§ 5365(b)(1)-(3) (the limitation on civil remedies for a state attorney general if a restricted transaction is received "on Indian lands" rendered meaningless if Indian tribes are not "persons"); 5365(b)(3)(B) (the rule of construction regarding UIGEA and IGRA rendered meaningless if Indian tribes are not "persons"). Accordingly, Iipay and its corporations are "persons" subject to UIGEA.[9]

### 2.   The Tribal Defendants are Engaged in a Gambling Business.

Although UIGEA does not affirmatively define a "business of betting or wagering," the Act does exclude certain entities: "The term 'business of betting or wagering' does not include the activities of a financial transaction provider, or any interactive computer service or telecommunications service." 31 U.S.C. § 5362(2).

The Tribal Defendants do not fall within these exclusions. *See* SSUMF No. 9. Nevertheless, they deny that they were "engaged in the business of betting and wagering" when they operated DRB. *See* Admission Responses, Ex. "10," Response No. 9. Their denial, however, cannot be reconciled with the law and evidence.

As noted above in Section V.C.4., words of a statute must be construed in a manner consistent with "their ordinary, contemporary, common meaning." *Chubb Custom Ins. Co.*, 710 F.3d at 958. Applying this rule, it follows that a person is "engaged in the business of betting or wagering" if they are involved with a commercial gambling enterprise. *See* Black's Law Dictionary (10th ed. 2014) ("engage" means to "involve oneself," "business" means a "commercial enterprise," and "gambling" is the "act of risking something of value . . . for a chance to win a prize"); 31 U.S.C. § 5362(1) ("bets

---

[9] If SYI and TDC are not "arms" of the sovereign, the analysis is more straightforward; the term "person" includes corporations for the purpose of "determining the meaning of any Act of Congress, unless the context indicates otherwise." 1 U.S.C. § 1.

1    or wagers" include "risking something of value upon . . . a game subject to chance"); *cf.*

2    *United States v. Scavo*, 593 F.2d 837, 842-43 (8th Cir. 1979) ("An individual engages in

3    the business of betting or wagering [under the Wire Act] if he regularly performs a

4    function which is an integral part of such business").

5    Turning to the evidence, it is undisputed that DRB is a commercial gambling

6    enterprise.  *See* SSUMF Nos. 13-14, 22.  Additionally, it is undisputed that Iipay has

7    "sole proprietary interest in and responsibility for the conduct of" DRB, though the

8    enterprise is managed by SYI and TDC, Iipay's self-described "arms."  SSUMF No. 7-8,

9    13; *see* SSUMF No. 3 (Iipay's involvement in the business of gambling extends back to

10   its ownership of the Santa Ysabel Casino).  Indeed, the sole purpose for SYI's existence

11   is to pursue interactive gaming to generate profits for Iipay.  SSUMF No. 10.

12   Accordingly, Iipay, TDC and SYI are each "engaged in the business of betting or

13   wagering" for purposes of UIGEA.

14   **E.    The Tribal Defendants Accept Restricted Transactions**.

15   The Tribal Defendants admit that they accept credit card proceeds, electronic fund

16   transfers and checks from their DRB patrons.  SSUMF Nos. 20.  If the United States

17   sought criminal penalties in this case, it would be required to prove that the Tribal

18   Defendants "knowingly" accept such funds "in connection with the participation of [their

19   patrons] in unlawful Internet gambling."  *See* 31 U.S.C. §§ 5363 ("No person . . . may

20   knowingly accept" restricted transactions); 5366 (criminal penalties are afforded only

21   when a "person . . . violates section 5363").  Because the United States is only seeking

22   injunctive relief in this case, however, proof of scienter is not required.  UIGEA

23   expressly authorizes an injunction to prevent a restricted transaction that "has been *or*

24   *will be* initiated, received, or otherwise made on Indian lands."  31 U.S.C. §

25   5365(b)(3)(A)(i) (emphasis added).  Accordingly, if a defendant accepts restricted

26   transactions but is innocently unaware that the transactions are derived through unlawful

27   Internet gambling, UIGEA nevertheless authorizes injunctive relief to prevent that

28   defendant from violating UIGEA in the future.

Alternatively, if scienter is a necessary element in this case, the United States need only prove "knowledge of the facts that constitute the offense." *See United States v. Crowder*, 656 F.3d 870, 874 (9th Cir. 2011), quoting *Dixon v. United States*, 548 U.S. 1, 5 (2006). (recognizing the "long-standing rule that 'unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense,' not a 'culpable state of mind,' or 'knowledge of the law'"). Here, there can be no dispute that the Tribal Defendants are fully aware of the circumstances in which the restricted transactions are made, because those circumstances are a product of their own design. They designed DRB to operate as a game of chance for real money; they intended that only patrons located off Iipay Indian lands and within the State of California would participate; that patrons are required to use the Internet and a web-enabled device to place their money at risk; and that the process by which a patron places his or her money at risk is initiated by the patron when he or she clicks "Submit Request!" on the DRB website. SSUMF Nos. 10, 13-15, 23-24, 44, 46-57.

