# SANTA YSABEL TRIBAL GAMING COMMISSION

SYGC 14-I009

## Commission Regulation

### Establishing Procedures and Requirements for Approval of Class II Bingo Gaming Systems and Equipment

Pursuant to SYGC Gaming Ordinance Section XI (F) & (G), regulation of gaming activity, the Santa Ysabel Gaming Commission hereby adopts the following regulation:

### 1.0   *Purpose of Regulation*

(a)   The Iipay Nation of Santa Ysabel ("Nation") has adopted the Iipay Nation of Santa Ysabel Gaming Ordinance ("Gaming Ordinance"), and, effective as of April 30, 2010, the Gaming Ordinance has been approved by the Chairman of the National Indian Gaming Commission ("NIGC") pursuant to the federal Indian Gaming Regulatory Act of 1988 ("IGRA"), P.L. 100-497, 25 U.S.C. §2701, *et seq.*, as it may be amended from time to time, and the regulations of the NIGC promulgated thereunder.

(b)   The Santa Ysabel Gaming Commission ("Gaming Commission") was established under Section XI, Paragraph A of the Gaming Ordinance to exercise regulatory authority over all gaming activities conducted within the jurisdiction of the Nation and, pursuant to Section XI, Paragraph G, is empowered, subject to Executive Branch and Legislative Branch review and comment, to promulgate regulations to implement the provisions of the Gaming Ordinance, including those necessary to the interpretation and application of the Gaming Ordinance by the Gaming Commission in connection with exercising its regulatory powers.

(c)   In order to describe the regulatory requirements for Class II Bingo Gaming Systems and Equipment conducted within the boundaries of the Santa Ysabel Indian Reservation, the Gaming Commission finds it necessary in connection with exercising its regulatory powers to promulgate a regulation governing the procedures for approval of Class II Bingo Gaming Systems and Equipment.

Chelette Dec. Exhibit No. 4

TD000045

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

## 2.0 _Definitions_

The terms used herein shall have the meanings described below (and any others not otherwise described shall have the meaning ascribed to them in the Gaming Ordinance).

(a) "Account Holder" means an individual at least twenty-one (21) years of age who has used a Class II Gaming System to establish an account to become a properly registered account holder with the Gaming Enterprise.

(b) "Bingo" means the Class II Gaming activity described and set forth in IGRA at 25 U.S.C. §2703(7)(A)(i)(I-III), (whether or not Electronic, Computer, or other Technologic Aids are used in connection therewith).

(c) "Classification Determination" means a formal determination made by the Gaming Commission under this Regulation that a Bingo game played using a designated Class II Gaming System is Class II Gaming activity permitted by the Gaming Ordinance and IGRA.

(d) "Class II Gaming" means those gaming activities defined as "class II gaming" in IGRA, 25 U.S.C. §2703(7).

(e) "Class II Gaming System" means a "Class II gaming system" as defined in 25 CFR §547.2; including any components that facilitate access to the system or communication between Account Holders, their proxy agents and the Gaming Enterprise.

(f) "Electronic, Computer or other Technologic Aid" or "Technologic Aid" has the   meaning set forth in Section 6(b) of this Regulation.

(g) "Electronic or Electromechanical Facsimile" has the meaning set forth in Section 6(c) of this Regulation.

(h) "Gaming Enterprise" means a tribal gaming business, owned and operated by the Nation, that is licensed by the Gaming Commission to conduct Class II Gaming activities, and receives the revenues, issues the prizes, and pays the expenses associated with such Class II Gaming activities

Chelette Dec. Exhibit No. 4

TD000046

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(i) "Gaming Enterprise Manager" means the individual employed by the Nation who serves as the general manager of a Gaming Enterprise conducting Class II Gaming activities.

(j) "NIGC Technical Standards" means the technical standards described in 25 CFR Part 547.

(k) "Prize Pool" means the cumulative amount of contributions paid by participants in one or more games of Bingo, which is used to fund prizes specified in the Rules of Play.

(l) "Progressive Prize" means a designated Prize Pool which accumulates until the conditions set forth in the Rules of Play are met for it to be won.

(m) "Rules of Play" means the specific rules, as defined and approved by the Gaming Commission from time to time, controlling the play of the subject game of Bingo.

(n) "Nation" means the Iipay Nation of Santa Ysabel, a federally recognized Indian Nation (federally recognized as the Iipay Nation of Santa Ysabel, California – previously listed as the Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation).

(o) "Vendor" means a Class II Gaming System supplier who, directly or indirectly, provides, has provided, or is deemed likely to provide in any twelve (12) month period at least twenty-five thousand dollars ($25,000) in Class II Gaming resources to the Gaming Enterprise, or who has received at least twenty-five thousand dollars ($25,000) from the Gaming Enterprise in any consecutive twelve (12) month period.

## 3.0    *Technological Aids Generally Allowed*

Pursuant to IGRA and the Gaming Ordinance, a Gaming Enterprise is permitted to conduct Class II Gaming activities, including Bingo games, using Electronic, Computer or other Technologic Aids. At the same time, IGRA strictly prohibits the play of Class III Gaming activities, including the use of Electronic or Electromechanical Facsimiles, without a tribal-state compact approved by or Class III Gaming procedures issued by the Secretary of the Interior. Therefore, any Class II Gaming System which the Gaming Commission determines is not

Chelette Dec. Exhibit No. 4

TD000047

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

a Technologic Aid to the play of Bingo shall not be used or operated by a Gaming Enterprise.

### 4.0   *Classification Determination Process*

(a)   Application Process

(1) Either the Gaming Enterprise Manager (including his/her duly authorized representative) or a Vendor may apply to the Gaming Commission for a Classification Determination under this Regulation.

(2) The Gaming Enterprise Manager (including his/her duly authorized representative) or a Vendor may apply to the Gaming Commission for a Classification Determination at any time under the following circumstances, but must do so before any new Class II Gaming System is offered for play:

(i) The Gaming Enterprise wishes to install a new Class II Gaming System that is not the subject of an existing Classification Determination; or

(ii) The Gaming Enterprise wishes to introduce a material modification to a previously approved Class II Gaming System, including a Class II Gaming System approved before the effective date of this Regulation.

(3) Although not required, the Gaming Enterprise Manager (including his/her duly authorized representative) or a Vendor also may apply for a Classification Determination under this Regulation in connection with a Class II Gaming System approved by the Gaming Commission before the effective date of this Regulation to confirm the classification of that Class II Gaming System.

(b)   Application Submission Requirements

(1) To obtain a Classification Determination, either the Enterprise Manager (including his/her duly authorized representative) or a Vendor must submit an application to the Gaming Commission, which consists of the following documentation and information:

Chelette Dec. Exhibit No. 4

TD000048
Page E56

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(i)    Request for a Classification Determination;

(ii)    Certification by the Vendor that the Class II Gaming System to be used by the Gaming Enterprise satisfies the following:

    (a) the game played using the Class II Gaming System is Bingo consistent with the standards of this Regulation;

    (b) complies in all respects with the specifications and standards set forth in the application; and

    (c) complies with any applicable regulations concerning such Class II Gaming System.

(iii)    A legal opinion, which may be obtained from the Vendor and/or the Gaming Enterprise's legal counsel or other source, that concludes that the Class II Gaming System is a Technologic Aid to the play of Bingo consistent with the standards of this Regulation;

(iv)    The Gaming Enterprise Manager's statement that the subject Class II Gaming System, to the best of his/her knowledge, meets the standards in this Regulation;

(v)    Designation of a point of contact authorized to provide additional information if required;

(vi)    Designation from the Vendor whether and where the Gaming Class II System is already in play;

(vii)    Complete written description from the Vendor of the Class II Gaming System, including the operational characteristics and Rules of Play;

(viii)    Complete description of the method used for accepting consideration from Account Holders, paying or distributing prizes, determining, retaining or paying any amounts to the Gaming Enterprise or Vendor from the consideration or any other source, and the awarding or funding of Prize Pools;

(ix)    If requested by the Gaming Commission, a copy of any of the Vendor's sales or promotional literature for the Class II Gaming System; and

(x)    Copies of any court or administrative decisions or other materials, supplied by the Vendor, which address the classification of the proposed Class II Gaming System, if any.

Chelette Dec. Exhibit No. 4

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(c)     Submission of Additional Information

Upon request of the Gaming Commission, the Gaming Enterprise Manager or the Vendor may be required to provide any further information or clarification as the Gaming Commission deems necessary to make a Classification Determination.

(d)     Report of Laboratory Tests

The Class II Gaming System must be submitted to an independent testing laboratory, which shall provide a report to the Gaming Commission to validate that the Class II Gaming System complies in all respects with the specifications and standards set forth in the application and meets the requirements of 25 CFR Part 547.

(e)     Modification of Class II Gaming Systems

(1) Either the Gaming Enterprise Manager (including his/her duly authorized representative) or a Vendor shall submit to the Gaming Commission a request for a review of a Class II Gaming System that is to be modified by providing a detailed description of the modification and how the modification affects the Class II Gaming System. If the Gaming Commission determines that the modification may represent a material change impacting the classification of the Class II Gaming System, either the Gaming Enterprise Manager or a Vendor must submit a new application pursuant to subsection (b) of this Section.

(2) An application for a new Classification Determination shall not be required if the modification does not result in a material change to the classification of the Class II Gaming System. However, even if the Gaming Commission determines that the proposed modification will not impact the classification of the Class II Gaming System, the modification is still subject to the review process set forth in 25 CFR Part 547.

(3) The Gaming Commission shall maintain a list of modifications determined by the Gaming Commission to be non-material, which shall be updated periodically by the Gaming Commission as technology advances.

Chelette Dec. Exhibit No. 4

TD000050

Page E58

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

### 5.0    *Classification Criteria*

(a)    Factors to be considered by the Gaming Commission in making a Classification Determination include:

(1) Whether the game played using the Class II Gaming System is Bingo consistent with the standards of this Regulation; and

(2) Whether the electronic equipment utilized in connection with the game:

(i)    is an Electronic, Computer or other Technologic Aid, which is permitted with Class II Gaming activities; or

(ii)   causes the game to be deemed an Electronic or Electromechanical Facsimile of a game of chance.

(b)    Electronic, Computer or other Technologic Aid:

(1) Is defined as electronic, computer, or other technologic equipment used in connection with a game of Bingo that:

(i)    assists Account Holders or the playing of a game;

(ii)   is not an Electronic or Electromechanical Facsimile; and

(iii)  is operated in accordance with applicable federal communications law.

(2) Includes, but is not limited to, electronic, computer, or other technologic equipment used in connection with a Bingo game that:

(i)    broadens participation in the game;

(ii)   facilitates communication between and among gaming sites or Account Holders, their proxy agents and the Gaming Enterprise; or

(iii)  requires Account Holders to play a game with or against other Account Holders  rather than with or against a machine.

Chelette Dec. Exhibit No. 4

TD000051

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(3) Examples include, but are not limited to, auto-daub readers or other card cover assist features, proxy play software programs, telephones, cables, televisions, screens, satellites, bingo blowers, electronic player stations and electronic cards.

(c)   An Electronic or Electromechanical Facsimile is a game played in an electronic or electromechanical format that replicates a game of chance by incorporating all of the characteristics of the game, except when, for a Class II game such as Bingo, the electronic or electromechanical format broadens participation by allowing multiple players to play with or against each other rather than with or against a machine.

(d)   Determination that the Class II Gaming System is a Technologic Aid to the play of Bingo

(1) A game played using the Class II Gaming System will be determined to be Bingo if the game is played consistent with the standards for Bingo required by this Regulation, and the fundamental aspects or characteristics of the game are preserved, unaltered by the game's electronic format.

(2) The Gaming Commission has determined that Bingo is at its core essentially a peer-to-peer number and card pattern matching game, and that the following are the fundamental aspects or characteristics of Bingo to be played consistent with the standards required by this Regulation:

(i)   The game is played for prizes, including monetary prizes:

(a) with cards bearing numbers;
(b) in which card holders match (i.e., cover) the numbers contained on their cards when objects with similar numbers are drawn or electronically determined; and
(c) the game is won by the first person holding a card containing a match of the previously designated game-ending pattern;

Page 8

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(ii) The Class II Gaming System mechanism for drawing or electronically determining the objects to be used for matching pre-designated patterns on a card must meet applicable standards for ensuring randomness as set forth in the NIGC Technical Standards or as established by the Gaming Commission;

(iii) Actual prize values must be defined before a prize can be awarded, but need not be defined before the start of a game; and

(iv) A game must require peer-to-peer competition between at least two (2) participants; however, those participants do not need to be physically located at the same location if the game is played using a Class II Gaming System.

(3) The Gaming Commission has determined that the following aspects or characteristics are consistent with, but not required for Bingo to be played consistent with the standards required by this Regulation:

(i) The numbers to be drawn or electronically determined in a game is not fixed; it may be varied from game to game, in accordance with the Rules of Play. The "numbers" to be drawn or electronically determined in a game may be displayed as any type of symbol, without limitation, as numbers, letters, icons, any other graphic or other enhancement, or any combination thereof.

(ii) A game may include any number of cards. The card may be in physical or electronic/digital form, and may be multi-dimensional.