Even assuming that knowledge of the law is a necessary element in this action, the United States has presented undisputed direct and circumstantial evidence that the Tribal Defendants had this requisite knowledge. It is undisputed, for example, that the Tribal Defendants solicited and received a legal opinion (provided by Great Luck) regarding the scope of UIGEA before commencing their DRB operation. SSUMF No. 17; *see* Excerpts of Foley Opinion, Ex. "14," TD000128 ("[Y]ou have requested us to opine whether . . . the Unlawful Internet Enforcement Act . . . prohibits . . . VPNAPS . . . ."). It is further undisputed that Mr. Chelette, SYI's President, was "familiar" with UIGEA when SYI operated DRB. *Id.* This internal awareness of the law even extends to California's gambling statutes. David Vialpando—the Chairman of Iipay's Gaming Commission whose approval of DRB was a necessary prerequisite to commencing the operation—is a former Special Agent with the California Bureau of Gambling Control ("the Bureau"). SSUMF Nos. 4-6. As an agent with the Bureau, Mr. Vialpando was responsible for,

///

among other things, investigating suspected violations of California gambling laws. *See* Cal. Bus. & Prof. Code §§ 19805(h), 19826(c), 19827.

Given this evidence—and the fact that the Tribal Defendants are in the business of gambling and are presumed to know all applicable laws—the Tribal Defendants should not be permitted to avoid an injunction by claiming ignorance of the law. *Cf. Cohen v. United States*, 378 F.2d 751, 757 (9th Cir. 1967) (in Wire Act cases "there is a rebuttable presumption that the accused had knowledge of the law," and "the professional gambler will find it difficult to go forward with evidence of ignorance of the law pertaining directly to his business"); *United States v. Lyons*, 740 F.3d 702, 717-18 (1st Cir. 2014) ("persons engaged in wide-ranging gambling operations . . . are not engaged in the types of conduct that would justify applying any exception to the general rule that ignorance of the law is no excuse" in a Wire Act case).

### F.   Injunctive Relief Is Necessary to Prevent Continuing Violations.

To establish a risk that the Tribal Defendants will violate UIGEA absent injunctive relief, the United States need only highlight their numerous press releases in which they have repeatedly and unapologetically criticized the government Plaintiffs, while insisting that they "will ultimately prevail" and re-open DRB.  SSUMF Nos. 69-71; *see, e.g.,* David Vialpando, "Iipay Nation's Battle for Tribal Sovereignty Continues," Indian Gaming Magazine, Vol. 25, No. 11 (November 2015). Ex. "23" ("[Y]ou've probably noticed the absence of news, leaving the impression perhaps that the tribe has acquiesced to the pressure of the state and federal government [yet] [n]othing could be further from the truth"); *see also* Screenshot, Ex. "25" to the Jagannathan Decl. ("We look forward to resuming the operation of DesertRoseBingo.com in the near future").

Clearly, the Tribal Defendants have invested too much in time and resources to simply abandon their illegal gaming operation.  Accordingly, an injunction is necessary. *See Meyer*, 2011 WL 11712610, *8 ("A defendant's persistence in claiming that (and acting as if) his conduct is blameless is an important factor in deciding whether future violations are sufficiently likely to warrant an injunction").

### G.   **UIGEA Does Not Affect IGRA In This Case**.

To avoid conflict with IGRA, UIGEA includes a rule of construction that states, "No provision of this section shall be construed as altering, superseding, or otherwise affecting the application of [IGRA]." 31 U.S.C. § 5365(b)(3)(B).  The Tribal Defendants rely on this provision as the basis for arguing that IGRA shields their conduct.  *See* Rule 26(f) Report [Doc. #31], 11:19-25.  Their reliance, however, is misplaced.

IGRA establishes a regulatory structure for Indian gaming conducted on Indian lands, and, for this purpose, separates Indian gaming activities into three categories:  (1) class I games ("social games . . . engaged in by individuals as a part of . . . tribal ceremonies or celebrations"); (2) class II games (which, with certain exceptions, includes bingo); and (3) class III games (all other gaming). 25 U.S.C. § 2703(6)-(8).  Subject to oversight by the National Indian Gaming Commission ("NIGC"), an Indian tribe may operate class II gaming "on Indian lands" notwithstanding any anti-gambling laws enacted by the state in which the tribe is situated.  25 U.S.C. §§ 2710(a)(2), (b).

The key phrase in IGRA is, of course, "on Indian lands," and the phrase operates to limit IGRA's scope.  *See Michigan v. Bay Mills Indian Community*, 134 S.Ct. 2024, 2032 (2014) (noting that the term "is repeated some two dozen times in the statute").  If gaming activity takes place "on Indian lands," IGRA governs.  Alternatively, if gaming activity occurs off Indian lands—as is the case here—IGRA does not apply.  *See Bay Mills,* 134 S.Ct. at 2034 ("Everything—literally everything—in IGRA affords tools . . . to regulate gaming on Indian lands, and nowhere else").

Here, the United States does not seek to interfere with gaming activity conducted on Iipay's Indian lands.  Instead, the United States seeks an injunction prohibiting the Tribal Defendants from accepting revenues generated by off-site gambling activities.  *See Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1109 n.5 (8th Cir. 1999), citing *AT&T Corp. v. Coeur D'Alene Tribe*, 45 F.Supp.2d 995, 1001 (D.Idaho 1998), rev'd on other grounds, 295 F.3d 899 (9th Cir. 2002) ("[the] Tribe's lottery is not on Indian lands when the wager is placed by telephone from off the reservation").  Because

1  IGRA does not regulate offsite gambling, the rule of construction at 31 U.S.C. §
2  5365(b)(3)(B) does not apply to prevent injunctive relief in this case.

3  **VI.    CONCLUSION**

4        For each of the foregoing reasons, the United States respectfully requests that the
5  Court issue an order granting summary judgment.

6  Date:  April 29, 2016          Respectfully submitted,
                                        LAURA E. DUFFY
7                                          United States Attorney

8                                      By  */s/ Glen F. Dorgan*
9                                      GLEN F. DORGAN
                                    Assistant United States Attorney
10                                      Attorneys for the United States

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28