(iii) Each digital card used in a Class II Gaming System may consist of a traditional 5X5 "bingo" matrix with numbers for each card. The five columns of the digital card face are to be labeled "B" "I" "N" "G" and "O" from left to right. The center space on the digital card may be marked "Free Space" and considered automatically filled when contained in a pattern. The range of numbers may be restricted by column, with the "B" column containing numbers between one and fifteen inclusive, the "I" column containing sixteen through

Chelette Dec. Exhibit No. 4

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

thirty, the "N" column containing thirty-one through forty-five, the "G" column containing forty-six through sixty, and the "O" column containing sixty-one through seventy-five. All digital cards to be used for a common game of bingo are to be unique (i.e., each card will contain a uniquely identifying serial number).

(iv)   Prize winning patterns can be of any configuration of matched numbers on a card. Interim and consolation prizes also can be awarded for the absence of matched numbers and based on other aspects of the game.

(v)   When playing Bingo, a fixed number of numbers may be drawn or electronically determined before cards are purchased and distributed for the game; provided that once cards are purchased by a least two (2) participants for a common game and the game commences, the drawn numbers must be released in the same sequence and delivered to all participants at the same time. Subsequent draws of numbers in a game may take place to assure that a game-ending pattern prize is awarded.

(vi)   Multiple prizes may be specified in a game based on, but not necessarily limited to, different patterns or the number of drawn numbers required to achieve a specified pattern. There may be multiple winners, on multiple cards. Prize levels can also vary for the same pattern as a function of the consideration paid for the card and/or how far the number draw raw has progressed for the game. Prizes may include interim or consolation prizes. Progressive Prizes may also be awarded based on specified criteria reflecting sequence or specific characteristics of the numbers matched on a card.

(vii)   A game participant may purchase and hold more than one card in a game of Bingo.

(viii)   Account Holders may engage agents located on the Indian lands of the Nation to assist with the play of the Bingo game on behalf of the Account Holders (also known as "proxy play").

(ix)   Account Holders may engage their proxy play agents using a Class II Gaming System containing a component that facilitates access through a secure

Chelette Dec. Exhibit No. 4

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

virtual private network connection between Account Holders and their proxy agents located on the Nation's Indian lands which assists with proxy play on behalf of the Account Holder.

(x)    Use of technologic aids such as auto-daub features or reader/dauber devices are expressly permitted to assist the proxy agent playing Class II bingo games on the Account Holder's behalf in determining whether a held card has a pre-designated pattern matching the numbers drawn for the Class II bingo game.

(xi)    There is no requirement for the proxy agent playing the Bingo game on the Account Holder's behalf to manually declare a "bingo" upon matching the numbers drawn with the pre-designated game-ending pattern on a card in order to collect the game-ending prize award;

(4) In determining whether a game played using a Class II Gaming System is Bingo, the Gaming Commission has determined that it is not necessary to impose any requirements that are intended to:

(i)    Limit the use of Technologic Aids in connection with assisting with the play of Bingo games, displaying cards, assisting with automatically and electronically identifying numbers drawn and determining whether any card contains those numbers as they are drawn, or assisting with identifying game-ending and other prize winning patterns and claiming prizes associated with those patterns;

(ii)    Limit the speed of play, card configuration, or the total number of number draws in a game;

(iii)    Limit how or when cards are distributed for a game;

(iv)    Limit the sequence of a numbers draw for a game;

(v)    Limit how prizes are to be claimed;

(vi)    Limit the type of entertaining display contained in a Class II Gaming System;

(vii)    Limit the maximum number of participants in any game of Bingo; or

(viii)    Limit the use of proxy play agents to assist with proxy play of Bingo on behalf of Account Holders.

Chelette Dec. Exhibit No. 4

TD000055

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

### 6.0     Classification Decisions

(a)     Issuance of a Written Classification Determination

When the Gaming Commission receives an application pursuant to this Regulation and determines that such Class II Gaming System meets the criteria described in Section 6(d) above, such determination shall be memorialized in a written Classification Determination and copies of such Classification Determination will be provided to the executive branch, the Legislature and the Gaming Enterprise Manager.   Such determination is final and binding as a matter of tribal law.

(b)     Issuance of an Unfavorable Classification Determination

If the Gaming Commission determines that the Class II Gaming System does not meet one or more of the criteria described in Section 6(d) above, such determination shall be memorialized in a written decision specifically addressing the reasons for its determination and copies of such decision shall be provided to the Executive Branch, the Legislature and the Gaming Enterprise Manager. The decision of the Gaming Commission will be final and binding as matter of tribal law. The Gaming Commission may, however, in its discretion allow a request for reconsideration upon a showing of new factual evidence or legal support.

### 7.0     Installation of Class II Gaming Systems

(a)     Confirmation of Specifications

The Gaming Commission shall require the Vendor of any Class II Gaming System intended for use in a Gaming Enterprise to certify, in writing, that prior to delivery to the Gaming Enterprise, the Class II Gaming System:

(1) Conforms precisely to the exact specifications of the system prototype tested and approved by the test laboratory.

Chelette Dec. Exhibit No. 4

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

    (2) Can be tested using one or more unique signatures, checksum values or similar technology for the operating programs used with the Electronic Computer, or other Technologic Aid.

    (3) Operates and plays in accordance with the 25 CFR Part 547 technical standards, this Regulation and all other applicable Gaming Commission regulations.

(b)   Integrity of Seals

Upon delivery of a Class II Gaming System to the Gaming Enterprise, no one will break the seal of any delivery container, nor will any system be removed from the shipping container without the physical presence and authorization of a Gaming Commission official.

(c)   Modifications

The Gaming Enterprise Manager shall develop policies and procedures to be approved by the Gaming Commission for installing, accessing, maintaining, repairing, and configuring the Class II Gaming System components, in the same manner as set forth in Gaming Commission regulations.

(d)   Delivery of Class II Gaming Systems

At least fourteen (14) calendar days prior to shipping and delivery of a Class II Gaming System, each Vendor shall report in writing to the Gaming Commission the following information for the Class II Gaming System:

    (1) the means by which the Class II Gaming System components will be transported into the Nation's Indian lands, and the name and street address of any common carrier or other person transporting the Class II Gaming System components.

    (2) The date of shipping and anticipated delivery date of the Class II Gaming System components.

(e)   Notice of New or Upgraded Software

Chelette Dec. Exhibit No. 4

TD000057

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

The Gaming Commission shall be notified by the Gaming Enterprise Manager, or his/her designated representative, within ten (10) calendar days of the date of purchase or receipt of any new or upgraded software used in connection with the Class II Gaming System that consists of operational program(s) governing the play of the Bingo game, display of results, and/or awarding of prizes for the Bingo game.

**8.0    *Labelling of Approved Class II Gaming Systems***

(a)    Serial Numbers

Once a Class II Gaming System has been determined to be a Technologic Aid to Class II Gaming, the Gaming Enterprise Manager will provide a serial number and description of Class II Gaming System components to the Gaming Commission in manner to be established by the Gaming Commission.

(b)    Requirement for Seals or Labels

The Gaming Commission shall affix a seal or a label on each of the internal components of each Class II Gaming System component as to be determined by the Gaming Commission to indicate proper determination. The seal or other label will show the version number(s) or other unique identifier(s), as documented by the testing laboratory. The seal or other label will be promptly removed from each Class II Gaming System component as to be determined by the Gaming Commission when the version number(s) or other unique identifier(s) of the software operated thereon are changed and a new seal or other label is affixed showing the version(s) of the software in use; provided the new version(s) meet the standards established in this Regulation.

Approved by:

July 1, 2014

Dave Vialpando, Chairman                    Date

Rev: 9-4-2014
Rev. 10-21-2014

Chelette Dec. Exhibit No. 4

TD000058
Page E66

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

SYGC 14-I010

## Commission Regulation

### Declaration of Situs of VPN Aided Class II Gaming Conducted Under the Tribal Gaming Ordinance

Pursuant to SYGC Gaming Ordinance Section XI (F) & (G), regulation of gaming activity, the Santa Ysabel Gaming Commission hereby adopts the following regulation:

### 1.0   *Purpose of Regulation*

    (a)    The Iipay Nation of Santa Ysabel ("Nation") has adopted the Iipay Nation of Santa Ysabel Gaming Ordinance ("Gaming Ordinance"), and, effective as of April 30, 2010, the Gaming Ordinance has been approved by the Chairman of the National Indian Gaming Commission ("NIGC") pursuant to the federal Indian Gaming Regulatory Act of 1988 ("IGRA"), P.L. 100-497, 25 U.S.C. § 2701, *et seq.*, as it may be amended from time to time, and the regulations of the NIGC promulgated thereunder.

    (b)    The Nation has also adopted as part of its substantive law an ordinance regarding tribal transactions or dealings ("Tribal Transaction Location Law") which applies to and governs the legal location of transactions or dealings involving the Nation or its instrumentalities, political subdivisions, agencies and wholly-owned tribally-chartered companies, including any tribal gaming operations, with any persons wherever physically located.

    (c)    The Santa Ysabel Gaming Commission ("Gaming Commission") was established under Section XI, Paragraph A of the Gaming Ordinance to exercise regulatory authority over all gaming activities conducted within the jurisdiction of the Nation and, pursuant to Section XI, Paragraph G, is empowered, subject to Executive Branch and Legislative Branch review and comment, to promulgate regulations to implement the provisions of the Gaming Ordinance, including those necessary to the interpretation and application of the Gaming Ordinance by the Gaming Commission in connection with exercising its regulatory powers.

    (d)    In a manner consistent with the Tribal Transaction Location Law and in order to facilitate expanded opportunities to participate in

P.O BOX 558
Santa Ysabel, CA 92070

PHONE: (760) 765-0553
FAX:      (760) 765-3772

Chelette Dec. Exhibit No. 5

TD000092

Page E67

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

Gaming activities conducted under the Gaming Ordinance, the Tribal Gaming Commission finds it necessary in connection with exercising its regulatory powers to promulgate a regulation related to VPN Aided Class II Gaming conducted within the Santa Ysabel Indian Reservation on Indian lands.

### 2.0   *Definitions*

The terms used herein shall have the meanings ascribed to them in the Gaming Ordinance and other regulations of the Gaming Commission.

### 3.0   *Declaration of Situs of VPN Aided Class II Gaming*

The Gaming Commission hereby declares that, consistent with the Tribal Transaction Location Law, any VPN Aided Class II Gaming operated by any tribal gaming operation shall be conducted using servers and computer equipment situated within the Santa Ysabel Indian Reservation on Indian lands. VPN Aided Class II Gaming shall be deemed to take place where the servers are located on the Indian lands of the Nation, regardless of a player's physical location.

### 4.0   *Location of VPN Aided Class II Gaming System Hardware and Software*

All hardware and software equipment used by any tribal gaming operation to conduct VPN Aided Class II Gaming shall be located in a restricted area of a Gaming Facility situated within the territorial limits of the Santa Ysabel Indian Reservation on Indian lands.

### 5.0   *Compliance with Legal Requirements*

The tribal gaming operation shall ensure that VPN Aided Class II Gaming complies with all applicable laws.

Approved by:

Dave Vialpando, Chairman

July 1, 2014

Date

Rev: 9-4-2014     10-21-2014

P.O BOX 558
Santa Ysabel, CA 92070

PHONE: (760) 765-0553
FAX:      (760) 765-3772

Chelette Dec. Exhibit No. 5

# SANTA YSABEL TRIBAL GAMING COMMISSION

SYGC 14-I011

## Commission Regulation

## Requirements for VPN Aided Class II Gaming Conducted within Boundaries of the Santa Ysabel Tribal Reservation

Pursuant to SYGC Gaming Ordinance Section XI (F) & (G), regulation of gaming activity, the Santa Ysabel Gaming Commission hereby adopts the following regulation:

### 1.0  *Purpose of Regulation*

(a)   The Iipay Nation of Santa Ysabel ("Nation") has adopted the Iipay Nation of Santa Ysabel Gaming Ordinance ("Gaming Ordinance"), and, effective as of April 30, 2010, the Gaming Ordinance has been approved by the Chairman of the National Indian Gaming Commission ("NIGC") pursuant to the federal Indian Gaming Regulatory Act of 1988 ("IGRA"), P.L. 100-497, 25 U.S.C. §2701, *et seq.*, as it may be amended from time to time, and the regulations of the NIGC promulgated thereunder.

(b)   The Santa Ysabel Gaming Commission ("Gaming Commission") was established under Section XI, Paragraph A of the Gaming Ordinance to exercise regulatory authority over all gaming activities conducted within the jurisdiction of the Nation and, pursuant to Section XI, Paragraph G, is empowered, subject to Executive Branch and Legislative Branch review and comment, to promulgate regulations to implement the provisions of the Gaming Ordinance, including those necessary to the interpretation and application of the Gaming Ordinance by the Gaming Commission in connection with exercising its regulatory powers.

(c)   In order to describe the regulatory requirements for VPN Aided Class II Gaming conducted within the boundaries of the Santa Ysabel Indian Reservation, the Gaming Commission finds it necessary in connection with exercising its regulatory powers to promulgate a regulation governing the operation of such VPN Aided Class II Gaming.

Chelette Dec. Exhibit No. 6

TD000059
Page E69

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

### 2.0   *Definitions used in this Regulation*

Any capitalized terms used herein not otherwise described in this Regulation shall have the meanings ascribed to them in this Section. Any capitalized terms not otherwise defined in this Regulation shall have the meaning ascribed to them in the Gaming Ordinance.

(a)   "Account" means an electronic ledger operated and maintained by the Gaming Enterprise wherein information relative to VPN Aided Class II Gaming is recorded on behalf of an Account Holder including the following types of transactions:

   (1)   Deposits;

   (2)   Withdrawals;

   (3)   Amounts risked;

   (4)   Amounts paid for prize winnings; and

   (5)   Adjustments to the account.

(b)   "Account Holder" means an individual at least eighteen (18) years of age who has used the VPNAPS to establish an account to become a properly registered account holder with the Gaming Enterprise.

(c)   "Class II Gaming" means those gaming activities defined as "class II gaming" in IGRA, 25 U.S.C. §2703(7).

(d)   "Class II Gaming System" means a "Class II gaming system" as defined in 25 CFR §547.2; including any components that facilitate access to the system or communication between Account Holders, their proxy agents and the Gaming Enterprise.

(e)   "Critical Components" means the hardware, software or other components required to be present and operational in order for the VPNAPS to properly operate.

(f)   "Data Storage Device" means any device that stores information or data from any electronic or optical medium, including, but not limited to, computers, cellular telephones, magnetic tape, electronic computer drives and optical computer drives, and the medium itself.

Page 2

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(g) "Encryption" means the protection of data in electronic or optical form, in storage or in transit, using: (1) an encryption technology that has been adopted by an established standards setting body, including, but not limited to, the Federal Information Processing Standards issued by the National Institute of Standards and Technology, which renders such data indecipherable in the absence of associated cryptographic keys necessary to enable decryption of such data; (2) appropriate management and safeguards of cryptographic keys to protect the integrity of the encryption using guidelines promulgated by an established standards setting body, including, but not limited to, the National Institute of Standards and Technology; and (3) any other technology or method identified and adopted by the Gaming Commission.

(h) "Gaming Enterprise" means the tribal gaming business owned and operated by the Nation, to be commonly known as and d/b/a Santa Ysabel Interactive, which conducts VPN Aided Class II Gaming, is licensed by the Gaming Commission to conduct such Class II Gaming activities and receives the revenues, issues the prizes, and pays the expenses associated with such Class II Gaming activities.

(i) "Hot Swappable" means VPNAPS components that can be replaced without shutting down the system.

(j) "Multifunctional Device" means a machine that incorporates the functionality of devices, which may include, without limitation, a printer, copier, scanner, facsimile machine or electronic mail terminal, to provide for the centralized management, distribution or production of documents.

(k) "Patron Registration Site" means the patron-facing interface of the VPNAPS, which, by virtue of the design of the VPNAPS, individuals must first access when using the VPNAPS.

(l) "Person" means any individual, partnership, joint venture, corporation, joint stock company, company, firm, association, trust, estate, club, business trust, municipal corporation, society, receiver, assignee, trustee in bankruptcy, political entity and any owner, director, officer or employee of any such entity or any group of individuals acting as a unit, whether mutual, cooperative, fraternal, nonprofit, or otherwise, the government of the Nation,

Chelette Dec. Exhibit No. 6

TD000061
Page E71

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

any governmental entity of the Nation or any of the above listed forms of business entities that are wholly owned or operated by the Nation; provided, however, that the term does not include the federal government and any agency thereof. The plural of "Person" is "People."

(m)   "Personally Identifiable Information" means any information about an individual maintained by the Gaming Enterprise including any information that can be used to distinguish or trace an individual's identity, such as (1) name, social security number, date and place of birth, mother's maiden name, or biometric records; and (2) any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information.

(n)   "Nation" means the Iipay Nation of Santa Ysabel, a federally recognized Indian Nation (federally recognized as the Iipay Nation of Santa Ysabel, California – previously listed as the Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation).

(o)   "VPN" means a virtual private network which (a) has been assigned a "special use" Internet protocol address in the range from 10.0.0.0-10.255.255.255,     172.16.0.0-172.31.255.255,     and 192.168.0.0-192.168.255.255 by the Internet Assigned Numbers Authority, and (b) uses a form of communication that utilizes secured and restricted access connections (i.e. via software and a server that authenticates users, encrypts data, and manages sessions with users) over connectivity infrastructure to create point-to-point connections segregated and isolated from the publicly accessible Internet network (also known as the World Wide Web), such as to constitute a closed, proprietary communication network.

(p)   "VPN Aided Class II Gaming" means server-based electronic bingo games offered by the Gaming Enterprise to be played on the Nation's sovereign Indian lands using a Class II Gaming System, known as the VPNAPS, containing several proprietary technologic aids, including a component that facilitates access through a secure virtual private network connection between Account Holders and their proxy agents located on the Nation's Indian lands which assists proxy play on behalf of the Account Holder.

Chelette Dec. Exhibit No. 6

TD000062
Page E72

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(q)  "VPN Aided Class II Gaming Service Provider" means any Class II Gaming vendor who, directly or indirectly, provides, has provided, or is deemed likely to provide at least twenty-five thousand dollars ($25,000) in Class II Gaming resources to the Gaming Enterprise conducting VPN Aided Class II Gaming in any 12-month period, or who has received at least twenty-five thousand dollars ($25,000) in any consecutive 12-month period.

(r)  "VPNAPS" means the Class II Gaming System known as the "Virtual Private Network Assisted Play System", a licensed, proprietary technology platform comprised of multiple software processes and hardware components that work together to offer Class II server-based electronic bingo games via a secure and restricted access VPN connection accessed through any web browser enabled device; including the collective hardware, software, VPN, proprietary hardware and software specifically designed or modified for, and intended for use by the Gaming Enterprise, to conduct VPN Aided Class II Gaming within the boundaries of the Santa Ysabel Indian Reservation on Indian lands.

## 3.0  *VPN Aided Class II Gaming Service Providers*

(a)  A VPN Aided Class II Gaming Service Provider who assists the Gaming Enterprise in offering VPN Aided Class II Gaming shall be subject to the provisions of this Regulation applicable to such services to the same extent as the Gaming Enterprise. The Gaming Enterprise continues to have an obligation to ensure, and remains responsible for, compliance with this Regulation regardless of its use of a VPN Aided Class II Gaming Service Provider.

(b)  A Person may act as a VPN Aided Class II Gaming Service Provider only if that Person holds a license specifically permitting the Person to act as a VPN Aided Class II Gaming Service Provider.

(c)  The Gaming Enterprise may only use the services of a VPN Aided Class II Gaming Service Provider that is licensed by the Gaming Commission as a VPN Aided Class II Gaming Service Provider.

## 4.0  *VPNAPS*

(a)  The Gaming Enterprise shall not operate the VPNAPS unless the VPNAPS has been approved by an endorsed independent testing

Chelette Dec. Exhibit No. 6

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

lab or the Gaming Commission. The VPNAPS shall meet, at a minimum, industry standards verified by an endorsed independent testing lab or such standards that are accepted by the Gaming Commission. All endorsed independent testing lab certifications shall be made available in writing to the Gaming Commission upon request.

(b)   No modification to the Critical Components of the VPNAPS shall be made unless the proposed Critical Component modification has been approved by the Gaming Commission.

(c)   Prior to commencing operations of the VPNAPS, the Gaming Commission shall be provided with a list of all individuals who may access the main computer or data communications components of the VPNAPS and any changes to that list shall be provided to the Gaming Commission within ten (10) days.

(d)   The Gaming Commission may at any time inspect and test the VPNAPS or any component thereof to ensure it operates within the parameters certified by an endorsed independent testing lab or as accepted by the Gaming Commission.

(e)   The Gaming Commission may at any time require the Gaming Enterprise to restrict or limit an individual's access to VPN Aided Class II Gaming via the VPNAPS while the individual is physically located in a particular state or foreign jurisdiction. The Gaming Enterprise, however, may choose to restrict or limit an individual's access to VPN Aided Class II Gaming via the VPNAPS while the individual is physically located in a particular state or foreign jurisdiction whether the Gaming Commission requires it or not.

**5.0   *Control System***

(a)   Internal controls that comply with industry standards or such standards that are accepted by the Gaming Commission shall be established, maintained, and implemented. Compliance with such minimum standards shall be evidenced in writing and submitted to the Gaming Commission for purposes of approval.

(b)   Internal control submissions shall include detailed information of the following:

Chelette Dec. Exhibit No. 6

TD000064
Page E74

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(1)   The VPNAPS;

(2)   Procedures and controls for the operation of the VPNAPS, including, but not limited to:

    i.   Registering Account Holders via the VPNAPS;

    ii.   Identifying and verifying Account Holders to prevent those who are not authorized Account Holders from using the VPNAPS. The procedures and controls must incorporate robust and redundant identification methods and measures in order to manage and mitigate the risks of non-face-to-face transactions inherent in VPN Aided Class II Gaming;

    iii.   Handling Account Holder deposits, withdrawals and all other account transactions;

    iv.   Protecting and ensuring confidentiality of Account Holders' accounts;

    v.   Recording credits and debits to Account Holders' accounts; and

    vi.   Identifying and blocking an individual's access to VPN Aided Class II Gaming via the VPNAPS while the individual is physically located in a particular state or foreign jurisdiction, either as required by the Gaming Commission or determined by the Gaming Enterprise.

(3)   Procedures and controls for protecting Account Holders' Personally Identifiable Information, including, but not limited to:

    i.   Determining the nature and scope of all Personally Identifiable Information collected, the locations in which such information is stored, and the devices or media on which such information may be recorded;

    ii.   Protecting Personally Identifiable Information from unauthorized access;

Chelette Dec. Exhibit No. 6

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

    iii.   Notifying Account Holders of applicable privacy policies;

    iv.   Procedures to be used in the event a data security breach occurs; and

    v.   Procedures for compliance with all tribal, state and federal laws concerning privacy and security of Personally Identifiable Information.

(4)   Accounting systems and procedures that adhere to Generally Accepted Accounting Principles ("GAAP");

(5)   Procedures to be followed to assist proxy play of a Class II bingo game on behalf of the Account Holder by the proxy agent;

(6)   Procedures for aborted or miscarried Class II bingo games played on the Account Holder's behalf by the proxy agent;

(7)   Procedures and standards for the maintenance, security and storage of VPNAPS equipment to be used in conjunction with VPN Aided Class II Gaming;

(8)   Procedures for establishing and maintaining security facilities including general compliance and internal controls to access critical systems;

(9)   A disaster recovery plan;

(10)   An adequate system of data backup;

(11)   Procedures for promoting responsible VPN Aided Class II Gaming, preventing individuals who have self-excluded from engaging in VPN Aided Class II Gaming, and permanently banning players from participating in VPN Aided Class II Gaming;

(12)   Procedures and controls designed to detect and prevent transactions that may be associated with money laundering, fraud or other criminal activities and to ensure compliance with all federal laws related to money laundering;

Chelette Dec. Exhibit No. 6

TD000066
Page E76

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

(13)   Procedures outlining the policies and procedures for surveillance;

(14)   Procedures for calculating and submitting appropriate taxes or fees to the Gaming Commission; and

(15)   Any other information that the Gaming Commission may require.

(c)   The financial accounting records, quarterly audits and approved control system shall be subject to an annual audit conducted by an independent, licensed, CPA firm.

(d)   The costs incurred for such an audit shall be borne by the Gaming Enterprise. A copy of the annual audits shall be provided to the Gaming Commission within one hundred twenty (120) days of the end of the Gaming Enterprise's fiscal year.

(e)   The Gaming Commission shall have the right to direct the Gaming Enterprise to change or modify the approved control system in any manner whatsoever, within a period of time which shall be not less than thirty (30) days from the date on which the directive is served on the Gaming Enterprise.

(f)   All VPN Aided Class II Gaming shall be conducted only under the control system which has been approved by the Gaming Commission.

### 6.0   *Physical Security of Servers and Equipment*

(a)   The Gaming Enterprise shall take all reasonable steps to ensure that the premises on which is kept any servers and equipment used to facilitate the conduct of VPN Aided Class II Gaming are free from access by unauthorized individuals.

(1)   All areas with servers and equipment used to facilitate the conduct of VPN Aided Class II Gaming and other critical areas shall be secured with sufficient means and meet industry standards or such standards that are accepted by the Gaming Commission for surveillance coverage which include at a minimum:

Chelette Dec. Exhibit No. 6

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

    i.    Access technology that will adequately determine the identity of and restrict access to authorized individuals;

    ii.    Ability to detect and log any unauthorized access or attempts to gain unauthorized access; and

    iii.    Surveillance technology that will continuously monitor and record the area housing the VPNAPS, including access thereto. Surveillance technology shall monitor and record individuals assigned to oversee and monitor the VPNAPS.

(2)    At any time, the Gaming Enterprise may be required to implement other physical security measures as required by the Gaming Commission.

(3)    A certificate(s) shall be submitted to the Gaming Commission that security measures in subsection 6(a)(1) have been tested by a licensed independent or state governmental security testing entity. Information shall include:

    i.    The name of the company or body that carried out the testing;

    ii.    The individuals' names and credentials who performed the testing;

    iii.    The starting and ending dates and times of testing;

    iv.    A declaration that the access controls have been tested and conform to industry standards or such standards that are accepted by the Gaming Commission;

    v.    A declaration that the physical security of the equipment is free and secure from unauthorized individuals and meets industry standards or such standards that are accepted by the Gaming Commission;

Chelette Dec. Exhibit No. 6

TD000068

SANTA YSABEL TRIBAL
GAMING COMMISSION

vi.   A list of aspects that have been deemed inadequate; and

vii.   Any such information that is deemed to be necessary from time to time by the Gaming Commission for whatever reason.

(4)   The certificate(s) described in subsection 6(a)(3) shall be submitted annually, or at an interval deemed appropriate by the Gaming Commission.

(5)   Access to the VPN Aided Class II Gaming related servers and equipment described in subsection 6(a)(1) shall be restricted to those individuals who are deemed necessary for installing, repairing or maintaining the integrity of the servers and equipment for the purposes of ensuring the servers and equipment are not compromised.

(6)   The ability to gain access and logon to the servers and equipment used to conduct VPN Aided Class II Gaming shall be restricted to being physically at the servers and equipment; remote accessing of servers and equipment shall be restricted to controls approved by the Gaming Commission. .

(7)   All servers and equipment used to facilitate the conduct of VPN Aided Class II Gaming shall be located on Indian lands within the jurisdiction of the Nation.

## 7.0   *VPNAPS and System Architecture*

(a)   Prior to operation, a detailed description of the VPNAPS shall be submitted to an endorsed independent testing lab to certify functionality, security and compliance with industry standards or such standards that are accepted by the Gaming Commission. Such descriptions shall include:

(1)   Detailed description of equipment architecture, software and hardware;

(2)   Detailed description of the server(s);

(3)   Detailed description of communication protocols; and

Chelette Dec. Exhibit No. 6

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

(4)   Detailed list of which modules affect (if changed):

        i.     Processes;

        ii.    Parameters;

        iii.   Outcomes;

        iv.   Accounting; and

        v.    Protocols.

(5)   Any other information that is of material importance to the specific hardware or software.

(b)   The VPNAPS shall be designed such that data may be backed up at intervals established by the Gaming Commission, and, if deemed necessary by the Gaming Commission, such backup shall be sent to an additional server located at a different location.

(c)   In the event of a power loss to the VPNAPS, an auxiliary or backup power source shall be available and capable of providing immediate restoration of power, for a minimum of twenty four (24) hours to all Critical Components that enable the VPNAPS to operate. Auxiliary or backup power sources such as UPS systems, a backup generator, or an alternate utility supplier satisfy this requirement.

(d)   The VPNAPS shall be equipped to self-test and will lock up or inform the Gaming Enterprise of problems.

(e)   The VPNAPS shall provide audit functions and store information in an unalterable read-only format for a duration established by the Gaming Commission. Such information shall include:

(1)   Log in name, dates and times;

(2)   A log of any changes to permissions, protocols or processes;

(3)   A log of any changes to critical Components or Hot Swappable components;

(4)   Additions, removals, upgrades to any software; and

Chelette Dec. Exhibit No. 6

TD000070

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

     (5)   Any other information or data deemed necessary by the Gaming Commission.

(f)   The VPNAPS shall employ a mechanism that complies with industry standards or such standards that are acceptable by the Gaming Commission to detect and identify the physical location, by state or foreign jurisdiction, of an individual when attempting to access VPN Aided Class II Gaming via the VPNAPS. If, when attempting to access VPN Aided Class II Gaming via the VPNAPS, an individual is physically located in a state or foreign jurisdiction from which access has been restricted or limited, either as required by the Gaming Commission or determined by the Gaming Enterprise, the VPNAPS shall deny or disable the individual's access to VPN Aided Class II Gaming via the VPNAPS.

(g)   The VPNAPS shall be tested by an endorsed independent testing lab to certify functionality, security and compliance with industry standards or such standards that are accepted by the Gaming Commission. The Gaming Commission may at any time require additional testing to be performed on the VPNAPS or any component thereof.

(h)   No changes to the VPNAPS or any component thereof that may interrupt or affect the function or operating parameters of VPN Aided Class II Gaming may be performed without prior written approval from the Gaming Commission.

(i)   Where approval of the VPNAPS is not granted, the Gaming Commission shall inform the applicant of its decision in writing stating the reasons for refusal.

## 8.0  *Cyber-Attacks*

(a)   All appropriate measures that meet industry standards or standards accepted by the Gaming Commission shall be implemented to prevent, detect and suppress cyber-attacks.

(b)   In the event of a cyber-attack of any sort, the Gaming Commission shall be notified immediately, and the VPNAPS shut down if deemed necessary by the Gaming Enterprise or the Gaming Commission to prevent unauthorized access to Account Holders' accounts or

Chelette Dec. Exhibit No. 6

TD000071

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

changes to or money transfers from their accounts, or unauthorized access to data or physical protections of the VPNAPS.

**9.0   Data Security**

(a)   The Gaming Enterprise shall implement and maintain reasonable security measures to protect those records containing Personally Identifiable Information from unauthorized access, acquisition, destruction, use, modification or disclosure.   "Records" shall include, but not be limited to, private and financial information of all Account Holders and their accounts, including any loyalty awards. If a state or federal law requires greater protection to records that contain Personally Identifiable Information and the Gaming Enterprise is in compliance therewith, the Gaming Enterprise shall be deemed to be in compliance with the provisions of this Section.

(b)   With respect to subsection 9(a), reasonable security measures shall include, but not be limited to, the following:

(1)   Requiring passwords that are a minimum of 8 characters that include at least three of the following characteristics and ensure the proper authentication of Account Holders;

   i.   Uppercase letters;

   ii.   Lowercase letters;

   iii.   Numbers; or

   iv.   Special Characters.

(2)   Complying with the current version of the Payment Card Industry (PCI) Data Security Standard, as adopted by the PCI Security Standards Council or its successor organization, with respect to those transactions, not later than the date for compliance set forth in the Payment Card Industry (PCI) Data Security Standard or by the PCI Security Standards Council or its successor organization;

(3)   Encrypting the transfer of any Personally Identifiable Information through an electronic, non-voice transmission to a Person outside of the VPNAPS or when moving any Data

Chelette Dec. Exhibit No. 6

TD000072

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

Storage Device containing personal information beyond the logical or physical controls of the Gaming Enterprise, its data storage contractor or, if the Data Storage Device is used by or is a component of a Multifunctional Device, a Person who assumes the obligation of the Gaming Enterprise to protect personal information;

(4)   Locating gaming platforms and the associated communications systems in facilities which provide physical protection against damage from fire, flood, hurricane, earthquake and other forms of natural or man-made disaster;

(5)   Adopting and implementing security perimeters and secure areas protected by appropriate entry controls to ensure that access is restricted to authorized personnel;

(6)   Ensuring equipment is protected from power failures and other disruptions caused by failures in supporting utilities, and that power and telecommunications cabling carrying data or supporting information services shall be protected from interception or damage; and

(7)   Ensuring secure areas include an intrusion detection system with the ability to detect and log any unauthorized access or attempts to gain unauthorized access.

(c)   Records containing Personally Identifiable Information shall be subject to reasonable measures to ensure the destruction of those records when the Gaming Enterprise determines that the records will no longer be maintained following expiration of the maintenance and preservation requirements set forth in subsection 19(c).  For purposes of this subsection, reasonable measures to ensure the destruction includes any method that modifies the records containing the Personally Identifiable Information in such a way as to render the personal information contained in the records unreadable or undecipherable, including, without limitation: (1) shredding of the record containing the Personally Identifiable Information; or (2) if in electronic form, erasing of the Personally Identifiable Information from the hard disks, magnetic tapes, solid state memory and other Data Storage Devices or Multifunctional Devices before the device is decommissioned; if

Chelette Dec. Exhibit No. 6

TD000073

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

erasure is not possible, the Data Storage Device or Multifunctional Device must be destroyed.

(d)    Any breach of security of VPNAPS data (including, but not limited to, Data Storage Devices and Multifunctional Devices) must be immediately disclosed following discovery if Personally Identifiable Information was, or is reasonably believed to have been, acquired by an unauthorized Person. The disclosure must be made in the most expedient time possible and without unreasonable delay to the Gaming Commission, consistent with the legitimate needs of law enforcement or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the VPNAPS data.

(e)    The Gaming Enterprise shall be in compliance with, and shall ensure that the VPNAPS data is in compliance with:

    (1)    The Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.*;

    (2)    The Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501–6506;

    (3)    Sarbanes-Oxley, 15 U.S.C. §§ 7241 *et seq.*; and

    (4)    Controlling the Assault of Non-Solicited Pornography And Marketing Act of 2003 (CAN SPAM), §§ 15 U.S.C. 7701 *et seq.*

## 10.0 Disaster Recovery and Redundancy

One or more of the following methods to support redundancy and disaster recovery shall be utilized:

(a)    Hardware: Procedures required to ensure redundancy and disaster recovery of the VPNAPS or components thereof include, but are not limited to:

    (1)    Redundant hardware, such as network interface cards operating in parallel, which shall ensure the continuous function of the VPNAPS in the event that a component thereof fails;

Chelette Dec. Exhibit No. 6

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

(2) High-availability hardware, such as identically configured routers, which shall continue to function without administrative action if a VPNAPS component fails;

(3) Exact copies of Critical Components that can be readily swapped or replaced in the event of a failure;

(4) Mirroring all data, including changes, by replicating such data to a second location in real-time to facilitate the replacement of Critical Components or the restoration of data in the event of a failure; and

(5) Employing multiple data centers or sites, i.e. a primary and secondary site, the latter of which can be utilized in the event of a major emergency and/or natural disaster at the primary site.

(b) Network: Procedures required to ensure network backup include, but are not limited to:

(1) Creation and documentation of a disaster recovery plan that defines the necessary level of backup information;

(2) Maintaining accurate and complete records of backup material in accordance with the documented disaster recovery plan;

(3) Establishing and documenting backup and restoration procedures consistent with industry standards or such standards that are accepted by the Gaming Commission;

(4) Storing backup data in a remote location sufficiently removed from the primary site to escape damage but accessible for timely data availability.

(5) Affording backup data with a level of physical and environmental protection consistent with the standards and controls applied at the primary site consistent with industry standards or such standards that are accepted by the Gaming Commission;

(6) Regularly testing backup data to ensure that it can be relied upon for emergency use when necessary;

Page 17

Chelette Dec. Exhibit No. 6

TD000075

SANTA YSABEL TRIBAL
GAMING COMMISSION

(7)   Regularly checking and testing restoration procedures to ensure that they are effective and can implemented within the time allotted in the disaster recovery plan; and

(8)   Encrypting backup data that contains Personally Identifiable Information using technology that has been adopted by an established standard setting body or such technology that is accepted by the Gaming Commission.

### 11.0  *Class II Bingo Rules*

(a)   Written and comprehensive Class II bingo rules shall be adopted, adhered to and available for review at all times by Account Holders through a conspicuously displayed link on the Patron Registration Site of the VPNAPS. Such Class II bingo rules shall include, but not be limited to, specifying the following:

(1)   Clear and concise explanation of all fees;

(2)   The rules of play of a Class II bingo game;

(3)   Any monetary limits on Class II Gaming activities; and

(4)   Any time limits pertaining to the play of a Class II bingo game.

Prior to adopting or amending such house rules, such Class II bingo rules shall be submitted to the Gaming Commission for its approval.

(b)   A Gaming Enterprise employee monitoring the proxy functions of the VPNAPS shall act as the legally designated agent of the Account Holder and, assisted by the technologic aid of proxy software elements contained in the VPNAPS, shall conduct proxy play of Class II bingo games on the Account Holder's behalf.

(c)   There is no requirement for the proxy agent playing Class II bingo games on the Account Holder's behalf to manually declare a "bingo" upon matching the numbers drawn with the pre-designated game winning pattern on a purchased bingo card in order to collect the game prize; use of technologic aids such as an auto-daub feature is expressly permitted to assist the proxy agent playing Class II bingo games on the Account Holder's behalf in determining whether

Chelette Dec. Exhibit No. 6

TD000076
Page E86

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

a card held has a pre-designated pattern matching the numbers drawn for the Class II bingo game.

## 12.0 *Information Displayed on the Patron Registration Site of the VPNAPS*

(a)  The following information must be prominently displayed to Account Holders on the Patron Registration Site of the VPNAPS before any Class II bingo game play is commenced on behalf of an Account Holder:

(1)  The full name of the Gaming Enterprise, ownership of the Gaming Enterprise, and the physical location from which the Gaming Enterprise conducts its Class II Gaming activities;

(2)  A statement that the Gaming Enterprise is licensed and regulated by the Gaming Commission;

(3)  The license number and date of the license issued to the Gaming Enterprise, if applicable;

(4)  A statement that individuals under the age of twenty-one (21) are not permitted to become Account Holders; and

(5)  Active links to the following:

   i.  Information explaining how disputes with the Gaming Enterprise concerning VPN Aided Class II Gaming are resolved;

   ii.  A problem gambling website that is designed to offer information pertaining to responsible gaming;

   iii.  The Gaming Commission's website;

   iv.  A page that allows Account Holders to choose to be excluded from engaging in VPN Aided Class II Gaming or to establish time and monetary limits; and

   v.  A link to the Class II bingo rules of the Gaming Enterprise.

Chelette Dec. Exhibit No. 6

TD000077
Page E87

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

(b)   While Account Holders are logged into the VPNAPS, the following information must be prominently displayed on the Patron Registration Site at all times:

(1)   Real time information reflecting the Account Holder's account balance denominated in US dollars.

### 13.0  *Problem Gambling*

(a)   Policies and procedures for self-exclusion must be in place and all reasonable steps to immediately refuse service to or otherwise prevent an individual who has self-excluded from being an Account Holder with the Gaming Enterprise must be taken. These policies and procedures shall comply with Gaming Commission Regulation SYGC 14-I002 Responsible Gaming and will include without limitation the following:

(1)   The closing of the account held by the Account Holder who has self-excluded;

(2)   The maintenance of a register of those individuals who have self-excluded that includes the name, address and account details of self-excluded individuals;

(3)   Provisions precluding an individual who has self-excluded from being allowed to again become an Account Holder with the Gaming Enterprise until a reasonable amount of time of not less than thirty (30) days has passed since the individual self-excluded; and

(4)   Employee training to ensure enforcement of these policies and procedures.

(b)   All reasonable steps to prevent any marketing material from being sent to an individual who has self-excluded must be taken.

(c)   Any advances in information about problem gambling, technology to discover problem gambling, and techniques for combating problem gambling must be noted and acted appropriately upon.

(d)   Account Holders may, by written notice to the Gaming Enterprise, set a limit on their account activity in accordance with the following means:

Chelette Dec. Exhibit No. 6

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

(1) Establishing a limit on the amount of funds that the proxy agent can use to make purchases on the Account Holder's behalf indefinitely or for a specified period;

(2) Establishing a limit on the number of Class II bingo games and on the maximum number of bingo cards the proxy agent can play on the Account Holder's behalf indefinitely or for a specified period;

(3) Establishing a limit on the amount of funds the Account Holder may deposit daily into their account indefinitely or for a specified period; and

(4) Specifying that the Account Holder wishes to be excluded permanently, or for a specific period of time, from the Gaming Enterprise and VPN Aided Class II Gaming.

(e) An Account Holder may, by written notice to the Gaming Enterprise, change or remove the limit on the Account Holder's account activity by further written notice to the Gaming Enterprise. Written notice increasing or removing a limit shall not have effect until at least twenty-four (24) hours after such notice is received.

(f) In the event that an Account Holder self-excludes or has been permanently banned, all funds shall be returned to the Account Holder individual and their account with the Gaming Enterprise closed within seven (7) business days after receipt of the Account Holder's notice of self-exclusion or the issuance of a permanent ban by the Gaming Enterprise.

(g) The Gaming Enterprise shall establish adequate controls to ensure a permanently banned Account Holder cannot reestablish an account with the Gaming Enterprise.

### 14.0 *Registration of Account Holders*

(a) The Gaming Enterprise shall not permit an individual to establish an account with the Gaming Enterprise unless the individual is registered and satisfies all the requirements for becoming an Account Holder.

(b) An individual shall use the VPNAPS to register as an Account Holder.

Chelette Dec. Exhibit No. 6

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(c)   To register as an Account Holder, the individual shall provide the following information:

    (1)   The individual's full legal name;

    (2)   The individual's date of birth showing that the individual is eighteen (18) years of age or older;

    (3)   The individual's legal address;

    (4)   The individual's valid email address;

    (5)   Confirmation that the individual has not previously self-excluded with the Gaming Enterprise and does not otherwise remain on the self-exclusion list; and

    (6)   Confirmation that the individual has not been permanently banned by the Gaming Enterprise.

(d)   Before the Gaming Enterprise registers an individual as an Account Holder, the individual must affirm the following:

    (1)   That the registration information provided is accurate;

    (2)   That the individual has reviewed and agrees to the Gaming Enterprise's Class II bingo rules associated with VPN Aided Class II Gaming;

    (3)   That the individual has reviewed and agrees to the Gaming Enterprise's terms of service and applicable privacy policies associated with VPN Aided Class II Gaming;

    (4)   That the individual has been informed and understands that, as an Account Holder, they are prohibited from allowing any other individual access to or use of their account;

    (5)   That the individual has been informed and understands that, as an Account Holder, they are prohibited from establishing more than one account with the Gaming Enterprise;

    (6)   That the individual has been informed an understands that, if the information provided by such individual pursuant to subsection 14(c) cannot be verified within thirty (30) days of

Chelette Dec. Exhibit No. 6

TD000080
Page E90

SANTA YSABEL TRIBAL
GAMING COMMISSION

registration, any prize winnings credited to the individual's account will be forfeited and the individual shall have no right to such prize winnings;

(7) That by establishing an account with the Gaming Enterprise the individual consents to the exclusive regulatory and adjudicatory jurisdiction of the Nation, acknowledges that the individual is authorizing proxy play of Class II bingo games on their behalf and the Gaming Enterprise's VPN Aided Class II Gaming is conducted on the Nation's sovereign Indian lands, and agrees that any disputes between the individual and the Gaming Enterprise concerning VPN Aided Class II Gaming shall be resolved exclusively pursuant to procedures established by the Gaming Enterprise consistent with Gaming Commission regulations; and

(8) That the individual consents to the monitoring and recording by the Gaming Enterprise and the Gaming Commission of any of their account activities.

(e) Where it is known or reasonably should be known that an individual has provided false information, or the Gaming Enterprise has identified through a mechanism that complies with industry standards or such standards that are accepted by the Gaming Commission that the individual does not satisfy all the requirements for becoming an Account Holder, such individual shall not be permitted to register as an Account Holder.

(f) Within thirty (30) days of the registration, the information provided by the individual pursuant to subsection 14(c) shall be verified by the Gaming Enterprise. Until such verification has occurred:

(1) The individual may not deposit more than $5,000.00 (US) in their account; and

(2) The individual may not withdraw any funds from their account.

(g) If verification of the information provided by the individual pursuant to subsection 14(c) has not occurred within thirty (30) days or where it becomes known that such information is false, the following action shall be taken by the Gaming Enterprise:

Chelette Dec. Exhibit No. 6

TD000081

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(1) Immediately terminate the individual's account activities;

(2) Retain any prize winnings credited to the individual's account; and

(3) Refund the balance of deposits made to the individual's account to the source of such deposit or by issuance of a check and then permanently close the individual's account.

(h) Where it becomes known that an individual who has been previously self-excluded or permanently banned has registered for an account without proper authorization from the Gaming Enterprise, the following action shall be taken by the Gaming Enterprise:

(1) Immediately terminate the individual's account activities;

(2) Retain any prize winnings credited to the individual's account; and

(3) Refund the balance of any deposits made to the individual's account to the source of such deposit or by issuance of a check and then permanently close the individual's account.

(i) Upon verification of the information provided by the individual pursuant to subsection 14(c), any prize winnings credited to that Account Holder's account shall be immediately made available for withdrawal by the Account Holder.

## 15.0 *Account Holders Information and Account Restrictions*

(a) The following information relating to an Account Holder shall be recorded and maintained by the Gaming Enterprise:

(1) The date and time an account with the Gaming Enterprise is established or terminated by the Account Holder;

(2) The date and time the Account Holder logs into and out of the VPNAPS; and

(3) The physical location of the Account Holder, by state or foreign jurisdiction, while logged into the VPNAPS.

Chelette Dec. Exhibit No. 6

### SANTA YSABEL TRIBAL
### GAMING COMMISSION

(b) All Account Holders shall have reasonable access to their account information including, but not limited to, the following:

  (1) All credits and debits to the Account Holder's account;

  (2) A complete history for every Class II bingo game played by the proxy agent on the Account Holder's behalf, including:

    i. The date and time a Class II bingo game began and ended;

    ii. The outcome of every Class II bingo game; and

    iii. The amounts used to purchase bingo cards and the prize amounts won in connection with every Class II bingo game played by the proxy agent on the Account Holder's behalf.

(c) The following account restrictions shall apply:

  (1) An individual registered as an Account Holder may only register and maintain a single account; and

  (2) No anonymous accounts or accounts in fictitious names may be established.

(d) A list of all Account Holders and their respective accounts shall be maintained at all times by the Gaming Enterprise.

(e) An Account Holder shall not be allowed to transfer funds to any other Account Holder's account.

(f) All accounts shall require a specified password unique to each Account Holder for logging in to the account.

(g) All Account Holders shall be required to change their passwords at least annually or on an interval established by the Gaming Commission.

### 16.0  *Access to VPN Aided Class II Gaming Via the VPNAPS*

No Person shall be permitted access to VPN Aided Class II Gaming via the VPNAPS:

Page 25

TD000083
Page E93

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

(a) When it is known or reasonably should be known that the individual is on the self-exclusion list for the Gaming Enterprise;

(b) When it is known or reasonably should be known that the individual is in violation of this Regulation's requirements for Account Holders; or

(c) When it is known or reasonably should be known that the individual is physically located in a state or foreign jurisdiction from which access to the Patron Registration Site of the VPNAPS or VPN Aided Class II Gaming via the VPNAPS has been restricted or limited, either as required by the Gaming Commission or determined by the Gaming Enterprise.

### 17.0  *Financial Stability and Funds Security*

(a) Funds are permitted to be deposited by an Account Holders into the account assigned to that Account Holder as follows:

 (1) Cash deposits made directly with the Gaming Enterprise;

 (2) Personal checks, cashier's checks, wire transfer and money order deposits made directly or mailed to the Gaming Enterprise;

 (3) Debits from an Account Holder's Visa or MasterCard debit or credit card;

 (4) Transfers through the automated clearing house or from another mechanism designed to facilitate electronic commerce transactions; or

 (5) Any other means approved by the Gaming Commission.

(b) An Account Holder's account may be credited by the following means:

 (1) Deposits made in accordance with subsection 17(a);

 (2) Prize award payments in connection with every Class II bingo game played by the proxy agent on the Account Holder's behalf;

Page 26

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

 (3) Promotional credits, or bonus credits that are subject to the terms of service and Class II bingo rules established by the Gaming Enterprise as long as such credits are clearly identified as such; and

 (4) Adjustments following the resolution of a dispute between the Account Holder and the Gaming Enterprise concerning the Account Holder's account activities.

(c) An Account Holder's account may be debited by the following means:

 (1) Amounts used to purchase bingo cards in connection with every Class II bingo game played by the proxy agent on the Account Holder's behalf;

 (2) Purchases of VPN Aided Class II Gaming related merchandise and services requested by an Account Holder;

 (3) Withdrawals by the Account Holder pursuant to the withdrawal policy established by the Gaming Enterprise;

 (4) Adjustments following the resolution of a dispute between the Account Holder and the Gaming Enterprise concerning the Account Holder's account activities; and

 (5) Debits as otherwise approved by the Gaming Commission.

(d) Funds deposited into an Account Holder's account from a financial institution shall not be transferred out of the account to a different financial institution except as otherwise allowed by the Gaming Commission.

(e) Unless there is a pending unresolved dispute or investigation concerning the Account Holder's account activities, a request for a withdrawal of funds by an Account Holder from their account shall be fulfilled within a reasonable amount of time. Any processing of accounts fund withdrawals pursuant to a request by the Account Holder shall be in compliance with all applicable federal and state laws concerning applicable income taxes to be paid by the Account Holder. Before remitting funds to an Account Holder, such time as is reasonably necessary shall be taken for the purposes of:

Chelette Dec. Exhibit No. 6

TD000085

Page E95

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(1)     Verifying the Account Holder's status as an Account Holder is in good standing;

(2)     Conducting security and other internal control procedures in relation to the Account Holder's account, including verification of the withdrawal request against funds in the Account Holder's account; and

(3)     Ensuring compliance with the applicable Gaming Enterprise rules relating to the awarding of prizes to the Account Holder's account.

(f)     An Account Holder shall not be allowed to transfer funds to any other Account Holder's account.

(g)     An Account Holder's account shall not be allowed to be overdrawn unless caused by payment processing issues outside the control of the Gaming Enterprise.

(h)     Extension of credit to an Account Holder shall not be permitted nor shall the deposit of funds into an Account Holder's account that are derived from the extension of credit by affiliates or agents be allowed. For purposes of this subsection, credit shall not be deemed to have been extended where, although funds have been deposited into an account, actual receipt of such funds is pending in the ordinary course of business.

(i)     If an Account Holder's account is inactive for twelve (12) consecutive months or more, a maintenance fee may be charged subject to approval of Gaming Commission. The monthly maintenance fee will be deducted from the Account Holder's account each consecutive month thereafter if it remains inactive. The monthly maintenance fee will not be deducted from the account if there are no funds in account. However, if the Account Holder's account has no funds and has been inactive for twelve (12) or more consecutive months the account may be closed.

(j)     The Gaming Enterprise shall keep the account funds of Account Holders separate from the Gaming Enterprise's own funds in an account held with a financial institution approved by the Gaming Commission.

Page 28

Chelette Dec. Exhibit No. 6

TD000086

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

(k)   The financial institution at which the account funds of Account Holders are held shall be instructed and authorized to disclose any information as may be requested by the Gaming Commission relating to Account Holders' accounts.

(l)   Each financial institution which holds either the Gaming Enterprise's own funds or the account funds of Account Holders shall be pre-approved by the Gaming Commission. The financial institution shall be in good standing and use accounting standards and practices as is generally accepted in the industry.

(m)   Upon receipt of a formal request from an Account Holder, the Gaming Enterprise shall provide in a reasonable manner to such Account Holder all details of amounts credited and/or debited to such Account Holder's account that are not otherwise accessible through the Account Holder's account.

## 18.0 *Reserve Requirements*

In order to ensure the Gaming Enterprise has sufficient funds on hand, the Gaming Enterprise must meet minimum amounts or formulas of cash on hand or in a financial institution in the amounts or pursuant to the formulas established by the Gaming Commission.

## 19.0 *Records*

(a)   With respect to the transactions and affairs relating to the conduct of VPN Aided Class II Gaming, proper accounts and records shall be kept by the Gaming Enterprise which reflects a true, accurate and fair view of the financial position and state of affairs of the Gaming Enterprise's VPN Aided Class II Gaming operations.

(b)   In addition to any other records required to be maintained pursuant to this Regulation, complete and accurate records of all matters related to the conduct of VPN Aided Class II Gaming shall be maintained by the Gaming Enterprise, including without limitation the following:

(1)   The identity of all current and prior Account Holders;

(2)   All information used to register an Account Holder;

Chelette Dec. Exhibit No. 6

TD000087
Page E97

SANTA YSABEL TRIBAL
GAMING COMMISSION

(3)   A record of any changes made to an Account Holder's account;

(4)   A record and summary of all person-to-person contact, by telephone or otherwise, with an Account Holder;

(5)   All credits and debits to an Account Holder's account;

(6)   A complete game history for every Class II bingo game played by the proxy agent on the Account Holder's behalf, including the date and time a Class II bingo game begins and ends, the outcome of every Class II bingo game, the amounts used to purchase bingo cards and the prize amounts won in connection with every Class II bingo game played by the proxy agent on the Account Holder's behalf; and

(7)   Disputes arising between the Account Holder and the Gaming Enterprise concerning the Account Holder's account activities.

(c)   All records required by this Regulation shall be maintained and preserved by the Gaming Enterprise for a minimum of five (5) years after they are made, or for an amount of time deemed appropriate by the Gaming Commission.

## 20.0  *Advertising and Promotions*

(a)   No advertising or promotions shall be engaged by the Gaming Enterprise in that are:

(1)   Indecent, pornographic or offensive;

(2)   False, deceptive or misleading;

(3)   Intended to appeal specifically to individuals under the age of twenty-one (21); or

(4)   In breach of copyright laws.

(b)   Any promotion related to VPN Aided Class II Gaming shall clearly and concisely explain the terms of the promotion and adhere to such terms.

Chelette Dec. Exhibit No. 6

TD000088
Page E98

### SANTA YSABEL TRIBAL
### GAMING COMMISSION

**21.0** *Grounds for Disciplinary Action*

(a)     Failure to comply with the provisions of this Regulation shall be an unsuitable method of operation and grounds for disciplinary action against any Person licensed by the Gaming Commission.

(b)     The Gaming Commission may limit, condition, suspend, revoke a license or fine any Person licensed by the Gaming Commission for failing to comply with this Regulation.

**22.0** *Qualifications for Endorsed Independent Testing Laboratories*

(a)     An endorsed independent testing lab is an independent or governmental gaming testing laboratory recognized in the gaming industry and which:

(1)     Is competent and qualified to conduct scientific tests and evaluations of Class II Gaming Systems and their Class II bingo games, hardware, software and accounting systems; and

(2)     Is licensed or approved by any of the following states: Arizona, California, Colorado, Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, Nevada, New Jersey, or Wisconsin.

(b)     The endorsed independent testing lab shall submit to the Gaming Commission documentation that demonstrates it satisfies the qualifications required under subsection 22(a) before certifying the VPNAPS and its Class II bingo games, hardware, software and accounting systems.

(c)     If, at any time, the endorsed independent testing lab's license and/or approval required by subsection 22(a)(2) is suspended or revoked by any of those states or the Gaming Commission determines that the endorsed independent testing lab is not eligible for a Gaming Vendor License under the Gaming Ordinance, then the Gaming Commission may reject the further use of the independent testing lab, and upon such rejection, the independent testing lab shall discontinue any certifying of the VPNAPS and its Class II bingo games, hardware, software and accounting systems.

Chelette Dec. Exhibit No. 6

TD000089

# SANTA YSABEL TRIBAL
# GAMING COMMISSION

### 23.0 *Resolution of Account Holder Disputes*

(a)   The Nation values each Account Holder with the Gaming Enterprise and intends, at all times, to see that questions, concerns, issues, and/or disputes raised by Account Holders concerning their account activity are addressed in a fair and orderly manner. **However, nothing in this Section specifically nor this Regulation generally shall constitute or be construed as a waiver of the Nation's sovereign immunity, or any of the Nation's rights and privileges arising therefrom.** The Gaming Commission's Patron Dispute Process is outlined in Commission Regulation SYGC 14-I006.

(b)   Dispute Resolution Procedure

    (1)   Account Holders who, in the course of the their otherwise lawful and proper use their account with the Gaming Enterprise, have questions or concerns about their account activity or any aspect of the Gaming Enterprise's VPN Aided Class II Gaming, or who otherwise believe themselves to be aggrieved in connection with their account activity or any aspect of the Gaming Enterprise's VPN Aided Class II Gaming, shall direct their questions, concerns, issues, complaints or disputes (hereinafter collectively "Disputes") in the first instance to the Gaming Enterprise in a manner established in the Gaming Enterprise's terms of service associated with VPN Aided Class II Gaming .

    (2)   Disputes shall be raised by the Account Holder as soon as reasonably possible after the event that gives rise to the Dispute; however, no Dispute may be raised more than ten (10) calendar days after the triggering event.

    (3)   Upon being notified of an Account Holder Dispute, the Gaming Enterprise shall first attempt to informally resolve the matter expeditiously via a customer care system established in the Gaming Enterprise's terms of service associated with VPN Aided Class II Gaming.

    (4)   Upon being notified that Account Holder remains dissatisfied by the informal resolution of the Dispute, the Gaming Enterprise shall expediently and informally gather facts and

Chelette Dec. Exhibit No. 6

TD000090
Page E100

## SANTA YSABEL TRIBAL
## GAMING COMMISSION

documentation concerning the Dispute sufficient for an initial determination to be made about the Dispute (i.e., whether the Dispute has any merit, whether further investigation is required, whether to take any corrective action, etc.). In the event that the Dispute concerns debits or credits of funds to an Account Holder's account with the Gaming Enterprise, all disputed amounts may be frozen until final resolution of the Dispute.

(5)   In a manner established in the Gaming Enterprise's terms of service associated with VPN Aided Class II Gaming, the Gaming Enterprise shall forward the Dispute and the collected facts and documentation concerning the dispute to the Gaming Commission who will make a determination regarding any additional investigation and notify the Account Holder of the status of the complaint.

(6)   The Gaming Commission representative shall inform the Account Holder in a manner established in the Gaming Enterprise's terms of service associated with VPN Aided Class II Gaming and pursuant to SYGC 14-I006 of the initial determination as soon as is reasonably practicable. At that time, if the Account Holder indicates that they are still not satisfied with the initial determination, the Account Holder may appeal the decision directly to the Gaming Commission in a manner outlined in SYGC 14-I006.

### 24.0 *Waiver of Requirements of Regulation*

Upon written request and good cause shown, the Gaming Commission may waive one or more of the requirements of this Regulation. If a waiver is granted, the Gaming Commission may impose alternative requirements.

Approved by:

September 4, 2014

_____

Dave Vialpando, Chairman

Date

Rev. 10-21-2014; 11-10-2014

Chelette Dec. Exhibit No. 6

TD000091

TRIBAL CHARTER OF INCORPORATION

Issued by

THE IIPAY NATION OF SANTAYSABEL

For the

SANTA YSABEL INTERACTIVE, INC.

A tribally chartered corporation

*******************************

RECITALS

WHEREAS, on September 28 2011, the Legislature, utilizing the Legislative Process as set forth in Article IV Section 3 of the Constitution, authorized and directed the Chairman of the Iipay Nation of Santa Ysabel (the "Chairman") to issue a tribal charter of incorporation to the Nation to establish the Santa Ysabel Tribal Development Corporation (SYTDC); and

WHEREAS, Article VII, Paragraph D of said tribal charter authorizes the SYTDC to "charter and to hold Tribal interests therein of subsidiaries or other subordinate organizations"; and

WHEREAS, by Unanimous Consent Resolution #13-09, dated July 26, 2013, the Board of Directors for the SYTDC has authorized the formation of SANTA YSABEL INTERACTIVE, INC. and the issuance of this tribal charter,

NOW, THEREFORE, I, Virgil Perez, Chairman of the Iipay Nation of Santa Ysabel, by virtue of the power conferred upon me by the said Act and delegated to me, do hereby issue this Charter of Incorporation (the "Charter") to the Santa Ysabel Tribal Development Corporation for Santa Ysabel Interactive, Inc., to be operative immediately.

ARTICLE I:  NAME

The name of the Corporation is Santa Ysabel Interactive, Inc.

ARTICLE II:  PRINCIPAL OFFICE AND REGISTERED OFFICE

A.  Principal Office.  The principal office of the Corporation shall be located within Tribal trust land in San Diego County, California.  The Corporation may have such other offices, either within or without Tribal trust lands, as the Board of Directors may designate or as the business of the Corporation may require from time to time.

B.  Registered Office.  The registered office of the Corporation may be, but need not be, identical with the principal place of business of the Corporation.  The registered office may be changed from time to time by the Board of Directors.

1 of 16

TD000313
Page E102

## ARTICLE III:  AUTHORITY FOR CHARTER

The Corporation is organized, incorporated, and chartered under the laws of the Iipay Nation of Santa Ysabel as a tribally chartered corporation and shall have the powers, privileges, and immunities granted by such laws, as embodied in this Charter.

## ARTICLE IV:  STATUS OF CORPORATION

A.     The Corporation is a legal entity wholly owned by the Nation, but distinct and separate from the Nation.  The activities, transactions, obligations, liabilities, and property of the Corporation are not those of the Nation.

B.     Nothing in this Charter shall be deemed to waive, or to permit the Corporation to waive, the sovereign immunity of the Nation.

C.     The Corporation shall have the same immunities under federal law as the Nation. The Corporation shall retain the Nation's tax exemption status and shall enjoy any tax advantages available to this type of corporation.

## ARTICLE V:  OWNERSHIP OF THE CORPORATION

A.     The total number of shares of common stock which the Corporation shall have authority to issue is [10,000] shares with no par value.

B.     100% of the shares of the Corporation shall be owned by the Santa Ysabel Tribal Development Corporation for the benefit of the Nation and its Members.

C.     The Board of Directors of the SYTDC shall appoint a representative or representatives to serve on the Board of Directors for Santa Ysabel Interactive, Inc. as Shareholder's representative(s), and all rights of the Shareholder shall be exercised by said appointees.  No individual member of the General Council, of the Legislature, or of the Executive Branch, as an individual member of the Nation, or any other person whomsoever shall be recognized as acting as or on behalf of the Nation as owner.

## ARTICLE VI:  PERIOD OF DURATION

The Corporation's duration of existence is perpetual, or until this Charter is revoked or surrendered as provided in Article XVI of this Charter.

## ARTICLE VII:  CORPORATE PURPOSES

The purposes for which the Corporation is organized are:

A.     To provide the Nation with economic development opportunities, and Members of the Nation with opportunities for employment; and

B.     To provide revenue to the Nation to fund its governmental operations and programs to improve the health, safety, and welfare of its Members; and

Chelette Dec. Exhibit No. 7

TD000314
Page E103

C.      To provide resources for the preservation and protection of the unique culture and heritage of the Nation; and

D.      To insulate the Nation's assets, other than the property and funds developed, acquired, used, or produced by or with respect to the Corporation, from obligations, liabilities, and claims of the Corporation and its business and operations; and

E.      To facilitate the borrowing of funds necessary and appropriate for the development and operation of the Corporation; and

F.      To buy, sell, lease and otherwise acquire and maintain buildings, offices, shops and other appurtenances proper and necessary for the carrying on of the business of the Corporation.

G.      To undertake and carry out any and all functions and activities which are necessary, appropriate, useful, or desirable for the furtherance, accomplishment, fostering, or attainment of the foregoing purposes, either directly or indirectly, and either alone or in conjunction or cooperation with other organizations, governmental, for profit, or non-for-profit, and persons; and

H.      To engage in any type of lawful business, enterprise or venture which promotes the economic development of the Nation within or without the boundaries of the Nation's reservation or trust lands.

## ARTICLE VIII:  CORPORATE POWERS

Subject to applicable federal law, the Corporation is authorized and empowered to engage in, carry on, and conduct any lawful business in which corporations may engage, including, but without limiting the broad authorization of the foregoing, the following:

A.      To sue and be sued in its Corporate name to the extent provided in Article XVII of this Charter.

B.      To purchase, take by gift, bequest, lease or otherwise and to own, hold, manage, operate, use and otherwise deal in and with real or personal property of every description or any interest therein, wherever situated, including the power to purchase land and issue in exchange therefore interests in corporate property; provided that the title to any real property acquired by the Corporation shall be put into federal trust status for the Nation whenever possible under federal law.

C.      To sell, convey, mortgage, pledge, lease as lessor or lessee, exchange, transfer or otherwise dispose of all or any part of its corporate property or assets in accordance with Tribal law and Section A of this Article VIII; provided that the Corporation has no authority to sell, mortgage, or lease as lessor any property of the Nation without the express consent of the General Council given in the specific instance; and provided further that the previous exception shall not prevent the Corporation from mortgaging or subleasing any leasehold interest that the Corporation may have as lessee of any property of the Nation.

Chelette Dec. Exhibit No. 7

TD000315

D.      To charter and to hold Tribal interests therein of subsidiaries or other subordinate organizations either owned in whole or in part by the Nation or to create divisions of the Corporation to carry on its business either within or without the lands of the Nation and in whatever form it deems appropriate; _provided_ that no form of business organization may be used which does not preserve and protect the immunities and assets of the Corporation.

E.      To enter into and make contracts of every kind and nature with any person, firm, association, corporation, municipality, nation, Indian tribe, state or body politic, without the approval of the Secretary of the Interior pursuant to 25 U.S.C. § 81, except when a mortgage, lien, or lease of trust or federally-restricted Indian property requires such approval pursuant to 25 U.S.C. § 415 or other applicable statute.

F.      Subject to the limitations imposed by Sections C and E of this Article VIII, to incur debts and raise, borrow and secure the payment of any money in any lawful manner, including the issue and sale or other disposal of stocks, bonds, indentures, obligations, negotiable and transferable instruments and evidence of indebtedness of all kinds, whether secured by mortgage, pledge, deed of trust or otherwise, without the approval of the Nation or the Secretary of the Interior, except when the use of trust or federally-restricted Indian property requires such approval.

G.      To apply for, obtain, register, purchase, lease or otherwise acquire, own, hold, use, operate and introduce, and to sell, assign or otherwise dispose of any trademark, trade name, patent, invention, improvements and processes used in connection with or secured under letters patent, and to use, exercise, develop, grant and give licenses in respect thereto.

H.      To apply for, purchase or acquire by assignment, transfer or otherwise, and to exercise, carry out and enjoy and license, power, authority, franchise, concession, right or privilege which any government or authority or any corporation or other public body may be empowered to enact, make, or grant, and, subject to the limitations imposed by Article IX, to pay for and to appropriate any of the Corporation's assets to defray the necessary costs, charges, and expenses thereof.

I.      To distribute all revenues of the Corporation to : (i) defray corporate obligations; (ii) make dividend payments to the Owner (as defined herein) of the Corporation; and (iii) establish and invest in a suitable capital reserve fund; _provided_ that the Board of Directors shall endeavor at all times to manage and operate the Corporation with the objective of minimizing expenses and maximizing dividends to the Nation.

J.      To employ or appoint employees and agents of the Corporation and define their duties and fix their compensation.

K.      To lend money for its corporate purposes, invest and reinvest its funds and take and hold real and personal property as security for the payment of funds so lent and invested.

L.      To adopt and amend bylaws for the regulation of the internal affairs of the ~~Corporation consistent with this Charter without the approval of the Secretary of the Interior.~~

Chelette Dec. Exhibit No. 7

TD000316
Page E105

M.      To pay pensions and establish pension plans, pension trusts, profit-sharing plans, and other incentive plans for any or all of its directors, officers and employees.

N.      To obtain a certificate of authority to transact business in any of the United States as a foreign corporation and to comply with applicable state law governing foreign corporations.

O.      To have and exercise all lawful powers incidental, necessary, or convenient to effect any or all of the purposes for which the Corporation is organized.

P.      To make and use a common seal and attest to the same.

Q.      To have any other lawful activity for which a tribal corporation may be later authorized by Congress and/or the Secretary.

### ARTICLE IX:  LIMITATIONS ON CORPORATE POWERS

A.      The Corporation shall have no power:

1.      To enter into any agreement of any kind on behalf of the Nation, either expressly or by implication;

2.      To waive the sovereign immunity of the Nation;

3.      To pledge the credit of the Nation;

4.      To dispose of, pledge, or otherwise encumber real or personal property of the Nation other than the Corporation's interests therein;

5.      To waive any right, privilege or immunity of, or release any obligation owed to, the Nation; or

6.      To enter into any sublease or other encumbrance or instrument respecting lands leased to the Corporation by the Nation without the express written approval of the Shareholder.  Such approval may be reflected in the written lease agreement(s) between the Iipay Nation of Santa Ysabel and the Corporation.

7.      To sell or otherwise dispose of all or substantially all of the Corporation's assets other than in the usual and regular course of business, without the prior written consent of the Shareholder.  Prior to any proposed sale or disposition of such assets, the Corporation shall give reasonable notice to the Shareholder.  The consent of the Shareholder to any such proposal, sale, or disposition shall be in the form of a tribal law or resolution, duly adopted in accordance with applicable Tribal law.

B.      Nothing in this Charter, and no action taken by the Corporation pursuant to the Charter, shall be construed as permitting, recognizing, or granting the State of California any regulatory jurisdiction or taxing jurisdiction over the property or activities of the Corporation or its employees located within the boundaries of the Nation's trust lands.

Chelette Dec. Exhibit No. 7

TD000317
Page E106

## ARTICLE X: SHAREHOLDER ACTION

A.  Annual Meeting. The annual meeting of the Shareholder shall be held as scheduled by the Corporation but no later than the 31st day of March of each year for the purpose of electing Directors, approving the Corporation's annual business plan and budget, and transacting any business that may come before said meeting.

B.  Special Meetings. Special meetings of the Shareholder, for any purpose or purposes, unless otherwise prescribed by applicable law, may be called by the Shareholders or a majority of the Directors. Special meetings shall require written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called. Such notice shall be delivered not less than ten (10) nor more than fifteen (15) days before the date of the meeting, either personally or by mail, to each of the directors of the Corporation. Any business in addition to that specified in the notice of the meeting may be transacted at any special meeting of the Shareholder.

1.  Emergency Meetings. Notwithstanding Paragraphs A and B of this Article X, the Shareholder may conduct emergency meetings of the Shareholder, whether in person or via telephone conference and upon written waiver of notice as required for a special meeting to address any matter critical to the operation of the Corporation where resolution of such matter at a special or annual meeting may result in potential harm to the Corporation. The reasons for conducting such emergency meetings, as well as the compilation of written waiver(s) of notice to the holding of such meeting, shall be entered in the minutes of such meeting.

C.  Meeting Procedures. At all meetings of the Shareholder, whether a regular meeting or a special meeting, the SYTDC Board of Directors shall sit in its capacity as the representative of the Shareholder of the Corporation, and not in any capacity as the SYTDC Board of Directors. Matters within the scope and legal authority of the Shareholder under this Charter shall only be discussed and decided by the SYTDC Board of Directors when sitting as the Shareholder's representatives at a Shareholder meeting duly called as provided in this Charter. On any issue or question presented to the Shareholder, a vote shall be taken of those members of the SYTDC Board of Directors present. All meetings and votes of the Shareholder shall be conducted consistent with the procedures applicable to SYTDC Board of Directors meetings, except that notice of special meetings shall also be consistent with paragraph B of this Article X.

## ARTICLE XI: BOARD OF DIRECTORS

A.  Management Authority. The business affairs of the Corporation shall be managed exclusively by its Board of Directors. The Iipay Nation of Santa Ysabel shall have no authority to direct the business affairs of the Corporation. The Santa Ysabel Tribal Development Corporation shall have no authority to direct the business affairs of the Corporation, except through its status as the sole shareholder of the Corporation and as provided in this Charter.

B.  Number and Positions. The Board shall consist of two (2) members elected by the SYTDC Board of Directors, but the number of Directors may thereafter be increased or decreased at any time by a duly adopted resolution of the Shareholders. The Board shall elect a

Chelette Dec. Exhibit No. 7

TD000318
Page E107

Chairperson, Vice-Chairperson, Treasurer and Secretary. The Chairperson and Vice-Chairperson must be members of the Board, but the Treasurer and Secretary may be members of the staff of the Corporation. The Treasurer shall serve as Treasurer of both the Corporation and the Board of Directors. The Secretary shall serve as the Secretary of both the Corporation and the Board of Directors. No two persons may hold more than one Board position except that the same person may be Secretary and Vice-Chair or Secretary and Treasurer provided that only a Director may be Vice-Chair. The Chairperson shall preside at Board meetings. The Vice-Chairperson shall assume the duties of the Chairperson in the absence of the Chairperson. The Tribal Council may appoint one or more of its members as non-voting, ex-officio members of the Board.

C.    How Elected. Elections shall be held at the regular meetings of the Shareholders of the Corporation. Nominations for each open position shall be made and seconded by Shareholders until nominations cease. The Shareholders shall elect a person to fill each open position from the list of seconded nominations for that position. The Shareholders may choose to vote by voice vote or by written ballot. The person receiving the highest number of votes for each position shall fill that position.

D.    Term of Office. The Directors shall be elected for terms of three (3) years each, and shall serve only for the term of office or until resignation, removal or death. When a term is completed, a vacancy shall occur. When electing Directors to increase the number of Directors or to fill a vacancy, the Shareholder may lengthen or shorten the term of office of any Director then being elected in order to achieve staggered terms of office. A Director may serve any number of consecutive three-year terms for which he or she is elected.

E.    Initial Board of Directors. The Initial Board of Directors of the Corporation shall be determined by the SYTDC Board of Directors at the time this Charter is issued.

F.    Qualifications of Directors.

1.    Each Director shall possess the level of business experience and expertise determined by the SYTDC Board of Directors as representative of the Shareholder to be necessary to carry out the duties of a Director and to contribute to the ability of the Corporation to achieve the purposes for which this Charter is issued.

2.    No person who has been convicted of a felony within the last five (5) years shall sit on the Board. A felony is a crime punishable by at least one (1) year in jail, regardless of whether the person actually served a full year in jail.

3.    No person who has ever been convicted of any crime involving theft or conversion of money or property shall sit on the Board.

4.    No employee of the Bureau of Indian Affairs shall be eligible to serve as a Director during the time of such employment.

5.    No member of the Tribal Council is eligible to serve as a Director of the Corporation at any one time, except for ex-officio Directors as stated in Article XI(B).

Chelette Dec. Exhibit No. 7

TD000319
Page E108

6.    No more than half of the members of the Board may be non-members of the Nation.

G.    Duties of Directors. The Board of Directors shall manage the general affairs and business of the Corporation. The Directors shall in all cases act as a Board, regularly convened, by a majority vote, and they may adopt such rules and regulations for the conduct of their meetings and the management of the Corporation as they may deem proper, not inconsistent with this Charter, the bylaws of the Corporation and applicable tribal or federal law. A Director shall perform the duties of a Director in good faith, in a manner the Director believes to be in or not opposed to the best interests of the Corporation and the shareholder, and with such care as an ordinarily prudent person would use under similar circumstances in a like position. In performing such duties a Director shall be entitled to rely on factual information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

1.    one or more officers or employees of the Corporation whom the Director reasonably believes to be reliable and competent in the matters presented;

2.    legal counsel, public accountants or other persons as to matters which the Director reasonably believes to be within such person's professional or expert competence; or

3.    a committee of the board upon which the Director does not serve, duly designated in accordance with a provision of the bylaws, as to matters within its designated authority, which committee the Director reasonably believes to merit confidence, but the Director shall not be considered to be acting in good faith if the Director has knowledge concerning the matter in question that would cause such reliance to be unwarranted.

H.    Conflicts of Interest.

1.    No sitting Board member shall engage in any activity that is, or creates the appearance of, a conflict of interest. A conflict of interest occurs when circumstances create a possibility that a Board member's duty of undivided loyalty to the Corporation might be compromised. Should a conflict of interest develop for a Director, he or she shall state the conflict in writing to the Chairperson of the Board, with a copy to the Shareholders representative. If the conflict cannot be avoided to the satisfaction of the Chairperson and Chairman, the Director shall immediately resign. In the event of a potential conflict of interest, a Director shall recuse himself or herself from any vote involving the potential conflict of interest.

2.    No member of the Board of Directors of the Corporation, and no husband, wife, parent, child, or sibling of a Board member, shall be a signatory to or beneficiary of any contract or agreement with the Corporation.

3.    No member of the Board of Directors of the Corporation shall have any financial interest in any business entity that is a signatory to or beneficiary of any contract or agreement with the Corporation.

Chelette Dec. Exhibit No. 7

TD000320
Page E109

4.      No member of the Board of Directors shall act as an agent of the Corporation without having authority to do so expressly granted to the Board member by a Resolution of the Board.

5.      No two persons who are married to each other, parent and child, in-laws, or siblings may sit on the Board at the same time.

I.      Directors' Meetings. Regular meetings of the Board of Directors shall be held immediately following the first regular meeting of the Shareholder to elect officers of the Board and the Corporation. Special meetings of the Board of Directors may be called by the Chairperson of the Board at any time, and shall be called by the Chairperson or the Secretary upon the request of the Tribal Council or of two Directors.

J.      Notice of Meetings. Notice of meetings, other than the regular semiannual meetings, shall require written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called. Such notice shall be delivered not less than five (5) days before the date of the meeting, either personally or by mail, to each of the Directors. No business other than that specified in such notice shall be transacted at any special meeting. This notice requirement may be waived at any time by individual Directors who do not receive such notice. At any meeting at which every member of the Board of Directors shall be present, although held without notice, any business may be transacted which might have been transacted if the meeting had been duly called.

K.      Quorum. At a meeting of the Board of Directors, a majority of the Board shall constitute a quorum for the transaction of business; but in the event of a quorum not being present, a lesser number may adjourn the meeting from time to time without further notice. Ex-officio members of the Board shall not be counted in reaching a quorum of the Board.

L.      Voting. At a meeting of the Board of Directors, each Director has a vote. Ex-officio members of the Board may not vote. A majority of a quorum of the Board of Directors carries any issue.

M.      Meeting Options. Except as otherwise restricted by the bylaws of the Corporation, members of the Board of Directors or any committee designated thereby may participate in a meeting of the Board or committee by means of a conference telephone call or similar communications equipment by which all persons participating in the meeting can hear each other at the same time and participation by such means shall constitute presence in person at a meeting. Except as otherwise restricted in the bylaws of the Corporation, any action required or permitted to be taken at a meeting of the Board of Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Directors, and the consent shall have the same effect as a unanimous vote.

N.      Resignation and Removal of Directors.

1.      Any Director may resign at any time by giving written notice to the Board Chair, and such resignation shall be effective on the date specified in the notice.

Chelette Dec. Exhibit No. 7

TD000321
Page E110

2.      Any one or more of the Directors may be removed for cause at any time by the SYTDC Board of Directors acting as the representative of the owner. In addition, any one or more of the Directors may be removed for cause at any time by the unanimous vote of the remaining Directors, at a special meeting called for that purpose or at a regular meeting. Cause for removal shall consist of malfeasance, misfeasance or non-feasance of office, gross neglect of duty, misconduct reflecting on the dignity and integrity of the Corporation, or an irresolvable conflict of interest. In addition, any Director who is absent from three (3) consecutive meetings of the Board, whether such meetings be regular meetings, special meetings, or a combination thereof, shall be automatically removed.

3.      The Director shall be informed in writing of the specific grounds for removal and shall be given a reasonable opportunity to respond in person or through counsel before a decision to remove is made.

4.      Any decision by the Board to remove a Director may be appealed to the Tribal Council acting as the representative of the owner. The owner's decision concerning removal shall be final, and shall not be subject to any further appeal or review.

O.      Vacancies. Whenever any vacancy shall occur in the Board of Directors by death, resignation, removal or otherwise, the same shall be filled without undue delay by the Shareholder at a special meeting of the Shareholder's representative which shall be called for that purpose. Such election shall be held within sixty (60) days after the occurrence of such vacancy. The person so chosen shall hold office until the next regular meeting or until a successor shall have been chosen at a special meeting of the Shareholder.

P.      Presumption of Assent. A Director who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken, unless such dissent shall be entered in the minutes of the meeting or unless the Director shall file a written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the Secretary of the Corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favor of such action.

Q.      Liability of Directors. A Director shall not be personally liable to the Corporation or its Shareholder for monetary damages for breach of fiduciary duty as a Director unless:

1.      the Director has breached or failed to perform the duties of the Director's office as provided in paragraph G of this Article XI, and

2.      the breach or failure to perform constitutes willful misconduct or recklessness.

R.      Council Member/Tribal Employee Directors. Tribal Council members or employees of the Nation serving as Directors shall not be deemed to be acting within the scope of their duties as Council members or tribal employees or acting in any other capacity while acting on behalf of the Corporation or under color of office of the Corporation.

Chelette Dec. Exhibit No. 7

TD000322
Page E111

S.     Compensation. The Directors shall receive such compensation and expense reimbursement as is reasonable, prudent, and consistent with the Corporations budgets pursuant to this Charter. Director compensation and expense reimbursement shall be subject to written policies and procedures drafted by the Board of Directors and approved by the Shareholders representative. The Board shall disclose to the Shareholders representative each Directors compensation and reimbursements.

## ARTICLE XII: OFFICERS

A.     Officer Positions. The officers of the Corporation shall be the Chairperson, Vice-Chairperson, Treasurer and Secretary elected pursuant to paragraph B of Article XI of this Charter.

B.     Staff Positions and Duties. The staff position(s), job description(s), duties, and powers of the staff of the Corporation shall be provided in the Corporations bylaws and/or the business plans. Staff positions shall not be created and staff shall not be directed to perform work that unnecessarily duplicates the duties of employees of the tribal government or the Board of Directors or otherwise imprudently expends the Corporations financial resources. The Corporation shall limit staff positions to part-time employees to the extent possible and consistent with the best interests of the Nation.

C.     Staff Compensation. The staff shall receive such compensation and expense reimbursement as is reasonable, prudent, and consistent with the Corporations budgets and budgets for the construction and operation of justice program and facilities pursuant to this Charter. Staff compensation and expense reimbursement shall be subject to written policies and procedures drafted by the Board of Directors and approved by the Shareholders representative. The Board shall disclose to the Shareholders representative each Staff member's compensation and reimbursements.

D.     Council Member/Tribal Employee Officers and Staff. Tribal Council members or Tribal employees serving as officers or staff of the Corporation shall not be deemed to be acting within the scope of their duties as members of the Legislature, the Executive Branch or tribal employees or acting in any other capacity while acting on behalf of the Corporation or under color of office of the Corporation.

## ARTICLE XIII: INDEMNIFICATION

The Corporation may, in the discretion of the Board of Directors, indemnify any current or former Director, officer or employee against (i) reasonable expenses actually and necessarily incurred by such person in connection with the defense of any action, suit, or proceeding in which such person is made a party by reason of being, or having been, such Director, officer or employee of the Corporation, and (ii) the reasonable costs of settlement of any such action or proceeding, if a majority of Board members not seeking indemnification or otherwise involved in the controversy shall determine in good faith that:

1.     ~~such person did not act, fail to act, or refuse to act willfully or with gross~~ negligence or with fraudulent or criminal intent; and

Chelette Dec. Exhibit No. 7

TD000323
Page E112

2.      any legal fees paid or any settlements made are reasonable; and

3.      the person seeking indemnification did not act beyond the scope of his or her employment or office; and

4.      it is in the best interests of the Corporation that indemnification be made.

### ARTICLE XIV:  DIVIDENDS

A.      The Board of Directors may declare dividends from the surplus profits of the Corporation whenever, in its opinion, the condition of the Corporation's affairs will render it expedient for such dividends to be declared; provided, that no distribution may be made if either:

1.      the Corporation would not be able to pay its debts as they become due in the usual course of its business; or

2.      the Corporation's total assets would be less than the sum of its total liabilities.

B.      All dividends declared by the Board of Directors shall be paid to the Nation as the owner of the Corporation and in such a manner to distribute equally these funds.

### ARTICLE XV:  REPORTS TO OWNER

A.      The Corporation shall maintain its financial records in conformity with generally accepted accounting principles.

B.      No less frequently than quarterly, the Board of Directors of the Corporation shall report in writing to the SYTDC Board of Directors, as the representative of the owner of the Corporation, on the financial and operating condition of the Corporation, including the assets and liabilities of the Corporation and the official actions of the Corporation's officers.

C.      The Board of Directors of the Corporation shall prepare a Business Plan and submit it to the Business Committee for review and approval not less than 30 days prior to the beginning of each fiscal year.

D.      The financial and operating records of the Corporation shall at all reasonable times be open to inspection by the representative of the owner of the Corporation designated by resolution of the Tribal Council, as representative of the Shareholder of the Corporation.

E.      The Corporation shall, within 120 days following the close of the Corporation's fiscal year, submit to the SYTDC Board of Directors, as representative of the Shareholder of the Corporation, an audited financial statement showing the status of the Corporation as of the last day of the Corporation's fiscal year.

---

Chelette Dec. Exhibit No. 7

TD000324
Page E113

## ARTICLE XVI: DISSOLUTION AND REVOCATION

A.    After issuance of this Charter, the business of the Corporation may be suspended or the Corporation may be dissolved, and this Charter revoked, only as provided in this Article.

B.    The business of the Corporation may be suspended, and/or the Corporation may be dissolved as follows:

1.    The Board of Directors shall adopt a resolution recommending that the business of the Corporation be suspended and/or the Corporation dissolved and directing that the question of suspension and dissolution be submitted to a vote of the Shareholders at a meeting of the Shareholders, which may be either a regular or special meeting.

2.    Written notice shall be given to the Shareholders in the manner provided in this Charter for giving notice of meetings of the Shareholders, and shall state that the purpose, or one of the purposes, of the meeting is to consider the advisability of dissolving the Corporation and revoking this Charter.

3.    At the meeting, a vote shall be taken on a resolution to dissolve the Corporation.

4.    Upon adoption of the resolution, a statement of intent to suspend business and/or to dissolve shall be executed by the Corporation by its Chairperson or Vice-Chairperson and by its Secretary and verified by one of the officers signing the statement, and shall be delivered to the Chairman of the Iipay Nation of Santa Ysabel.

5.    Upon filing of the statement of intent to suspend business and/or to dissolve with the Secretary of the Interior, the Corporation shall cease to carry on its business, except insofar as necessary for the winding up thereof, but its corporate existence shall continue until this Charter is revoked by resolution of the SYTDC Board of Directors.

6.    After filing the statement of intent to suspend business, the Corporation shall follow the procedures provided in the bylaws.

7.    After filing the statement of intent to dissolve, the Corporation shall immediately cause notice thereof to be mailed to each known creditor of the Corporation; shall proceed to collect its assets, convey and dispose of such of its properties as are not to be distributed in kind to its Shareholder, pay, satisfy and discharge its liabilities and obligations and do all other acts required to liquidate its business and affairs, and, after paying or adequately providing for the payment of all its obligations, distribute the remainder of its assets, either in cash or in kind, to its Shareholder.

8.    By resolution of the at any time prior to revocation of this Charter by the SYTDC Board of Directors, the Corporation may revoke voluntary dissolution proceedings. Written notice of the revocation shall be filed with the SYTDC Board of Directors' official minutes. Upon filing the notice of revocation of voluntary dissolution proceedings, the revocation shall be effective and the Corporation may again carry on its business.

Chelette Dec. Exhibit No. 7

TD000325
Page E114

9.      If voluntary dissolution proceedings have not been revoked, when all debts, liabilities and obligations of the Corporation have been paid and discharged, or adequate provision has been made therefore, and all of the remaining property and assets of the Corporation have been distributed to the owner of the Corporation, the SYTDC Board of Directors shall take all actions necessary to revoke this Charter and dissolve the Corporation.

### ARTICLE XVII: CLAIMS AGAINST THE CORPORATION

A.      The Corporation is an instrumentality of the Iipay Nation of Santa Ysabel and is entitled to all of the privileges and immunities of the Nation, except as provided in this Article XVII.

B.      The Corporation is authorized to waive, as provided in this Article XVII, any defense of sovereign immunity from suit that the Corporation, its directors, officers, employees or agents may otherwise enjoy under applicable federal, state or tribal law, arising from any particular agreement, matter or transaction as may be entered into to further the purposes of the Corporation, to consent to suit in state and/or federal court, and to consent to alternative dispute resolution mechanisms such as arbitration or mediation.

C.      The Corporation is authorized to waive, as provided in this Article XVII, any defense the Corporation, its directors, officers, employees or agents may otherwise assert that federal, state or tribal law requires exhaustion of tribal court remedies prior to suit against the Corporation in a state or federal court otherwise having jurisdiction over the subject matter and the parties.

D.      Any waiver by the Corporation authorized by paragraph B or C of this Article XVII shall be in the form of a resolution duly adopted by the Board of Directors, a copy of which resolution shall be mailed to the Shareholder, but the resolution shall not require the approval of the Iipay Nation of Santa Ysabel or the Secretary of the Interior. The resolution shall identify the party or parties for whose benefit the waiver is granted, the transaction or transactions and the claims or classes of claim for which the waiver is granted, the property of the Corporation which may be subject to execution to satisfy any judgment which may entered in the claim, and shall identify the court or courts in which suit against the Corporation may be brought. Any waiver shall be limited to claims arising from the acts or omissions of the Corporation, its directors, officers, employees or agents, and shall be construed only to affect the property and income of the Corporation.

E.      Nothing in this Charter, and no waiver of the Corporation's sovereign immunity pursuant to this Article shall be construed as a waiver of the sovereign immunity of the Iipay Nation of Santa Ysabel or any other instrumentality of the Iipay Nation of Santa Ysabel, and no such waiver by the Corporation shall create any liability on the part of the Iipay Nation of Santa Ysabel or any other instrumentality of the Iipay Nation of Santa Ysabel for the debts and obligations of the Corporation, or shall be construed as a consent to the encumbrance or attachment of any property of the Iipay Nation of Santa Ysabel or any other instrumentality of the Iipay Nation of Santa Ysabel based on any action, adjudication or other determination of liability of any nature incurred by the Corporation.

Chelette Dec. Exhibit No. 7

F.      Nothing in this Charter, and no action taken by the Corporation pursuant to this Charter, shall be construed as permitting, recognizing, or granting the State of California any regulatory jurisdiction or taxing jurisdiction over the property or activities of the Corporation or its employees located within the boundaries of the Iipay Nation of Santa Ysabel's Indian country.

## ARTICLE XVIII:  AMENDMENTS

A.      The authority to petition for amendments to this Charter is vested in the Shareholders, but such amendments shall have no legal effect until ratified by the SYTDC Board of Directors.

Chelette Dec. Exhibit No. 7

TD000327
Page E116

## CERTIFICATE OF APPROVAL

I, Virgil Perez, Chairman of the Iipay Nation of Santa Ysabel, by virtue of the authority granted to me do hereby approve this Tribal Corporate Charter for use by the Santa Ysabel Interactive, Inc. It shall become effective immediately; provided that nothing in this approval shall be construed as authorizing any action under this document that would be contrary to Federal law. Upon approval of the Charter, the Directors will enact bylaws to be approved by the Shareholders, within 180 days.


Virgil Perez
Chairman
Iipay Nation of Santa Ysabel

Date:  7-26-13

Chelette Dec. Exhibit No. 7