1  Little Fawn Boland (CA No. 240181)
   Ceiba Legal, LLP
2  35 Madrone Park Circle
   Mill Valley, CA 94941
3  Phone: (415) 684-7670 ext. 101
   Fax: (415) 684-7273
4  littlefawn@ceibalegal.com
5

6  In Association With
   *Pro Hac Vice*
7  Kevin C. Quigley (MN No. 0182771)
8  Gray, Plant, Mooty, Mooty & Bennett, P.A.
   80 South Eighth Street
9  Minneapolis, MN 55402
10 Phone: (612) 632-3398
   Fax: (612) 632-4398
11 kevin.quigley@gpmlaw.com
12
13 *Pro Hac Vice*
   Scott Crowell (AZ No. 009654)
14 Crowell Law Office-Tribal Advocacy Group
15 1487 W. State Route 89A, Ste. 8
   Sedona, AZ 86336
16 Phone: (425) 802-5369
   Fax: (509) 290-6953
17 scottcrowell@clotag.net
18
19
20
21
22
23
24
25
26
27
28

Declaration of David Vialpando in Support of Tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                          3:14-cv-02724-AJB-NLS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, | CASE NO. 3:14-cv-02724-AJB-NLS |
| Plaintiff, | CASE NO. 3:14-cv-02855-AJB-NLS |
| v. | |
| IIPAY NATION OF SANTA YSABEL, *et al*. | **DECLARATION OF DAVID VIALPANDO IN SUPPORT OF TRIBAL DEFENDANTS' CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO USA AND STATE OF CALIFORNIA MOTIONS FOR SUMMARY JUDGEMENT [ECF #61 & #63]** |
| Defendants. | |
| UNITED STATES OF AMERICA, | **[FRCP RULE 56 & 65]** |
| Plaintiff, | |
| v. | Hearing Date:   June 27, 2016 |
| IIPAY NATION OF SANTA YSABEL, *et al*. | Time:                3:00pm |
| | Courtroom:       3B |
| Defendants. | Judge:  **Hon. Anthony J. Battaglia** |

Declaration of David Vialpando in Support of Tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                                                 3:14-cv-02724-AJB-NLS

I, David Vialpando, declare as follows:

1.    I make this declaration in support of the Tribal Defendants' Consolidated Points and Authorities in Opposition to Plaintiffs United States ("USA") and State of California ("California") Motions for Summary Judgment.  If called and sworn, I would testify competently to the following from my personal knowledge.

2.    I am the Chairman of the Santa Ysabel Gaming Commission ("SYGC"), the tribal regulatory authority of the Iipay Nation of Santa Ysabel ("Iipay"), a federally recognized Indian tribe.  I have served in this capacity since December 2012.

3.    My duties as SYGC Chairman include ensuring that all gaming enterprises operated on Iipay Indian lands by tribal entities owned by Iipay comply with applicable tribal laws and regulations, as well as federal law, including the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq., P.L. 100-497, 102 Stat. 2467 ("IGRA") and applicable regulations promulgated by the National Indian Gaming Commission ("NIGC").

4.    SYGC is the primary regulator under Iipay law of Desert Rose Bingo ("DRB"), a tribal gaming business located on Iipay sovereign lands owned and operated by Santa Ysabel Interactive, Inc. ("SYI"), a tribally-chartered corporation and wholly owned subsidiary of  Santa Ysabel Tribal Development Corporation ("TDC"), a tribally-chartered corporation wholly owned by Iipay.

5.    Prior to serving as Chairman of SYGC, my professional career included numerous regulatory duties and responsibilities related to the gaming industry, specifically Indian gaming.  From February 2008 to November 2012, I was the Special Agent-in-Charge Southern California for the California Department of Justice, Bureau of Gambling Control, with responsibility for ensuring regulatory compliance by tribal casinos located in my assigned area.  Prior to being promoted to Special-Agent-in-Charge, from July 2005 to February 2008, I served as a Special

Agent Supervisor in the Riverside and Los Angeles offices of the Bureau of Gambling Control with responsibility for ensuring regulatory compliance by tribal casinos located in those areas.

6.      In addition to serving as SYGC Chairman, for the last several years I have also served as a gaming commissioner for another tribal regulatory agency overseeing regulation of a tribal gaming operation located on Indian lands within the exterior boundaries of the State of California.

7.      In February 2010, Iipay's legislature passed Legislative Bill 05-09, which enacted the "Iipay Nation of Santa Ysabel Gaming Ordinance" ("Iipay Gaming Ordinance") for the purpose of authorizing and regulating the terms and conditions under which gaming may be conducted within the boundaries of the Santa Ysabel Indian Reservation.

8.      On April 30, 2010, the National Indian Gaming Commission ("NIGC") approved the Iipay Gaming Ordinance pursuant to IGRA; this ordinance replaced Iipay's original gaming ordinance first approved by the NIGC in 1996.

9.      SYGC was established under Section XI, Paragraph A of the Iipay Gaming Ordinance to exercise regulatory authority over all gaming activities conducted within the jurisdiction of Iipay and, pursuant to Section XI, Paragraph G, is empowered, subject to Executive Branch and Legislative Branch review and comment, to promulgate regulations to implement the provisions of the Iipay Gaming Ordinance, including those necessary to the interpretation and application of the Iipay Gaming Ordinance by SYGC in connection with exercising its regulatory powers.

10.      Based upon my experience in the Indian gaming regulatory industry, I am well acquainted with the historical developments concerning the evolution of Class II bingo gaming under IGRA.

11.      For example, I am aware that in 2002 the NIGC revised its original Part 502 regulations in connection with the definitions associated with what

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion          2          3:14-cv-02724-AJB-NLS

1   constitutes Class II gaming and Class III gaming under IGRA.  These revisions
2   were designed to conform the NIGC's original 1990s-era regulations to subsequent
3   court decisions that interpreted which "electronic" gaming devices may properly be
4   classified as Class II games.

5       **12.**   I am also aware that following the 2002 amendments to the Part 502
6   definition regulations, a Tribal Gaming Working Group, consisting of Indian
7   gaming regulators and industry leaders, worked with the NIGC to bring forth new
8   regulations that would be consistent with IGRA's regulatory structure and the
9   tribes' historical sovereign rights to govern their gaming activities on their lands.
10  The end result was the adoption in November 2008 of NIGC regulations published
11  at 25 CFR Part 547 - Minimum Technical Standards for Class II Gaming Systems
12  and Equipment (73 Fed Reg. 60508 (Oct. 10, 2008)and 25 CFR Part 543 -
13  Minimum Internal Control Standards for Class II Gaming (73 Fed Reg. 60492 (Oct.
14  10, 2008).

15      **13.**   I am also aware that Parts 543 and 547 have been amended by the
16  NIGC as of October 2012, 77 Fed. Reg. 58708 (Sept. 21, 2012) and 77 Fed. Reg.
17  58473 (Sept. 21, 2012).

18      **14.**   The Part 543 and 547 regulations recognize that tribal gaming agencies
19  have the primary day-to-day responsibility of Class II gaming under IGRA.

20      **15.**   I am aware that in their role as the primary regulators of Class II
21  gaming, tribal gaming agencies are the regulatory bodies which must approve and
22  license a server-based electronic bingo gaming system before the gaming system is
23  allowed to be placed on a tribal casino gaming floor for play.

24      **16.**   As part of their approval and licensing process of a server-based
25  electronic bingo gaming system, tribal gaming agencies must also affirmatively
26  make a classification decision that the system components constitute "technologic
27  aids" to bingo game play, otherwise the gaming system will not be permitted as a
28  Class II game.

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                3                3:14-cv-02724-AJB-NLS

17.    I am aware that tribal gaming agencies have made these classification determinations on a regular basis all over Indian country since the advent in the late 1990's of tribal casinos conducting bingo games played using the technologic aids contained in a gaming system built with client-server architecture.

18.    Key provisions of Parts 543 and 547 are consistent with this, and recognize the foundational principle of IGRA that Tribal governments are the primary regulators of Class II gaming conducted on their Indian lands by rightly delegating to the Tribal Gaming Regulatory Authority ("TGRA") the legal responsibility and authority to make a classification determination as to whether a server-based electronic bingo gaming system is properly classified as Class II gaming.  These provisions include Part 543.8(g) which requires the TGRA [not the NIGC] to establish procedures to safeguard integrity of technologic aids to the play of bingo during installations and operations, including procedures that require:  (1) the TGRA [not the NIGC] to approve "all technologic aids before they are offered for play; and (2) the TGRA [not the NIGC] to determine that all "Class II gaming systems" comply with Part 547 standards.

19.    Part 547.5(c) requires that the TGRA [not the NIGC] "may not permit the use of any Class II gaming system, unless following receipt of the testing lab's report, "the TGRA [not the NIGC] makes a finding that the Class II gaming system" conforms to the standards established by Part 547, applicable provisions of Part 543 and those standards further established by the TGRA [not the NIGC].

20.    Based upon the foregoing and my experience in the Indian gaming regulatory industry, it is my understanding that the NIGC has, by final agency action, acknowledged that tribal gaming agencies are the proper regulatory agencies under IGRA empowered to make the final decision for approval of innovative server-based electronic-linked bingo game systems (i.e. those with client-server architecture) so long as it is determined by a tribal gaming agency that such systems meet all of the required criteria as noted above in Parts 543 and 547 and tribal laws

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion          4          3:14-cv-02724-AJB-NLS

and regulations.

21.     Attached hereto as *Vialpando Dec. Exhibit No. 1* is an article containing an in-depth analysis of the tribal gaming agency's primary role in classifying server-based electronic bingo gaming systems under IGRA, which analysis I agree with and reflects my understanding of this issue.

22.     Attached hereto as *Vialpando Dec. Exhibit No. 2* is a true and correct copy of the NIGC's "MICS Class II – Audit Checklist, Bingo (BI)." This checklist for 25 CFR §543.8 highlights that it is the SYGC that has authority and responsibility under IGRA for approving server-based electronic bingo gaming systems for play in tribal casinos, and for ensuring that "Class II gaming systems" comply with the standards established for these gaming systems under 25 CFR Part 547.  See questions Nos. 129-130.  This checklist also highlights that both manual and electronic bingo using client-server architecture are permitted under IGRA. See, e.g. questions Nos. 29-42 vs. 43-47.  This checklist also highlights that, in connection with electronic bingo using client-server architecture, IGRA permits the ball draw for the bingo game to be made solely by an "electronic aid" (i.e. by software program on a server rather than by a mechanical "ball blower").  See question No. 51.

23.     In order to describe the regulatory requirements for Class II bingo gaming systems and equipment used in connection with bingo games conducted on Iipay Indian lands, SYGC exercised its regulatory powers to promulgate a regulation,   SYGC Regulation 14-I009 ("SYGC 14-I009"), governing the procedures for approval of Class II bingo gaming systems and equipment.

24.     Unlike SYGC, the NIGC does not have any regulations or rules of this type that expressly prescribes the classification determination process and describes the classification criteria to be considered for such a determination in connection with a bingo game played using a Class II gaming system.

///

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    5                    3:14-cv-02724-AJB-NLS

25.     SYGC 14-I009 establishes (1) that "technologic aids" with the conduct of Class II gaming activities are generally permitted (§3.0), (2) a specific classification determination application process and the requirements for the application submission, including, among other documentation, submission of a testing lab's report certifying the gaming system's compliance with the standards set forth in SYGC 14-I009 and Part 547 (§4.0); and (3) the classification criteria that SYGC is to consider when making a classification determination with respect to the gaming system before it is offered for play (§5.0).

26.     Prior to DRB commencing operations, SYGC promulgated Regulation 14-I010 ("SYGC 14-I010") pursuant to its authority under the Iipay Gaming Ordinance, which regulation (1) declared that the gaming to be offered by DRB using a gaming system technology platform called the "Virtual Private Network Aided Play System" ("VPNAPS") "shall be deemed to take place where the servers are located on the Indian lands of the Nation, regardless of a player's physical location" (§3.0) and (2) required that the servers used by DRB "shall be located in a restricted area of a Gaming Facility situated within the territorial limits of the Santa Ysabel Indian Reservation on Indian lands" (§4.0).

27.     SYGC 14-I010 is consistent with substantive tribal law which has been enacted by legislative action of the Iipay in adopting the Iipay's "Tribal Business Transactions Code" ("Tribal Business Transactions Code") that, among other things, declared as matter of tribal substantive law that any consumer dealings between any Iipay tribal gaming enterprise conducting Class II gaming (as defined by IGRA) and any persons wherever located "shall be conclusively deemed to be [] entered into, formed and made on the Tribe's Indian lands."

28.     Prior to DRB commencing operations, SYGC promulgated Regulation 14-I011 ("SYGC 14-I011") pursuant to its authority under the Iipay Gaming Ordinance, which regulation provided requirements for the gaming to be offered by DRB using the VPNAPS gaming system, including, among others, those

concerning (1) licensing of the gaming system vendor, (2) gaming system internal control features, (3) physical security of the gaming system, (4) system architecture, (5) cyber-attack protection features, (6) data security, (7) bingo rules, (8) patron registration site display information, (9) registration process for patrons, (10) patron account restrictions, (11) patron access restrictions, (12) account funds security, (13) record keeping, (14) advertising and promotions, (15) patron disputes resolution, (16) testing lab qualifications, and (17) problem gambling policies.

**29.**   At no time have SYGC 14-I009, SYGC 14-I010, and/or SYGC 14-I011 been submitted for approval to the NIGC.

**30.**   Prior to DRB commencing operations, SYI submitted to SYGC a written classification determination application under SYGC 14-I009 seeking a "Class II gaming system" determination with respect to its plan to offer Class II bingo games using the VPNAPS gaming system.

**31.**   Upon receipt of the SYI written classification determination application, I first ensured that all the supporting documentation required under Section 4.0(b)(1) of SYGC 14-I009 had been provided by SYI.

**32.**   This documentation included two written legal opinions from Tom Foley ("Foley Game Play" and "Foley Gaming System" opinions), a former Commissioner and Acting Chairman of the NIGC, which contained in-depth legal analysis and reasoning in connection with current NIGC definition regulations and classification standards relating to the proper evaluation factors that tribal gaming agencies have used under IGRA since 2002 in making a classification determination in connection with server-based electronic-linked bingo systems.

**33.**   Before making any classification determination, I reviewed and critiqued the Foley Game Play and Gaming System opinions, reviewed the BMM testing lab certification report information provided for the VPNAPS gaming system, and reviewed and analyzed the other certifications and materials provided by SYI to confirm that the gaming system met the standards and criteria established

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                7                3:14-cv-02724-AJB-NLS

by Section 5.0 of SYGC 14-I009.

34.     On October 24, 2014, following my review, analysis and evaluation of all applicable tribal and federal laws, regulations and standards, and pursuant to SYGC's authority under the Iipay Gaming Ordinance, SYGC 14-I009 and 25 CFR Parts 543 and 547, I issued a "Classification Determination" regarding the version of the VPNAPS gaming system ("Desert Rose Bingo v.1.5 rev 6171") to be used by DRB upon opening game play to paying patrons, concluding that the VPNAPS gaming system constitutes a Class II "technologic aid" to the game of "bingo" for purposes of IGRA.

35.     In making my classification determination, I specifically took into account IGRA (particularly 25 U.S.C. §2703(7)(A)), 25 CFR §§502.3, 502.7, 502.8, the NIGC's federal register publication of the Final Rule for Part 502 definitions, 67 Fed. Reg. 41166, 41171 (June 2002), the Iipay Gaming Ordinance, SYGC 14-I009, SYGC 14-I011, SYGC 14-I010, and the Tribal Business Transactions Code.

36.     In making my classification determination, I specifically considered and evaluated the fact that under SYGC 14-I009, the SYGC has determined:

(a)     "Technologic Aids" include "but are not limited to, auto-daub readers or other card cover assist features, proxy play software programs, telephones, cables, televisions, screens, satellites, bingo blowers, electronic player stations and electronic cards. See §5.0(b)(3).

(b)     "Bingo is at its core essentially a peer-to-peer number and card pattern matching game." See §5.0(d)(1).

(c)     "The fundamental aspects or characteristics of Bingo to be played consistent with the standards required by [SYGC 14-I009 are]:

(i)     The game is played for prizes, including monetary prizes:

(a)     with cards bearing numbers;

(b)     in which card holders match (i.e., cover) the numbers contained on their cards when objects with

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                8                3:14-cv-02724-AJB-NLS

1

similar numbers are drawn or electronically determined; and

2

(c)  the game is won by the first person holding a card containing a match of the previously designated game-ending pattern;

3

4

(ii)  The Class II Gaming System mechanism for drawing or electronically determining the objects to be used for matching pre-designated patterns on a card must meet applicable standards for ensuring randomness as set forth in the NIGC Technical Standards or as established by the Gaming Commission;

5

6

7

8

9

(iii)  Actual prize values must be defined before a prize can be awarded, but need not be defined before the start of a game; and

10

11

(iv)  A game must require peer-to-peer competition between at least two (2) participants; however, those participants do not need to be physically located at the same location if the game is played using a Class II Gaming System."

12

13

See §5.0(d)(2).

14

15

(d)  That among the "aspects or characteristics which are consistent with, but not required for Bingo to be played" are the following:

16

17

(i)  "The card may be in physical or electronic/digital form, and may be multi-dimensional;"

18

(ii)  "Account Holders may engage agents located on the Indian lands of the Nation to assist with the play of the Bingo game on behalf of the Account Holders (also known as "proxy play");"

19

20

21

(iii)  "Account Holders may engage their proxy play agents using a Class II Gaming System containing a component that facilitates access [through a communication connection] between Account Holders and their proxy agents located on the Nation's Indian lands which assists with proxy play on behalf of the Account Holder;"

22

23

24

25

(iv)  "Use of technologic aids such as auto-daub features or reader/dauber devices are expressly permitted to assist the proxy agent playing Class II bingo games on the Account Holder's behalf in determining whether a held card has a pre-designated pattern matching the numbers drawn for the Class II bingo game;" and

26

27

28

(v)     "There is no requirement for the proxy agent playing the Bingo game on the Account Holder's behalf to manually declare a "bingo" upon matching the numbers drawn with the pre-designated game-ending pattern on a card in order to collect the game-ending prize award."

See §5.0(d)(3).

37.     In making my classification determination, I also specifically considered and evaluated the fact that under SYGC 14-I009, the SYGC has determined:

(a)     "It is not necessary to impose any requirements that are intended to:

(i)     Limit the use of Technologic Aids in connection with assisting with the play of Bingo games, displaying cards, assisting with automatically and electronically identifying numbers drawn and determining whether any card contains those numbers as they are drawn, or assisting with identifying game-ending and other prize winning patterns and claiming prizes associated with those patterns;

(ii)    Limit the speed of play, card configuration, or the total number of number draws in a game;

(iii)   Limit how or when cards are distributed for a game;

(iv)    Limit the sequence of a numbers draw for a game;

(v)     Limit how prizes are to be claimed;

(vi)    Limit the type of entertaining display contained in a Class II Gaming System;

(vii)   Limit the maximum number of participants in any game of Bingo; or

(viii)  Limit the use of proxy play agents to assist with proxy play of Bingo on behalf of Account Holders."

See §5.0(d)(4).

38.     In making my classification determination, I also took into consideration the Game Play and Gaming System descriptions submitted by SYI in connection with the bingo games DRB intended to offer using the VPNPAS gaming system.

///

**39.** In making my classification determination, I also took into consideration the legal analysis and reasoning contained in the Foley Game Play and Foley Gaming System opinions submitted by SYI in connection with the bingo games DRB intended to offer using the VPNPAS gaming system.

**40.** In making my classification determination, I also applied my extensive knowledge and experience in regulating Indian gaming operations.

**41.** My knowledge and experience in regulating Indian gaming operations includes my tenure as SYGC Chairman overseeing regulation of the Class II electronic bingo game systems offered by Iipay at its "brick-and-mortar" casino called the Santa Ysabel Resort and Casino while it was open to the public.

**42.** The Class II electronic bingo game systems offered by Iipay at the Santa Ysabel Resort and Casino contained the standard client-server architecture used by server-based electronic-linked bingo game systems that have been approved and licensed by tribal regulators on a regular basis as a "Class II gaming system" for operation in Indian casinos since the Parts 543 and 547 regulations were promulgated in 2008.

**43.** The basic design features of today's standard "Class II gaming system" are:  client-server architecture with the game play servers located in a secure back room electronically linked to patron interface terminal boxes with entertaining video display screens which are located in the public space of the tribal gaming facility – i.e. "wholly-electronic format."

**44.** In making my classification determination, I took into consideration the fact that, except for a "proxy play technology set" and enhanced access security features contained in the VPNAPS gaming system, the system's design features are basically the same as today's standard "Class II gaming system" built with client-server architecture.

**45.** The size of the servers used as part of a "Class II gaming system" in use today in Indian casinos are approximately same size as the servers contained in

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion          11          3:14-cv-02724-AJB-NLS

the VPNAPS gaming system.

46.     With the "Class II gaming system" in use today, all of the game play video displays on the tangible components of the gaming system, including the "electronic cards" generated for the game, are merely a visual representation of the bingo mathematics and game management software programs electronically run on the back room math and game management servers.

47.     The key feature of today's "Class II gaming system" for purposes of IGRA is the same one contained in the VPNAPS gaming system:   at least two patrons (or their proxies in the case of the DRB gaming) must have requested bingo cards for the same common game (i.e. "head-to-head competition" among persons is required) or the bingo game will not start and the bingo mathematics and game management software programs will not electronically run.

48.     In other words, with today's "Class II gaming system," the bingo game play originates on the math and game management servers located in the secure back office area of the tribal casino, and the game results are then sent on a time delayed basis via a communication link to the patron's interface (there is no requirement that this patron interface be a "fixed unit," see 25 CFR Part 547.2 (definition of "player interface"), where the game results are revealed by software components that "translate" the winning or losing associated with the patron's bingo card into an entertaining graphic display.

49.     Other than making a request to join a game by purchasing a bingo card, the patron need not take any other action to play bingo games using a standard "Class II gaming system" if the tribal casino chooses to activate the gaming system's "auto-daub" functionality.

50.     In this respect, in making my classification determination, I took into consideration the fact the NIGC now states that (a)  permitting a device to assist the player to "cover" when the numbers are drawn is consistent with the second and third elements of IGRA's three statutory requirements for a game of bingo, and (b)

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    12                    3:14-cv-02724-AJB-NLS

1   these so-called "One Touch Bingo" systems do not change the "fundamental aspect
2   of bingo" since in a linked electronic system a "player is still competing with other
3   bingo players for a prize."

4       **51.**   In making my classification determination, I took into consideration
5   the fact the designers of the VPNAPS gaming system started with the standard
6   electronically linked server-based bingo gaming system operated in Indian country
7   since the late-1990s and enhanced it by adding a proxy play technology set to the
8   gaming system.   This technology set consists of (1) software and hardware
9   components to assist a patron to engage their designated agent proxy (located on
10  Iipay sovereign lands) via a modern communication link (i.e. Internet) and an
11  electronic proxy engagement feature; (2) auto-daub (electronic bingo card minder)
12  functionality via software and hardware components to assist the patron's
13  designated agent proxy (located on Iipay sovereign lands) to play (on behalf of
14  patron) a bingo game using a digital-format system with functionality like standard
15  server-client architecture of electronic-linked bingo gaming systems; and (3)
16  software and hardware components to assist the designated agent proxy to report
17  via a modern communication link (i.e. Internet) on a time delayed basis to the
18  patron the results of the bingo game played on the patron's behalf.

19      **52.**   Attached hereto as ***Vialpando Dec. Exhibit No. 3*** is document which
20  describes the similar nature of the technology features relating to game system
21  design between the VPNAPS gaming system and current Class II server-based
22  electronic bingo gaming systems, and which outlines the authority I considered in
23  making my classification determination.

24      **53.**   In making my classification determination, I specifically relied on the
25  "flexible" policy toward technology for Class II gaming announced by Congress in
26  enacting IGRA, and took into account the NIGC's guidance that any interpretation
27  of bingo under IGRA should "embrace[] rather than stifle[] technological
28  advancements in gaming." 54. In making my classification determination, I also

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                 13                 3:14-cv-02724-AJB-NLS

1  applied my knowledge of the historical developments concerning the evolution of

2  Class II bingo gaming under IGRA.

3       **55.**   In this respect, I am aware of the following and considered each for

4  guidance in making my classification determination:

5       (a)    The July 26, 1995, NIGC Chairman Declaration re:  "Proxy

6  Play, which described "proxy play" as a concept involving "the use of computer

7  aided technology to assist the agent [located on Indian lands] or, 'proxy player,' to

8  track the bingo cards for a number of proxy play purchasers;" and declared that "in

9  the opinion of the Commission" such proxy play is permitted under IGRA because

10 "[t]he NIGC has considered the question of whether this game is actually being

11 played on Indian lands.  There is no statutory prohibition against the use of agents

12 for the conduct of bingo.  Accordingly, the acts of the agent, which occur on Indian

13 lands, are deemed to be acts of the principal." (Emphasis added).

14      (b)    The Ninth Circuit's decision in U.S. v. 103 Electronic Gaming

15 Devices, 223 F.3d 1091 (9th Cir. 2000) wherein the gaming system at issue was

16 described as one in which "players compete against each other in a single,

17 interlinked electronic game via a network of individual computer terminals;" and

18 court held that the bingo game played on the system is a "legal Class II game" and

19 player terminals are "legal Class II electronic aid[s] to bingo," because IGRA's

20 three explicit criteria constitute the sole legal requirements for a game to count as

21 Class II bingo.  (Emphasis added).

22      (c)    The October 26, 2000 OGC Advisory Letter re:  LVD Internet

23 Bingo Operation issued while the Coeur d'Alene Lottery case appeal was pending

24 in Ninth Circuit, wherein the OGC expressly declines to address whether "Internet

25 Bingo is a Class II technological aid under IGRA" under NIGC definitional

26 regulations existing at that time; but rather, with minimal analysis of the

27 "conducted on Indian lands" issue, provides guidance relying on the  district court

28 decision analysis in the Coeur d'Alene Lottery case – which analysis adopted a

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                14                3:14-cv-02724-AJB-NLS

1    "physically present" standard later rejected by the Ninth Circuit.

2          (d)    The Tenth Circuit's decision in <u>U.S. v. 162 MegaMania</u>

3    <u>Gambling Devices</u>, 231 F.3d 713 (10th Cir. 2000) wherein the court agrees with the

4    Ninth Circuit that IGRA sets forth "three explicit criteria" for classification of a

5    Class II game, and "turn[s] for guidance to the definitions relating to Class II

6    games" published in the CFR.  (Emphasis added).

7          (e)    The November 14, 2000 OGC Advisory Letter re:  National

8    Indian Bingo, wherein the OGC provides guidance as to what a "complete" bingo

9    game consists of – i.e. "For the game of bingo to be played, cards must be

10   purchased, balls must be drawn, and results called out or otherwise communicated,"

11   and describes proxy play as meeting IGRA's second statutory criteria to "cover"

12   cards by agent responsibilities carried out by tribal gaming employees using

13   "reader/dauber" machines to read and daub cards.  (Emphasis added).  The OGC

14   guidance notes that tribal gaming facility employees, acting as agents of purchasers

15   not physically present on Indian lands at time of game activity, who use bingo card

16   machines to read and daub cards do not violate IGRA because "[w]hen the agent

17   plays the [bingo] card for the player, the act of playing the card is deemed to be the

18   act of the player/principal.    The legal effect is that the agent is the

19   player")(emphasis in original).

20          (f)    In this respect, the OGC guidance as to what constitutes a

21   "complete" bingo game is consistent with my view that, for purposes of IGRA, the

22   only essential bingo "gaming activity" elements that must be held on Indian lands

23   are:  (1) bingo cards must be assigned and distributed to players (or their proxy), (2)

24   random numbers must be drawn, and (3) the results of the bingo game must be

25   communicated to players (or their proxy).  Like today's "Class II gaming systems,"

26   each of these three essential elements of bingo game play is conducted on and

27   originates on the math and game management servers of the VPNPAS gaming

28   system which are located on Iipay Indian lands.

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion            15                    3:14-cv-02724-AJB-NLS

1    (g)    My interpretation of IGRA on this issue is consistent with the

2    view of the U.S. Supreme Court as to what constitutes "gaming activity" for

3    purposes of IGRA.   In <u>Michigan v. Bay Mills Indian Community, 572 U.S.</u>

4    <u>_____</u>, 134 S.Ct. 2024, 2032 (2014) the Court rejected the State's argument that

5    mere "administrative action" associated with a tribal gaming enterprise constituted

6    part of the "gaming activity" conducted by the tribal casino.   Rather, "gaming

7    activity" for purposes of IGRA means only the essential game play elements – i.e.

8    "the stuff involved in playing the [] games," like "each roll of the dice and spin of

9    the wheel." In this light, mere pre-game administrative functions performed on the

10   payment server and security server components of the VPNAPS gaming system are

11   not legally relevant under IGRA as to the actual bingo game play (i.e. the three

12   essential bingo play elements) that is conducted on and originates on the math and

13   game management servers of the VPNPAS gaming system which are located on

14   Iipay Indian lands.

15   (h)    The NIGC's publication of the Final Rule for the 2002

16   amendments to the Part 502 definitions, 67 Fed. Reg. 41166 (June 17, 2002).   I

17   particularly noted and gave weight to the NIGC's statement that "several key terms

18   were not specifically defined [in IGRA], and thus subject to more than one

19   interpretation," its acknowledgment that under the original "facsimile" definition

20   the "Commission defined a key term in an overbroad manner," and its statement

21   that "Today's Final Rule more properly captures the intent of Congress as to the

22   distinction between permissible class II aids and prohibited class III facsimiles." I

23   especially took note of the fact that under the 2002 amendments the NIGC adopted

24   the so-called plain-meaning "exact replica" definition of facsimile adopted by the

25   <u>Sycuan</u> and <u>Cabazon</u> courts – but only as to any game of chance except bingo and

26   lotto and other games similar to bingo, and expressly carved out a "server-based

27   electronic bingo game system exception" from the definition of facsimile.

28   ///

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion          16          3:14-cv-02724-AJB-NLS

1  (i)   The fact that two federal court appellate decisions, involving

2  electronic "pull-tab" devices, have applied the amended 2002 version of the

3  NIGC's regulations, and are consistent with the holdings in the MegaMania Bingo

4  Cases; each finding that the electronic pull-tab devices constituted a permissible

5  Class II game played with a technological aid.  See United States v. Santee Sioux

6  Tribe, 324 F.3d 607, 613-15 (8th Cir. 2003); Seneca Cayuga Tribe v. NIGC, 327

7  F.3d 1019, 1025 (10th Cir. 2003).

8  (j)   The Ninth Circuit's decision in AT&T Corporation v. Coeur

9  d'Alene Tribe, 295 F.3d 899 (9th Cir. 2002) wherein the court rejected the district

10 court's conclusion that "IGRA unambiguously requires that a purchaser of a chance

11 in the Lottery be physically present on the reservation in order for the gaming

12 activity to fall within IGRA's preemptive reach" and found that the NIGC's final

13 agency action in approving the tribal ordinance, among others things, "evidences

14 the NIGC's determination that IGRA permits operation of the Lottery even though

15 it allows ticket sales via off-Reservation phone calls." (Emphasis added).

16 (k)   The fact that since the Ninth Circuit's decision in the Coeur

17 d'Alene Lottery case, the NIGC has again approved the Coeur d'Alene tribal

18 gaming ordinance which continues to permit "the use telephone and other off-

19 reservation means of access" to gaming activities conducted on its Indian lands.

20 (l)   The September 23, 2003 OGC Advisory Letter re:  Reel Time

21 Bingo ("RTB"), where in connection with the "mechanics of the game," the OGC

22 notes that RTB "is generated by a computer program" and the "system is driven by

23 three computers," and provides guidance that linking the system's player terminals

24 "creates a [electronic] format that 'allows multiple players to play with or against

25 each other,' which is one of the exceptions to the definition of electronic facsimile

26 for bingo games."  (Emphasis added).  The OGC also provides guidance that the

27 "electronic characteristics" of RTB are an aid because the "linked" nature of the

28 games – with at least 2 players in same or different locations "compet[ing] against

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion          17          3:14-cv-02724-AJB-NLS

1    each other" in "a single game" via the player terminals – means the system meets

2    all three analytic factors described in 25 CFR 502.7(b) describing an aid.

3            (m)    The September 26, 2003 OGC Advisory Letter re:  Mystery

4    Bingo, wherein the OGC describes Mystery Bingo as a "linked bingo system using

5    technologic aids," with the game played "electronically on a networked system of

6    components."    The heart of the game system is a central "computer that

7    electronically determines numbers for use in the game," which "communicates with

8    player terminals," "assigns bingo cards," and "groups players into common games."

9    The OGC's legal analysis begins by expressly noting that "the game of bingo

10   enjoys a favored status.  While bingo at its heart is a lottery, IGRA places the game

11   squarely in Class II and provides that the game may be played with [technologic

12   aids]" and notes that its classification evaluation of the game must be made "against

13   [this] backdrop of IGRA, NIGC regulations and [the MegaMania] cases."

14   (Emphasis added).  The OGC acknowledges that the "basic premise of bingo is play

15   and competition among others" in connection with evaluating the second and third

16   criterions for IGRA bingo.  (Emphasis added).

17           (n)    The fact that in the September 26, 2003 OGC Advisory Letter

18   re:  Mystery Bingo the OGC notes that for game play a "minimum of two players

19   must request play for the game to begin," but a new game will only begin "after a

20   configurable period of time if the minimum number of players has requested

21   admission." If not enough players are enrolled in the game, a message appears

22   "indicating the player must wait for additional players." The OGC also notes that

23   the central computer stops the ball draw after it makes the determination that a card

24   in play holds the first potential bingo pattern, and does so by automatically

25   "comparing the bingo cards in play to the numbers as they are drawn." (Emphasis

26   added).

27           (o)    The fact that in the September 26, 2003 OGC Advisory Letter

28   re:  Mystery Bingo the OGC provides guidance that in applying the new 2002

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion            18            3:14-cv-02724-AJB-NLS

definition regulations the game play satisfies the three statutory criteria for bingo, noting the electronic format of the gaming system "affirmatively enhances the bingo-like characteristics of the game:  interactive participation among players, not against the machine" (emphasis added), and also noting the "laudable feature" of a "post-game visual display" with a "very short" time delay after the bingo game is complete because the graphics do not "affect the outcome of game" played on the bingo card.

(p)     The fact that on January 21, 2004, the NIGC announced its intent to form a tribal advisory task force to develop more definitive "classification standards" regulations.

(q)     The October 18, 2004 OGC Advisory Letter re:  Rocket FastPlay Bingo, wherein the OGC describes FastPlay as a "linked bingo system" using "electronic player stations (EPS)" with a "computer program that facilitates play of the game" by determining when game start criteria are met, and another "software process" component that coordinates "software processes within the network" and "coordinat[es] game play functions." The OGC's legal analysis begins by expressly repeating the Mystery Bingo advisory language about "bingo enjoys a favored status" and that its classification evaluation of the game must be made "against [this] backdrop of IGRA, NIGC regulations and [the MegaMania] cases" (emphasis added), and then provides guidance that in applying the new 2002 definition regulations the game play satisfies the three statutory criteria for bingo.

(r)     The December 23, 2004 OGC Advisory Letter re:  Triple Threat Bingo, wherein the OGC describes Triple Threat Bingo as a "linked bingo system using technologic aids," with "multiple player stations" communicating with a "central server." "Through its operating system" the game system assembles players for individual games and requires "a minimum of two players for a game to begin." "To begin play," a player inserts money/ticket into a player terminal and is assigned a card, all of which must be done before any game has commenced.

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    19                    3:14-cv-02724-AJB-NLS

Relying on a testing lab certification report evaluating the game operating system and software which confirms that game system operates as described, the OGC provided guidance that in applying the new 2002 definition regulations, the game play satisfies the three statutory criteria for bingo.

(s)    The April 4, 2005 NIGC Advisory Letter re:  Nova Gaming Bingo, wherein the OGC describes the NOVA system as a "linked electronic bingo system," mostly consisting of a "central server" that controls both all communications to all networked devices and all ball calls (and that also verifies there are at least 2 players on the system and then waits anywhere from 2-10 seconds for additional players to log in), and electronic player terminals directly connected to a central server serving as a game play interface.  The OGC's legal analysis again begins by expressly repeating the Mystery Bingo advisory language about "bingo enjoys a favored status" and that its classification evaluation of the game must be made "against [this] backdrop of IGRA, NIGC regulations and [the MegaMania] cases" (emphasis added), and, relying on testing lab certification reports evaluating the game operating system and software completed by BMM and others which confirm that the game system operates as described, the OGC provided guidance that in applying the new 2002 definition regulations the game play satisfies the three statutory criteria for bingo.

(t)    The fact that on May 25, 2006, the NIGC published proposed Part 546 regulations re:   Classification Standards and Definition Regulation Amendments, 71 Fed. Reg. 30238 (May 25, 2006).

(u)    The fact that on June 4, 2008, the NIGC Chairman issued a decision disapproving the Metlakatla Indian Community's tribal gaming ordinance that permitted auto-daub features with electronic bingo systems as Class II bingo.  I noted that this decision was issued one day before the NIGC gave up on its regulatory overreach in connection with its proposed classification standards and definition regulation amendments.  I further noted that the ordinance disapproval

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                        20                        3:14-cv-02724-AJB-NLS

was premised upon an implied "participation" rationale expressed in some prior OGC advisory letters that run counter to the three express statutory criteria for bingo.  In this respect, the NIGC Chairman at the time tried to unilaterally usurp the 2002 Part 502 amendments to limit the scope of the "e-bingo system exception" to the definition of facsimile by "interpreting" this exception language to mean that the third criterion of IGRA bingo was not met with auto-daub features built into the gaming system – i.e. one touch bingo does not constitute Class II bingo because it does not require players to participate in the bingo game by taking further action to cover the numbers on the cards.  I did not agree that this analysis was correct under IGRA, and noted that it applied an erroneous legal standard and that its reasoning and conclusion as to auto-daub features with Class II electronic-linked bingo systems have been expressly overturned by the NIGC's June 13, 2003 One Touch Bingo Pronouncement, and, more importantly, by the provisions of SYGC 14-I009.

      (v)    The fact that on June 5, 2008, the NIGC announced a halt to the proposed classification standards and definition regulation amendments, official withdrawal in 72 Fed. Reg. 60482 and 72 Fed. Reg. 60483.

      (w)    The fact that on October 10, 2008, the NIGC published new Part 543 regulations re:  MICS for Class II Bingo Games, 73 Fed. Reg. 60498 (October 10, 2008).

      (x)    The fact that on October 10, 2008, the NIGC published new Part 547 regulations re:  Technical Standards for Technologic Aids Used in Play of Class II Bingo Games, 73 Fed. Reg. 60508 (October 10, 2008).

      (y)    The September 3, 2009 OGC Advisory Letter re:  Fast Track Bingo, wherein the OGC describes FTB as "electromechanical gaming system for facilitating the operation of bingo that is designed to be an alternative to full electronic bingo." The OGC provides guidance that FTB "meets all three criteria" for bingo and "FTB is not a facsimile of a game of chance [but is] a technologic aid." The OGC notes that "as a technological aid to a Class II game, "before [FTB]

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion      21      3:14-cv-02724-AJB-NLS

1   may be offered for use in a tribal casino" it must be tested by a lab under Part 547

2   and "approved for use by the relevant tribal gaming commission." (Emphasis

3   added).

4       (z)    The September 24, 2009 OGC Advisory Letter re:   Casino

5   Gateway Network, wherein, in connection with a game system in which "results of

6   completed games are made available to players on the Internet using the access

7   numbers provided," the OGC provided guidance that "[c]hecking the results of

8   completed [games] on the Internet does not constitute Internet gaming or [gaming]

9   involving the use of the Internet, in whole or in part., because the [gaming] is

10   complete at the [tribal] casino."

11       (aa)   The December 17, 2009 OGC Advisory Opinion re: DigiDeal

12   Digital Card System addressing whether card games played with a technologic aid

13   are excluded from the definition of Class II gaming under IGRA.  In this respect, I

14   noted that the OGC memorandum was not addressing e-bingo systems, and the

15   OGC analysis does not even quote the "e-bingo system exception" language in the

16   Part 502.8 definition, but only the part of the definition relating to an electronic

17   format that replicates a game of chance [that is not bingo, lotto or game similar to

18   bingo – i.e. pull-tabs, card games, etc.].   Accordingly, in my view, the OGC

19   statement that NIGC regulations "still follows the holding in Sycuan" (i.e. the

20   "exact replica" standard for facsimile) in evaluating games of chance that are NOT

21   bingo, lotto or game similar to bingo had no relevance to my evaluation of the

22   bingo games played using the VPNAPS gaming system.

23       (bb)   The fact that on June 25, 2013 the NIGC published in the

24   Federal Register its "One Touch Bingo Pronouncement," 78 Fed. Reg. 37988 (June

25   25, 2013), wherein the NIGC announced its intent to interpret IGRA so as to

26   classify what it calls "server-based electronic bingo systems" with an auto-daub

27   feature as a Class II game.  I particularly noted that, consistent with the regulatory

28   measures adopted by SYGC in SYGC 14-I009, it is now the NIGC's position that

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion     22     3:14-cv-02724-AJB-NLS

1    the second and third statutory criterions of IGRA bingo are satisfied because the

2    "cover" requirement by a player is met in one touch bingo systems "by the

3    assistance of the machine," and any "previous interpretation's requirement that the

4    cover of bingo card be done manually by the player through an additional pressing

5    of a button is an additional requirement not mandated by the statute." (Emphasis

6    added).

7            (cc)    The fact that in its One Touch Bingo Pronouncement, the NIGC

8    expressly rejected the prior OGC staff view that including a one touch bingo feature

9    in a linked bingo system transforms the system into a Class III facsimile of a game

10   of bingo – because in the full Commission's view the system "does not incorporate

11   all of the characteristics of bingo.  The machine, for example, does not replicate the

12   competitive element of bingo.  Players still compete with other players, not the

13   machine." (Emphasis added).  Based on this, the NIGC noted that the "application

14   of the [e-bingo system] 'exception' [to the definition of facsimile is not necessary,"

15   but, in any event, "we find [the Metlakatla Decision] interpretation [re:  the Part

16   502.8 exception to be] in error" because one touch bingo meets the "statutory

17   elements of the game" and also "does incorporate player participation in the game

18   beyond the pressing of a button.  (Emphasis added).

19           (dd)   The June 27, 2014 OGC Advisory Letter re:  Bingo Nation,

20   wherein the OGC provided guidance that a mostly electronic linked system

21   containing a proxy player element (assisted by minder device that requires the

22   proxy to hit a daub button) is a Class II aid to the game of bingo and not a Class III

23   facsimile.  I noted, however, that in reaching the correct result under IGRA, the

24   OGC guidance applied a flawed classification analysis that ignores the "e-bingo

25   system exception" to the facsimile definition under Part 502.  Instead, the OGC

26   staff improperly reverted to applying the Cabazon and Sycuan courts "exact

27   replica" plain-meaning standard (now expressly discarded under Part 502.8 for

28   electronic format bingo systems) for determining if a device is a "facsimile." The

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion              23                    3:14-cv-02724-AJB-NLS

OGC guidance not only failed to apply the proper "e-bingo system exception" standard under Part 502.8, but it also failed to properly apply any of the legal analysis contained in the "bingo enjoys favored status" e-bingo system guidance letters issued earlier by the OGC over the 2003 to 2005 period.

**56.**    In making my classification determination, I applied the Indian law canons of construction to IGRA, keeping in mind that any ambiguity or silence in IGRA concerning the "conducted on Indian lands" issue must be resolved "in favor of the Indians." In this respect, my analysis of this issue was guided in part by following legal authority, among other specific IGRA-related authority:

(a)    The Ninth Circuit's decision in In re Blue Lake Forest Products, Inc., 30 F.3d 1138, 1141 (9th Cir. 1994) (federal Indian law affording heightened protection to timber held in trust for tribes preempted state law in dispute between bank and tribe over proceeds of timber sale; resolution of preemption question depended on whether "the relevant activities occurred" on or off the reservation and where "the essential conduct occurred on the reservation;" though not all of the conduct did, relevant activities occurred on the reservation).

(b)    The Ninth Circuit's decision in Littell v. Nakai, 344 F.2d 486, 490 (9th Cir. 1965) (state court lacked jurisdiction even though "some of the alleged acts look place [off the reservation]" because the matter "was one demanding the exercise of the Tribe's responsibility for self-government" and of "intimate concern to the Tribe as a whole").

(c)    The recent New Jersey legislation concerning the state's internet-based gaming initiative, which declares that any internet-based gaming conducted by its licensed Atlantic City casinos actually "occurs" in Atlantic City where the casinos' servers are located – even if the casino patron participating in the internet-based gaming is not physically located in Atlantic City. See New Jersey P.L. 2013, c27(5:12-95.17(1)(J)) found online at http://www.njleg.state.nj.us/2012/Bills/PL13/27.HTM.

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    24                    3:14-cv-02724-AJB-NLS

1    (d)    The general legal principle that the place of a contract is the last

2    place where the last act necessary to make the complete of the contract was done.

3    See 2 Williston on Contracts, §6:62 (4th ed.).

4    (e)    In this respect, I noted that with the design of the VPNAPS

5    gaming system the fact that a patron may transmit a proxy play game request using

6    the "Request Form" pop-up window on the gaming system does not mean that it

7    will be accepted by DRB, as in the case where the patron has insufficient funds in

8    his DRB account or is excluded from making a game play request due a violation of

9    SYI access rules or exclusion pursuant to SYGC's Responsible Gambling Program.

10   (f)    I also noted that the decision to permit a patron to fund their

11   DRB account or to allow patron access to the VPNAPS gaming system is

12   ultimately a decision that SYI, and SYI alone, makes from Iipay Indian Lands using

13   features of the system after receiving payment processing, identify and age

14   verification ("KYC") and geolocation information from SYI's payment processing,

15   KYC and geolocation vendors.

16   (g)    The fact that judicial treatment of lotteries has followed the

17   general legal principle that any "gambling" contract is made is the site where the

18   gaming enterprise is located when accepting the offer to play made by the patron.

19   In this respect, I was aware that courts have recognized for more than 150 years that

20   the purchase of a lottery chance occurs in the state in which the lottery operator

21   accepts the order, not where the purchaser is located.  For example, the Supreme

22   Court of Vermont relied on this principle to hold that, when a Vermont resident

23   ordered a lottery chance by mail from Rhode Island, the sale occurred in Rhode

24   Island:

25           The defendant ordered the [lottery] tickets sent by mail, and they were
             so sent from Rhode Island.  This was a sale and delivery in Rhode
26           Island.  The title in the tickets vested in the defendant when mailed, as
             much as if delivered to the defendant personally there; and the
27           plaintiff's debt then became perfect.

28

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion          25          3:14-cv-02724-AJB-NLS

Case v. Riker, 10 Vt. 482, 484 (1838).  I found significant, for purposes of my analysis of the "conducted on Indian lands" issue, that the Vermont Supreme Court reached this conclusion even though Vermont law proscribed the sale of foreign lottery tickets in Vermont.  But since the lottery tickets were bought and sold in Rhode Island, the transaction did not offend Vermont law, even though the purchaser personally never left Vermont.

(h)    The fact that the National Gambling Impact Study Commission, June 18, 1999 Final Report, page 5-8, found "IGRA is ambiguous on the subject of tribes offering such games to individuals outside of the reservation and into the states and jurisdictions.").

(i)    The fact that in November 1997, the NIGC held a full-day public hearing on the effect of IGRA and NIGC regulations "on Internet gambling conducted by Indian tribes," and, following this public hearing, the NIGC took no formal agency action declaring that the use of the Internet as a communication technologic aid to the play of Class II bingo was not permitted for purposes of IGRA (or, for that matter, has taken to date any formal agency action expressly prohibiting the use of the Internet in conducting IGRA gaming).  Attached hereto as **Vialpando Dec. Exhibit No. 4** is a true and correct copy of the NIGC's Public Hearing Notice, 62 Fed. Reg. 53658 (Oct. 15, 1997).

(j)    The fact that "Advanced Depositing Wagering" ("ADW") is now authorized in the State of California in connection with the horse racing industry.  In ADW (not to be confused with "off-track betting' ("OTB"), a patron never has to physically visit a racetrack in order to gamble on the horse races conducted at the track site.  Rather, California residents can be remotely located anywhere (at their office, home, etc.) and use their computers, tablets or mobile phones to connect over the Internet to the racetrack and transfer funds to their ADW account at the racetrack , and then later use those funds to place horseracing bets on races to be run  in the future at the track.  This is different from OTB where

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    26                    3:14-cv-02724-AJB-NLS

the patron has to go to a licensed physical office space located in California before they can make a gamble on a horserace that is conducted at a racetrack.

      (k)    The fact that IGRA is game specific, and therefore bingo play under IGRA may be permitted to use technology "assistants" incorporated into a bingo gaming system design which may not be allowed for other games like craps, roulette, blackjack, keno, slots, etc.; and such aids may include modern communication technologies like the Internet.

     **57.**    Attached hereto as ***Vialpando Dec. Exhibit No. 5*** is a true and correct copy of the Arbitration Award re: Internet Gaming Dispute referred to Binding Arbitration by the Iowa Tribe of Oklahoma and the State of Oklahoma, dated November 24, 2015, certified by federal district court order dated April 18, 2016 in <u>Iowa Tribe of Oklahoma v. State of Oklahoma</u>, Case no. 5:15-CV-01379-R (W. D. Okla.), wherein the "conducted on Indian lands" issue was addressed and decided consistent with my classification determination analysis.

     **58.**    In making my classification determination, I also considered the fact that the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-5367  UIGEA did not change the status quo – Indian gaming that is legal under IGRA remains legal.  <u>See</u> 31 U.S.C. § 5361(b) ("No provision of [UIGEA] shall be construed as altering, limiting, . . . any Federal [law like IGRA] . . . permitting, or regulating gambling in the United States")(emphasis added); 31 U.S.C. § 5365(b)(3)(B) ("No provision of [UIGEA] shall be construed as altering, superseding, or otherwise affecting the application of [IGRA]").

     **59.**    In sum, as the foregoing demonstrates, as the primary regulator with the authority and responsibility under IGRA for determining if the gaming to be offered by DRB using the VPNAPS gaming system constitutes "Class II bingo" that is legally "conducted on Indian lands" for purposes of IGRA, I correctly applied all applicable tribal and federal laws, regulations and standards (including the <u>current</u> NIGC definition regulations and classification standards relating to the

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion       27       3:14-cv-02724-AJB-NLS

proper e-bingo system evaluation factors used under IGRA since 2002), and, pursuant to SYGC's authority under the Iipay Gaming Ordinance, SYGC 14-I009 and 25 CFR Parts 543 and 547, I issued a "Classification Determination" regarding the version of the VPNAPS gaming system ("Desert Rose Bingo v.1.5 rev 6171") to be used by DRB upon opening game play to paying patrons, concluding that the VPNAPS gaming system constitutes a Class II "technologic aid" to the game of "bingo" for purposes of IGRA.

**60.**    I am aware that the OGC has issued an informal advisory letter dated April 15, 2016 concerning the version of the VPNAPS gaming system ("Desert Rose Bingo v.1.5 rev 6171") originally used by DRB when first operational in late 2014.

**61.**    Unlike every other "courtesy guidance" letter ever sent by the OGC – which were in response to an express "guidance" request made by a tribal gaming regulator, its tribal gaming operator or the vendor of an electronic bingo gaming system – this "courtesy guidance" letter from OGC (which replaces and supersedes one dated November 18, 2015) was not sent in response to any "guidance" request made by SYGC, SYI or any of DRB's vendors.  In fact, the unsolicited "courtesy guidance" letter (both the November 18 and April 15 version) was only sent by OGC <u>after</u> the NIGC had become an adverse party to Iipay in the present litigation (i.e. after Iipay sued the NIGC for violating IGRA in seeking to circumvent its own regulations by refusing to confirm and honor the classification determination made by SYGC).  At no time prior to being sued in this lawsuit did the NIGC ever take any agency enforcement action against the DRB gaming, nor for that matter has the NIGC ever done so to date.

**62.**    In its letter, the OGC provided guidance that, in its view, the gaming offered by DRB purportedly does not satisfy the second and third criteria of IGRA bingo play, and therefore the gaming using the VPNAPS gaming system does not constitute "Class II bingo" using a "technologic aid."  Unfortunately the analysis

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    28                    3:14-cv-02724-AJB-NLS

that led the OGC to this result is fatally flawed factually and legally, and fails to adhere to proper legal standards and current NIGC definition regulations and classification standards relating to the proper e-bingo system evaluation factors used under IGRA since 2002.  It also fails to give due regard to applicable tribal laws and regulations, runs counter to the NIGC's own June 2013 One Touch Bingo Pronouncement reasoning, and fails to keep in mind that "bingo enjoys a favored status" and that any classification evaluation of a bingo game system must be made "against [this] backdrop of IGRA, NIGC regulations and [the MegaMania] cases."

63.    First, the OGC contends that the bingo games offered by DRB using the VPNAPS gaming system do not "comply with the second criteria for bingo" because the VPNAPS gaming system purportedly uses "pre-drawn numbers" (i.e. "the ball draw occurs, is completed, and is stored before the bingo cards are created").  See pp. 15-17.  This is simply factually incorrect, and is not an accurate depiction of how the actual bingo game play sequence unfolds on the VPNAPS gaming system.

64.    Even if the bingo game play sequence was as described by OGC, in my view it has no legal consequence as to the play of "bingo" under IGRA. Nevertheless, rather than spend time highlighting the reasons the OGC is wrong on this issue (i.e. that the OGC position is premised on an overly restricted "interpretation" of the second element of IGRA bingo described in §2703(7(A)((i)(II)), SYGC will, in an abundance of caution, require that this game play sequence be re-examined by a testing lab under the Part 547 certification process before DRB is permitted to re-open to the public; and if need be, require a software program "patch" be applied to the VPNAPS gaming system to ensure that the game play sequence order is first card generation and distribution, then the ball draw, and then card number comparison (cover).  This will eliminate the OGC's purported concern as to the "pre-drawn numbers" issue.

65.    Second, OGC contends that the bingo games offered by DRB using the

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    29                    3:14-cv-02724-AJB-NLS

VPNAPS gaming system do not comply with the "cover" requirements contained in the second and third statutory criteria for IGRA bingo. In this respect, the sole premise raised by OGC in support of their contention is merely that "in the play of DRB, neither the player nor the 'proxy agent' takes any action or actively participates in any way to cover the numbers on the electronic cards." (Emphasis added). See pp. 13-15, and 17.  In essence, OGC reads into IGRA's "three explicit criteria" that constitute the sole legal requirements for a game to count as Class II bingo a new implicit "actively participates" standard for cover that requires a "physical act" of some sort by the patron or their proxy.

66.    There are, however, several problems with OGC's position that highlight why this position is contrary to IGRA's text and legislative history, applicable tribal and NIGC regulations and the NIGC's very own June 2013 One Touch Bingo Pronouncement; and why gaming using the VPNAPS gaming system does indeed satisfy the "cover" requirements contained in the second and third statutory criteria for IGRA bingo.

67.    First and foremost, neither the term "actively participates" nor "physical act" appears in the text of IGRA's "three explicit criteria" for Class II bingo generally, nor specifically in connection with the second and third criteria "cover" related language.

68.    Second, it runs counter to the "flexible" policy toward technology for Class II gaming announced by Congress in enacting IGRA, and fails to take into account the NIGC's guidance that any interpretation of bingo under IGRA should "embrace[] rather than stifle[] technological advancements in gaming."

69.    Third, it appears that the OGC is again trying to introduce a "Platonic" essence of traditional bingo into IGRA bingo that OGC feels is implied by the "essential ingredient" to bingo play – i.e. no player "involvement in covering" means "player is not participating in the game." In this respect, OGC is harking back to the early 2000s when it sought, without legal basis, to limit auto-daub

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                    30                    3:14-cv-02724-AJB-NLS

features in system designs because such automatic cover features purportedly did not meet an "actual cover" participation requirement that OGC felt was implied by the "inherent character of bingo" regarding "participation" such that an "actual cover" participation requirement had to be grafted into the interpretation of IGRA's definition of bingo.

70.    But OGC's position on this point has been soundly and explicitly rejected by the NIGC's own June 2013 One Touch Bingo Pronouncement, which made any so-called "active" participation system design "requirements" superfluous.   As the Pronouncement noted, "The statute and implementing regulations merely require that a player cover numbers without specifying how they must be covered." More directly, the NIGC stated "whether a game constitutes bingo or not cannot be reduced to the number of times a button is pushed. . . . [W]e must look to whether the statutory elements of the game are met."

71.    As, in my view, the NIGC rightly explained, "Player participation in an electronically linked one tough bingo game exists and players are actively and actually participating in the game.  Whether the player presses a button one time or two, the player is engaging the [system], participating in the bingo, and competing with fellow players on the electronically linked bingo system." (Emphasis added).

72.    In this respect, it must be kept in mind that the term "one touch" does not necessarily connote a "physical" press of a button; rather it represents a patron's request to join a bingo game by offering to purchase a bingo card (i.e. engage the system).  That is the only "participation" in a bingo game that is required under IGRA.  In other words, the manner in which this request to play is communicated to the game system is not limited to a "physical act" by the patron, especially when one considers that 'technologic aids" include any technology that "broaden the participation levels in a common game." See 25 C.F.R. §502.7(b)(1).

73.    Why the OGC's newly invented implicit "physical act" requirement for the second and third "cover" criteria is not consistent with IGRA's "three

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                      31                       3:14-cv-02724-AJB-NLS

explicit criteria" for Class II bingo can be shown by considering "technologic aids" features that assist our disabled population in enjoying play of IGRA bingo. For example, a tribe may wish to broaden participation in its bingo games by using a Class II gaming system that caters to blind individuals, wounded war vets or others without limbs, etc. To facilitate their participation in the bingo games, the Class II gaming system used by the tribe could have a voice-recognition technology set that allows the disable patron to verbally state to the gaming system that he wants to purchase a five cent bingo card for the next five cent game and verbally provide his tribal gaming account number and password to fund the game play request (i.e. making the "initial touch" for a bingo game by verbal command only). The voice-recognition technology set then translates this verbal command into software code that the gaming system can read and understand, and then transmits it to the math and game management servers located in the back office area of the tribal casino – similar in nature to how a "physical touch" is converted by the patron interface of today's standard "Class II gaming system" with client-server architecture and then transmitted by electric current or wirelessly to the math and game management servers of those systems, also located in the back office area of the tribal casino. Thereafter, just as is done for a patron who can initiate his game play request by using his arms and hands to press a tangible button, the cover requirements of the second and third criteria for IGRA bingo are performed by the disable patron through the assistance of an auto-daub feature in the gaming system as the NIGC's Pronouncement outlines.

**74.** It is nonsensical and contrary to IGRA to claim that under this scenario only the patron who is lucky enough to have hands, or is not blind or otherwise physically impaired, is "actively participating" in "covering" his bingo card because he used at least one "physical act" to start his game play request; while the disabled patron, who used specific technology designed to "broaden the participation levels in a common game," is not "actively participat[ing] in any way in such covering" of

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion      32      3:14-cv-02724-AJB-NLS

his bingo card.

75.    More importantly, the OGC position as to its purported implicit "actively participates" standard for cover that requires a "physical act" of some sort by the patron or their proxy is directly contrary to tribal regulations applicable to the gaming offered by DRB using the VPNAPS gaming system.  See SYGC 14-I009 (§5.0(d)(3)(x)("Use of technologic aids such as auto-daub features or reader/dauber devices are expressly permitted to assist the proxy agent playing Class II bingo games on the Account Holder's behalf in determining whether a held card has a pre-designated pattern matching the numbers drawn for the Class II bingo game"); SYGC 14-I011 (§11.0(b)(a tribal gaming employee "shall act as the legally designated agent of the Account Holder and, assisted by the technologic aid of proxy software elements contained in the VPNAPS, shall conduct proxy play of Class II bingo games on the Account Holder's behalf"); and SYGC 14-I011(c)("There is no requirement for the proxy agent playing Class II bingo games on the Account Holder's behalf to manually declare a "bingo" upon matching the numbers drawn with the pre-designated game winning pattern on a purchased bingo card in order to collect the game prize; use of technologic aids such as an auto-daub feature is expressly permitted to assist the proxy agent playing Class II bingo games on the Account Holder's behalf in determining whether a card held has a pre-designated pattern matching the numbers drawn for the Class II bingo game).

76.    Accordingly, while I appreciate the unsolicited guidance comments by the OGC as to whether the DRB gaming satisfies IGRA's "three explicit criteria" for Class II bingo (particularly the "cover" requirements contained in the second and third statutory criteria for IGRA bingo), I find them unpersuasive and not well grounded in IGRA's text and legislative history, applicable tribal and NIGC regulations and the NIGC's very own June 2013 One Touch Bingo Pronouncement. Therefore, I stand by and reaffirm my classification determination regarding the version of the VPNAPS gaming system ("Desert Rose Bingo v.1.5 rev 6171") to be

1  used by DRB upon opening game play to paying patrons, and continue to find that

2  the VPNAPS gaming system constitutes a Class II "technologic aid" to the game of

3  "bingo" for purposes of IGRA.

4  **I declare under penalty of perjury that the foregoing is true and correct.**

5  **This declaration is executed on May 26, 2016.**

6

7  David Vialpando

8  Date: 5-26-2016

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of David Vialpando in Support of tribal
Defendants' Consolidated Points and Authorities in
Opposition to Plaintiffs' SJ Motion                34                3:14-cv-02724-AJB-NLS

**EXHIBITS TO DECLARATION OF DAVID VIALPANDO**
**TABLE OF CONTENTS**

| Exhibit No. | Document Name/Title | Exhibit Page Nos. |
|---|---|---|
| 1. | Article re: "Classifying Server-Based Electronic Bingo Gaming Systems under the Indian Gaming Regulatory Act" | E1-E3 |
| 2. | NIGC's "MICS Class II – Audit Checklist, Bingo (BI)" | E4-E27 |
| 3. | "Tech Aid Component Stack" document describing the similar nature of technology features relating to the game system design between the VPNAPS gaming system and current Class II server-based electronic bingo gaming systems | E28-E39 |
| 4. | NIGC's Public Hearing Notice, 62 Fed. Reg. 53658 (October 15, 1997) | E40-E41 |
| 5. | Iowa Tribe "Internet Gaming" Arbitration Award dated November 24, 2015 | E42-E72 |



# Classifying Server-Based Electronic Bingo Gaming Systems under the Indian Gaming Regulatory Act

## *Who Gets to Decide Game Classification?*

BY KEVIN QUIGLEY AND TOM FOLEY



For many years there has been tension over the answer to this question between tribal gaming regulators (the primary regulators of Class II gaming conducted by tribes pursuant to IGRA) and the National Indian Gaming Commission ("NIGC") (the federal regulatory agency assigned with monitoring and oversight responsibility for Indian gaming operations in the United States). In light of the regulatory structure crafted into IGRA and the implementing regulations adopted by the NIGC, as well as the historical sovereign rights of tribes under the U.S. constitutional framework, we think the answer is now clear – game classification determinations for server-based electronic bingo gaming systems are to be made solely by the tribal gaming regulatory authority, not the NIGC.

The issue of which regulatory agency is responsible for making classification determinations for server-based electronic bingo gaming systems was first hotly debated in Indian country starting in 2002 when the NIGC revised its original regulations in connection with the definitions associated with what constitutes Class II gaming and Class III gaming under IGRA. These revisions were designed to conform the Commission's original 1990s-era regulations to subsequent court decisions that interpreted which "electronic" gaming devices may properly be classified as Class II games. Many commentators and Indian gaming law practitioners believe these amendments helped clarify what constitutes permissible Class II gaming, and have had the practical effect of expanding the field of Class II gaming.

This debate intensified a few years later when the NIGC attempted to adopt "bright line" classification-related regulations that would have assigned game classifications for electronic gaming devices (including server-based electronic bingo gaming systems) to the sole discretion of the NIGC. A firestorm rose in Indian country over this regulatory overreach and eventually the NIGC was forced to retreat. Instead, a Tribal Gaming Working Group, consisting of Indian gaming regulators and industry leaders, worked with the NIGC to bring forth new regulations that would be consistent with IGRA's regulatory structure and the tribes' historical sovereign

**G**aming vendors are offering new and innovative server-based electronic bingo gaming systems to tribal customers conducting gaming in the United States pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701, *et seq.*, P.L. 100-497, 102 Stat. 2467 (Oct. 17, 1988). And they often face a perplexing question: which regulatory agency is the proper authority under IGRA to make the game classification determining if their gaming systems are to be deemed a "Class II gaming system?"

Page E1

Vialpando Dec. Exhibit No. 1

> **"A firestorm rose in Indian country over this regulatory overreach and eventually the NIGC was forced to retreat. Instead, a Tribal Gaming Working Group, consisting of Indian gaming regulators and industry leaders, worked with the NIGC to bring forth new regulations that would be consistent with IGRA's regulatory structure and the tribes' historical sovereign rights to govern their gaming activities on their lands."**





Kevin Quigley        Tom Foley

rights to govern their gaming activities on their lands. The end result was the adoption in November 2008 of NIGC regulations published at 25 CFR Part 547 - *Minimum Technical Standards for Class II Gaming Systems and Equipment* and 25 CFR Part 543 - *Minimum Internal Control Standards for Class II Gaming.*

The Part 543 and Part 547 regulations were developed through a sometimes contentious process between the NIGC and the Tribal Gaming Working Group spanning several years and countless hours working out the language that was finally adopted. It was a triumph of tribal interests collaborating with the NIGC to create an outcome that benefited Class II gaming overall and reinforced tribal sovereignty at its core. Both Parts 543 and 547 recognize the primary and exclusive role that the Tribal Gaming Regulatory Agencies ("TGRAs") play in the regulation of Class II games. It is a foundational principle of IGRA that Tribal governments are the primary regulators of gaming conducted on their Indian lands. This is especially true with Class II gaming because Tribal-State compacts cannot apply to the rules and play of the games.

Whenever a TGRA approves and licenses a server-based electronic bingo gaming system and allows it to be placed on a gaming floor for play, it affirmatively makes a classification decision as the primary regulator. These determinations are done on a daily basis by TGRAs all over Indian country. To this end, key provisions of Parts 543 and 547 rightly delegate to the TGRA the legal responsibility and authority to make a classification determination as to whether a server-based electronic bingo gaming system is properly classified as Class II gaming. These provisions include Part 543.8(g) which requires the *TGRA* [not the NIGC] to establish procedures to safeguard integrity of technologic aids to the play of bingo during installations and operations, including procedures that require: (1) the *TGRA* [not the NIGC] to approve "all technologic aids before they are offered for play; and (2) the *TGRA* [not the NIGC] to determine that all Class II gaming systems comply with Part 547 standards.

Other regulation provisions highlight the TGRA's primacy in approving a server-based electronic bingo gaming system and determining if it is properly classified as Class II gaming. Part 547.4(a) requires that to ensure fairness as to game play on a Class II gaming system, a testing lab must calculate math expectations and submit a "report *to the TGRA*" – [not to the NIGC]. Part 547.4(b) requires that all components used with a Class II gaming

system must be identical to the prototype reviewed by testing lab "*and approved for use by the TGRA*" [not the NIGC] pursuant to Part 547.5. And Part 547.5(c) requires that *the TGRA* [not the NIGC] "may not permit the use of any Class II gaming system, unless following receipt of the testing lab's report, "the *TGRA* [not the NIGC] *makes a finding that the Class II gaming system*" conforms to the standards established by Part 547, applicable provisions of Part 543 and those standards further *established by the TGRA* [not the NIGC]. There are other provisions of the regulations that continue to make it clear that the TGRA [not the NIGC] is to make final determinations.

Accordingly, any informal NIGC practices (*e.g.*, advisory opinions) that were being followed as to reviewing *electronic-linked bingo game systems* prior to November 10, 2008, the date on which Parts 543 and Part 547 (a) were first effective for bingo and other games similar to bingo – or, at the latest – (b) September 21, 2012 when amended and fully implemented for all Class II gaming, are now simply irrelevant and superseded by Parts 543 and 547. In our view, any attempt by the NIGC or others to use the old informal NIGC practices to circumvent or undermine a TGRA classification decision made under these formal and binding regulations as part of the approval of any server-based electronic bingo gaming system would itself be a violation of the NIGC regulations and IGRA.

TGRAs routinely make classification determinations for Class II bingo gaming systems via final agency action as part of their licensing of Class II vendors to their respective gaming operations, and there is no record of the NIGC ever not endorsing those TGRA decisions. In fact, with only one exception, *neither the NIGC Chairman nor the full Commission* has ever made any determination via final agency action as to the classification of a particular Class II gaming system. (That exception was rendered in 2008 and rejected the Metlakatla Indian Community Class II gaming ordinance permitting generally one-touch bingo systems. Significantly, the NIGC no longer supports that analysis, as indicated by its one-touch bingo pronouncement officially published in the *Federal Register* in June 2013.)

The NIGC has *never* actually "rendered" *any* published classification determinations over the last fifteen years. Rather, the Commission involvement with classification issues has been limited to the NIGC's Office of General Counsel writing a handful of "private letter advisories" (between mostly 2003-2009) related to some early
*Continued on next page*

Page F2

Vialpando Dec. Exhibit No. 1



*Continued from previous page*

first-generation electronic linked bingo game systems, which are not published in the *Federal Register*. Instead, they are merely posted on the NIGC website as "guidance."

The foregoing demonstrates that the NIGC has, *by final agency action*, acknowledged that TGRAs are the proper regulatory agencies under IGRA empowered to make the final decision for approval of innovative server-based electronic bingo gaming systems so long as it is determined by a TGRA that such systems meet all of the required criteria as noted above in Parts 543 and 547 and tribal laws and regulations. If the NIGC ever did try to give itself the discre-

> " Indian law canons of construction apply to IGRA, meaning that the act must be construed in favor of tribal interests. In this context, strict construction of the IGRA bolsters the view of giving the highest deference to TGRA decisions. "

tionary right to "review" TGRA determinations and actions expressly made pursuant to NIGC regulations and an NIGC-approved tribal gaming ordinance, a dangerous precedent would be set – one that would violate federal law. It should be noted that NIGC regulations are federal law. The NIGC could then overrule a TGRA's determination and action at any time – potentially subject to political motivation – effectively shutting down Class II gaming.

It is clear that the NIGC cannot use any justification to overrule the classification decisions of a TGRA. Furthermore, the adoption of Parts 543 and 547 creates a deference defense for TGRA decisions made following those and all NIGC regulations. This is the precise deference that should be given to any final agency action interpreting an enabling statute.

Indian law canons of construction apply to IGRA, meaning that the act must be construed in favor of tribal interests. In this context, strict construction of the IGRA bolsters the view of giving the highest deference to TGRA decisions. The IGRA vests the NIGC with certain defined limited authority, including to (1) "review and approve tribal gaming ordinances" (25 U.S.C. §2710) but not classification determinations, (2) "monitor" the conduct of Class II gaming (25 U.S.C. §2706(b)). Direct regulation of bingo games and systems is administered by the TGRAs, with the NIGC monitoring the conduct of Class II gaming. The development of the IGRA itself supports this reading, as much of the focus of the Act was on regulating the money from Indian gaming – how it is spent, how contracts are awarded, and licensing of officials – leaving the day-to-day regulation and determinations to the TGRAs.

This regulatory arrangement reflects sound public policy as it relates to the regulation and oversight of a large and complex industry like Indian gaming. The competency and integrity of tribal regulators is above question, as evidenced by the NIGC's oft-stated praise of the "excellent job they do." The NIGC should neither unilaterally nor randomly second-guess the judgment and determinations of TGRAs. The NIGC should confine itself to the specific role granted to it in the IGRA. It is important for all parties to remember that IGRA did not "grant" anything to tribes; rather,

it recognized that Class II gaming on Indian lands would continue to be within the jurisdiction of tribes subject to certain provisions of IGRA (primarily NIGC-approved tribal gaming ordinance and management contracts). The NIGC should respect the primacy of TGR as contemplated by IGRA in connection with regulating Class II gaming, and support TGRA determinations and the regulatory work that TGRAs exercise daily.

The combination of the NIGC and the expansive network of tribal regulators is what Congress envisioned when it affirmed in IGRA that tribes are to be the primary regulators of Indian gaming. At the same time, Congress did delegate to the NIGC a broader policy mandate and a limited power to monitor the conduct of Class II gaming. The current state of affairs in Indian Gaming with the adoption of Parts 543 and 547 is an example of a federal-tribal collaboration functioning successfully.

Many may have missed the full impact of the adoption of Parts 543 and 547. We hope that as Class II gaming in the United States continues to grow and prosper, the important implications arising from these regulations (*i.e.* strengthening tribal sovereignty and confirming the primacy of tribal regulation under IGRA over Class II gaming conducted on Indian lands, subject only to the tribes' NIGC-approved gaming ordinances) will become better known and appreciated throughout Indian country and by gaming vendors developing the next generation of server-based electronic bingo gaming systems.[1] ❖

*Frequent speakers and writers on Indian gaming business matters, both Kevin Quigley and Tom Foley are elected members of the International Masters of Gaming Law, and have also been recognized as "Gaming's Legal Eagles" in Casino Enterprise Management's Guide to the World's Pre-eminent Gaming Attorneys, and been selected for The Best Lawyers in America in the areas of Gaming Law and Native American Law for years. Their practice is concentrated on Indian gaming law matters involving the development, management and regulation of Indian gaming operations conducted in the United States under the authority of IGRA, and applicable state and tribal law. With extensive experience with IGRA related regulations and case law decisions, they advise a wide variety of gaming equipment vendors and others regarding IGRA related issues.*

*Mr. Quigley is the chair of the national Gaming Law and Indian Country & Regulatory Affairs practice teams at the Gray Plant Mooty law firm, Minneapolis MN office. His practice is focused on providing Indian gaming business counsel services nationwide to casino management/development companies, gaming equipment vendors, financial institutions as well as tribal governments and their tribal agencies with matters related to federal, state and tribal regulatory compliance, financing, taxation, jurisdiction, Indian lands and i-gaming issues. Mr. Quigley also assists tribes and states in the negotiation of tribal-state compacts, acts as legal counsel to tribal gaming commissions, and advises utility companies with tribal jurisdiction issues. Besides his Indian country work, Mr. Quigley also assists gaming industry clients in connection with Minnesota state licensing and regulatory compliance matters.*

*Mr. Foley is Senior Counsel for the national Gaming Law and Indian Country & Regulatory Affairs practice teams at the Gray Plant Mooty law firm, Washington D.C. office. His practice concentrates on Administrative Law, Indian Law, and Gambling Law, representing tribes and gaming industry companies in connection with State and Federal regulatory and administrative issues. Mr. Foley has significant experience in administrative and public policy matters. After twenty-one years in law enforcement, Foley was appointed to the National Indian Gaming Commission (1995-1998) for a three-year term as Commissioner, Vice-Chairman, and Acting Chairman.*

[1]*The authors would like to acknowledge the assistance of Joe Valandra, CEO of Great Luck, LLC, with the development of this article.*

Vialpando Dec. Exhibit No. 1

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|

## § 543.8 - Bingo

| (a) | **Supervision** | | | | | |
|---|---|---|---|---|---|---|
| 1. | Is supervision provided during bingo operations by an agent(s) with authority equal to or greater than those being supervised?  (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(a) | |

| (b) | **Bingo Cards** | | | | | |
|---|---|---|---|---|---|---|
| 2. | Do the physical bingo card inventory controls address the placement of orders, receipt, storage, issuance, removal, and cancellation of bingo card inventory to ensure that the bingo card inventory can be accounted for at all times?  (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(b)(1)(i) | |
| 3. | Are bingo cards secured/ reviewed to ensure that they have not been marked, altered, or otherwise manipulated?  (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(b)(1)(ii) | |
| 4. | Upon initial receipt from the supplier, was the bingo card inventory inspected by an authorized agent (without breaking the factory seals, if any)? (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(b)(2)(i) | |
| 5. | Upon initial receipt, is the bingo card inventory counted, inventoried, and secured by an authorized agent?  (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(b)(2)(i) | |
| 6. | Do bingo card inventory records include the date received, quantities received, and the name(s) of the individual(s) conducting the inspection? (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(b)(2)(ii) | |
| 7. | Storage - Are controls established and procedures implemented to ensure the following: Bingo cards are maintained in a secure location, accessible only to authorized agents?  (Inquiry, observation, and review SICS | ____ | ____ | ____ | 543.8(b)(3)(i) | |
| 8. | Storage - Are controls established and procedures implemented to ensure the following: The bingo card storage has surveillance coverage adequate to identify persons accessing the storage area?  (Inquiry and/or coordination | ____ | ____ | ____ | 543.8(b)(3)(i) | |

Vialpando Dec. Exhibit No. 2

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | with auditor conducting Surveillance Audit for observation) | | | | | |
| 9. | Storage - Are controls established and procedures implemented to ensure the following: | | | | | |
| | Storage area is secured and separate from the working inventory?  (Note: For Tier A operations, bingo card inventory may be stored in a cabinet, closet, or other similar area) (Inquiry and observation) | —— | —— | —— | 543.8(b)(3)(ii) | |
| 10. | For issuance and returns of inventory, are controls established and procedures implemented to ensure that the bingo card inventory is documented with records signed by the issuer and the recipient? (Inquiry and review SICS) | —— | —— | —— | 543.8(b)(4)(i) | |
| 11. | For issuance and returns of inventory, is the transaction documented with records signed by the issuer and the recipient for the following: | | | | | |
| | Issuance of inventory from storage to a staging area?  (Inquiry, observation, and review supporting documentation) | —— | —— | —— | 543.8(b)(4)(i)(A) | |
| 12. | For issuance and returns of inventory, is the transaction documented with records signed by the issuer and the recipient for the following: | | | | | |
| | Issuance of inventory from a staging area to the cage or sellers?  (Inquiry, observation, and review supporting documentation) | —— | —— | —— | 543.8(b)(4)(i)(B) | |
| 13. | For issuance and returns of inventory, is the transaction documented with records signed by the issuer and the recipient under the following events: | | | | | |
| | Return of inventory from a staging area to storage?  (Inquiry, observation, and review supporting documentation) | —— | —— | —— | 543.8(b)(4)(i)(C) | |
| 14. | For issuance and returns of inventory, is the transaction documented with records signed by the issuer and the recipient for the following: | | | | | |
| | Return of inventory from cage or seller to staging area or storage?  (Inquiry, observation, and review supporting documentation) | —— | —— | —— | 543.8(b)(4)(i)(D) | |

Vialpando Dec. Exhibit No. 2

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| 15. | Cancellation and removal (not returned to the supplier) – Are bingo cards removed from inventory that are deemed out of sequence, flawed, or misprinted, cancelled to ensure that they are not utilized in the play of a bingo game?  (Inquiry, observation, and review supporting documentation) | —— | —— | —— | 543.8(b)(5)(i) | |
| 16. | Cancellation and removal (returned to the supplier) – Are bingo cards that are removed from inventory cancelled and logged as removed from inventory? (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(b)(5)(i) | |
| 17. | Cancellation and removal – Are bingo cards associated with an investigation retained intact outside of the established removal and cancellation policy?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(b)(5)(ii) | |
| 18. | Logs - Is the inventory of bingo cards tracked and logged from receipt until use or permanent removal from inventory?  (Inquiry and review SICS) | —— | —— | —— | 543.8(b)(6)(i) | |
| 19. | Logs - Does the bingo card inventory record(s) include:  Date?  (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(A) | |
| 20. | Logs - Does the bingo card inventory record(s) include:  Shift or session?  (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(B) | |
| 21. | Logs - Does the bingo card inventory record(s) include:  Time?  (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(C) | |
| 22. | Logs - Does the bingo card inventory record(s) include:  Location?  (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(D) | |
| 23. | Logs - Does the bingo card inventory record(s) include:  Inventory received, issued, removed, and returned?  (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(E) | |

Vialpando Dec. Exhibit No. 2

### NATIONAL INDIAN GAMING COMMISSION
### MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| 24. | Logs - Does the bingo card inventory record(s) include:<br><br>Signature of agent performing transaction? (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(F) | |
| 25. | Logs - Does the bingo card inventory record(s) include:<br><br>Signature of agent performing the reconciliation? (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(G) | |
| 26. | Logs - Does the bingo card inventory record(s) include:<br><br>Any variance? (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(H) | |
| 27. | Logs - Does the bingo card inventory record(s) include:<br><br>Beginning and ending inventory? (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(I) | |
| 28. | Logs - Does the bingo card inventory record(s) include:<br><br>Description of inventory transaction being performed? (Review supporting documentation) | —— | —— | —— | 543.8(b)(6)(ii)(J) | |
| (c) | **Bingo card sales** | | | | | |
| 29. | Are agents who sell bingo cards prevented from being the sole verifier of bingo cards for prize payouts? (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(c)(1) | |
| 30. | Manual bingo card sales - In order to adequately record, track, and reconcile sales of bingo cards, is the following information documented:<br><br>Date? (Examination of records) | —— | —— | —— | 543.8(c)(2)(i) | |
| 31. | Manual bingo card sales - In order to adequately record, track, and reconcile sales of bingo cards, is the following information documented:<br><br>Shift or session? (Examination of records) | —— | —— | —— | 543.8(c)(2)(ii) | |

Vialpando Dec. Exhibit No. 2

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| 32. | Manual bingo card sales -  In order to adequately record, track, and reconcile sales of bingo cards, is the following information documented: | —— | —— | —— | 543.8(c)(2) (iii) | |
| | Number of bingo cards issued, sold, and returned?  (Examination of records) | | | | | |
| 33. | Manual bingo card sales -  In order to adequately record, track, and reconcile sales of bingo cards, is the following information documented: | —— | —— | —— | 543.8(c)(2) (iv) | |
| | Dollar amount of bingo card sales? (Examination of records) | | | | | |
| 34. | Manual bingo card sales -  In order to adequately record, track, and reconcile sales of bingo cards, is the following information documented: | —— | —— | —— | 543.8(c)(2) (v) | |
| | Signature, initials, or identification number of the agent preparing the record?  (Examination of records) | | | | | |
| 35. | Manual bingo card sales -  In order to adequately record, track, and reconcile sales of bingo cards, is the following information documented: | —— | —— | —— | 543.8(c)(2) (vi) | |
| | Signature, initials, or identification number of an independent agent who verified the bingo cards returned to inventory?  (Examination of records) | | | | | |
| 36. | Manual bingo card sales -  In order to adequately record, track, and reconcile sales of bingo cards, is the following information documented: | —— | —— | —— | 543.8(c)(2) (vi) | |
| | Signature, initials, or identification number of an independent agent who verified the dollar amount of bingo card sales?  (Examination of records) | | | | | |
| 37. | Are bingo card sale voids processed in accordance with the rules of the game and established controls? (Inquiry and review SICS) | —— | —— | —— | 543.8(c)(3) | |
| 38. | Are bingo card sale voids processed in accordance with the rules of the game and established controls that include the following: | —— | —— | —— | 543.8(c)(3) (i) | |
| | Patron refunds?  (Review supporting | | | | | |

Vialpando Dec. Exhibit No. 2

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | documentation) | | | | | |
| 39. | Are bingo card sale voids processed in accordance with the rules of the game and established controls that include the following:<br><br>Adjustments to bingo card sales to reflect voids?  (Review supporting documentation) | —— | —— | —— | 543.8(c)(3)(ii) | |
| 40. | Are bingo card sale voids processed in accordance with the rules of the game and established controls that include the following:<br><br>Adjustment to bingo card inventory?  (Review supporting documentation) | —— | —— | —— | 543.8(c)(3)(iii) | |
| 41. | Are bingo card sale voids processed in accordance with the rules of the game and established controls that include the following:<br><br>Documentation of the reason for the void? (Review supporting documentation) | —— | —— | —— | 543.8(c)(3)(iv) | |
| 42. | Are bingo card sale voids processed in accordance with the rules of the game and established controls that include the following:<br><br>Authorization for all voids?  (Review supporting documentation) | —— | —— | —— | 543.8(c)(3)(v) | |
| 43. | Class II gaming system bingo card sales - In order to adequately record, track and reconcile sales of bingo cards, is the following information documented from the server (this is not required if the system does not track the information, but system limitation(s) must be noted):<br><br>Date?  (Examination of records) | —— | —— | —— | 543.8(c)(4)(i) | |
| 44. | Class II gaming system bingo card sales - In order to adequately record, track and reconcile sales of bingo cards, is the following information documented from the server (this is not required if the system does not track the information, but system limitation(s) must be noted):<br><br>Time?  (Examination of records) | —— | —— | —— | 543.8(c)(4)(ii) | |
| 45. | Class II gaming system bingo card sales - In order to adequately record, track and reconcile sales of | | | | | |

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | bingo cards, is the following information documented from the server (this is not required if the system does not track the information, but system limitation(s) must be noted):<br><br>Number of bingo cards sold?  (Examination of records) | ____ | ____ | ____ | 543.8(c)(4)(iii) | |
| 46. | Class II gaming system bingo card sales - In order to adequately record, track and reconcile sales of bingo cards, is the following information documented from the server (this is not required if the system does not track the information, but system limitation(s) must be noted):<br><br>Dollar amount of bingo card sales? (Examination of records) | ____ | ____ | ____ | 543.8(c)(4)(iv) | |
| 47. | Class II gaming system bingo card sales - In order to adequately record, track and reconcile sales of bingo cards, is the following information documented from the server (this is not required if the system does not track the information, but system limitation(s) must be noted):<br><br>Amount in, amount out and other associated meter information?  (Examination of records) | ____ | ____ | ____ | 543.8(c)(4)(v) | |
| **(d)** | **Draw** | | | | | |
| 48. | Are controls established and procedures implemented to ensure that all eligible objects used in the conduct of the bingo game are available to be drawn and have not been damaged or altered? (Inquiry, observation, and review SICS) | ____ | ____ | ____ | 543.8(d)(1) | |
| 49. | Is verification of physical objects performed by two agents before the start of the first bingo game/session?  (Inquiry and observation) | ____ | ____ | ____ | 543.8(d)(1) | |
| 50. | Is at least one of the verifying agents a supervisory agent or independent of the bingo games department?  (Inquiry) | ____ | ____ | ____ | 543.8(d)(1) | |
| 51. | Is the selection (of bingo balls/numbers) made through an electronic aid?  (Certification in accordance with 25 CFR 547.14 is acceptable for verifying the randomness of the draw and satisfies the requirements of paragraph (d)(1) of this section | ____ | ____ | ____ | 543.8(d)(2) | |

Vialpando Dec. Exhibit No. 2

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---------------|-----|-----|---------|------|---------|
| | (as applicable).)  (Observation and inquiry) (N/A and YES answers only) | | | | | |
| 52. | Are controls established and procedures implemented to provide a method of recall of the draw, which includes the order and identity of the objects drawn, for dispute resolution purposes? (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(d)(3) | |
| 53. | Verification and display of draw – Are controls established and procedures implemented to ensure that the identity of each object drawn is accurately recorded and transmitted to the participants? (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(d)(4)(i) | |
| 54. | Do the procedures identify the method used to ensure the identity of each object drawn?  (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(d)(4)(i) | |
| 55. | For all games offering a prize payout of $1,200 or more, as the objects are drawn, is the identity of the objects immediately recorded and maintained for a minimum of 24 hours?  (Inquiry, observation, and review supporting documentation) | ____ | ____ | ____ | 543.8(d)(4)(ii) | |
| **(e)** | **Prize payout** | | | | | |
| 56. | Are controls established and procedures implemented for cash or cash equivalents that address the following: Is the agent who is authorized to make a payout identified (by position)?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(e)(1)(i) | |
| 57. | Are controls established and procedures implemented for cash or cash equivalents that address the following: Are there predetermined payout authorization levels (by position)?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(e)(1)(ii) | |
| 58. | Are controls established and procedures implemented for cash or cash equivalents that address the following: Do documentation procedures ensure separate control of the cash accountability functions? | ____ | ____ | ____ | 543.8(e)(1)(iii) | |

Page E11

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | (Inquiry and review supporting documentation) | | | | | |
| 59. | Verification of validity – Are controls established and procedures implemented to verify that the following is valid for the game in play prior to payment of a winning prize:<br><br>Winning card(s)?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(e)(2)(i)(A) | |
| 60. | Verification of validity – Are controls established and procedures implemented to verify that the following is valid for the game in play prior to payment of a winning prize:<br><br>Objects drawn?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(e)(2)(i)(B) | |
| 61. | Verification of validity – Are controls established and procedures implemented to verify that the following is valid for the game in play prior to payment of a winning prize:<br><br>Is the previously designated arrangement of numbers or designations on such cards (as described in 25 U.S.C. 2703(7)(A)) valid for play?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(e)(2)(i)(C) | |
| 62. | Do at least two agents verify that the card, objects drawn, and previously designated arrangement were valid for the game in play?  (Inquiry, observation, and review supporting documentation)<br><br>(Note: Where an automated verification method is available, verification by such method is acceptable.) | —— | —— | —— | 543.8(e)(2)(ii) | |
| 63. | Validation – For manual payouts, do at least two agents determine the validity of the claim prior to the payment of a prize?  (Inquiry and review supporting documentation)<br><br>(Note: The system may serve as one of the validators.) (Note: For automated payouts, the system may serve as the sole validator of the claim.) | —— | —— | —— | 543.8(e)(3)(i) | |
| 64. | Verification – For manual payouts, do at least two agents verify that the winning pattern has been | —— | —— | —— | 543.8(e)(4)(i) | |

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II – AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | achieved on the winning card prior to the payment of a prize? (Inquiry and review supporting documentation)<br><br>(Note: The system may serve as one of the verifiers.) (Note: For automated payouts, the system may serve as the sole verifier that the pattern has been achieved on the winning card.) | | | | | |
| 65. | Authorization and signatures – For manual prize payouts, do at least two agents authorize, sign, and witness all manual prize payouts above $1,200? (Inquiry and review SICS.) | ____ | ____ | ____ | 543.8(e)(5)(i) | |
| 66. | Authorization and signatures – For manual prize payouts, if management has authorized manual prize payout thresholds that are lower than $1,200, is the predetermined amount documented?  State the predetermined amount $_____. (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(e)(5)(i) | |
| 67. | Authorization and signatures – For manual prize payouts, did the gaming operation receive TGRA approval for the policies and procedures and the threshold amount for manual prize payouts? (Review TGRA approval) | ____ | ____ | ____ | 543.8(e)(5)(i) | |
| 68. | Do manual prize payouts above the following threshold (or a lower threshold, as authorized by management) require one of the two signatures and verifications to be a supervisory or management employee independent of the operation of Class II Gaming System bingo and the following:<br><br>$5,000 for a **Tier A** facility?  (Inquiry, review SICS, and review supporting documentation)<br><br>If manual prize payouts are lower than ($5,000), state the predetermined amount $_____. | ____ | ____ | ____ | 543.8(e)(5)(ii)(A) | |
| 69. | Do manual prize payouts above the following threshold (or a lower threshold, as authorized by management) require one of the two signatures and verifications to be a supervisory or management employee independent of the operation of Class II Gaming System bingo and the following:<br><br>$10,000 for a **Tier B** facility?  (Inquiry, review | ____ | ____ | ____ | 543.8(e)(5)(ii)(B) | |

Vialpando Dec. Exhibit No. 2

### NATIONAL INDIAN GAMING COMMISSION
### MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | SICS, and review supporting documentation)<br><br>If manual prize payouts are lower than ($10,000), state the predetermined amount $_____. | | | | | |
| 70. | Do manual prize payouts above the following threshold (or a lower threshold, as authorized by management) require one of the two signatures and verifications to be a supervisory or management employee independent of the operation of Class II Gaming System bingo and the following:<br><br>$20,000 for a **Tier C** facility (with up to $100 million GGR)?  (Inquiry, review SICS, and review supporting documentation)<br><br>If manual prize payouts are lower than ($20,000), state the predetermined amount $_____. | —— | —— | —— | 543.8(e)(5) (ii)(C) | |
| 71. | Do manual prize payouts above the following threshold (or a lower threshold, as authorized by management) require one of the two signatures and verifications to be a supervisory or management employee independent of the operation of Class II Gaming System bingo and the following:<br><br>$50,000 for a **Tier C** facility (with over $100 million GGR)?  (Inquiry, review SICS, and review supporting documentation)<br><br>If manual prize payouts are lower than ($50,000), state the predetermined amount $_____. | —— | —— | —— | 543.8(e)(5) (ii)(D) | |
| 72. | Are the predetermined thresholds, whether set at the MICS level or lower, authorized by management, approved by the TGRA, documented, and maintained?  (Review TGRA approval) | —— | —— | —— | 543.8(e)(5) (iii) | |
| 73. | Does the Class II gaming system operation substitute for one authorization/signature verifying, validating or authorizing a winning card?  (Inquiry and review supporting documentation)<br><br>(Note: May not substitute for a supervisory or management authorization/signature.) | —— | —— | —— | 543.8(e)(5) (iv) | |
| 74. | Do payout records, including manual payout | —— | —— | —— | 543.8(e)(6) (i) | |

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | records, include the following information: | | | | | |
| | Date and time?  (Inquiry and review supporting documentation) | | | | | |
| 75. | Do payout records, including manual payout records, include the following information: | | | | | |
| | Amount of the payout (alpha & numeric for player interface payouts)?  (Inquiry and review supporting documentation) | ___ | ___ | ___ | 543.8(e)(6) (ii) | |
| 76. | Do payout records, including manual payout records, include the following information: | | | | | |
| | Bingo card identifier or player interface identifier?  (Inquiry and review supporting documentation) | ___ | ___ | ___ | 543.8(e)(6) (iii) | |
| 77. | Do manual payout records also include the following: | | | | | |
| | Game name or number?  (Inquiry and review supporting documentation) | ___ | ___ | ___ | 543.8(e)(6) (iv)(A) | |
| 78. | Do manual payout records also include the following: | | | | | |
| | Description of pattern covered, such as cover-all or four corners?  (Inquiry and review supporting documentation) | ___ | ___ | ___ | 543.8(e)(6) (iv)(B) | |
| 79. | Do manual payout records also include the following: | | | | | |
| | Signature of all, but not less than two, agents involved in the transaction?  (Inquiry and review supporting documentation) | ___ | ___ | ___ | 543.8(e)(6) (iv)(C) | |
| 80. | Do manual payout records also include the following: | | | | | |
| | For override transactions, verification by a supervisory or management agent independent of the transaction?  (Inquiry and review supporting documentation) | ___ | ___ | ___ | 543.8(e)(6) (iv)(D) | |
| 81. | Do manual payout records also include the following: | | | | | |
| | Any other information necessary to substantiate the payout?  (Inquiry and review supporting | ___ | ___ | ___ | 543.8(e)(6) (iv)(E) | |

Page E15

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---------------|-----|-----|---------|------|---------|
| | documentation) | | | | | |

**(f)    Cash and equivalent controls**

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---------------|-----|-----|---------|------|---------|
| 82. | Are cash or cash equivalents exchanged between two persons counted independently by at least two agents and reconciled to the recorded amounts at the end of each shift or session?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(f)(1) | |
| 83. | Are unexplained variances documented and maintained?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(f)(1) | |
| 84. | Are unverified transfers of cash or cash equivalents prohibited?  (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(f)(1) | |
| 85. | Are procedures implemented to control cash or cash equivalents based on the amount of the transaction?  (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(f)(2) | |
| 86. | Do the procedures to control cash and cash equivalents include documentation by shift, session, or other relevant time period of the following:<br><br>Inventory, including any increases or decreases?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(f)(2)(i) | |
| 87. | Do the procedures to control cash and cash equivalents include documentation by shift, session, or other relevant time period of the following:<br><br>Transfers?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(f)(2)(ii) | |
| 88. | Do the procedures to control cash and cash equivalents include documentation by shift, session, or other relevant time period of the following:<br><br>Exchanges, including acknowledging signatures or initials?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(f)(2)(iii) | |
| 89. | Do the procedures to control cash and cash equivalents include documentation by shift, | ____ | ____ | ____ | 543.8(f)(2)(iv) | |

Vialpando Dec. Exhibit No. 2

### NATIONAL INDIAN GAMING COMMISSION
### MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | session, or other relevant time period of the following: | | | | | |
| | Resulting variances?  (Inquiry and review supporting documentation) | | | | | |
| 90. | Do any changes to control of accountability, exchange, or transfer require that the cash or cash equivalents be counted and recorded independently by at least two agents and reconciled to the recorded amount?  (Inquiry, observation, and review SICS) | —— | —— | —— | 543.8(f)(3) | |
| **(g)** | **Technologic aids to the play of bingo** | | | | | |
| 91. | Are controls established and procedures implemented to safeguard the integrity of technologic aids to the play of bingo during installations, operations, modifications, removal and retirements?  (Inquiry and review SICS) | —— | —— | —— | 543.8(g) | |
| 92. | Shipping and receiving - Is a communication procedure established between the supplier, the gaming operation, and the TGRA to properly control the shipping and receiving of all software and hardware components and do such procedures include the following: | —— | —— | —— | 543.8(g)(1) (i)(A) | |
| | Is a notification of pending shipments provided to the TGRA by the gaming operation?  (Inquiry and review supporting documentation) | | | | | |
| 93. | Shipping and receiving - Is a communication procedure established between the supplier, the gaming operation, and the TGRA to properly control the shipping and receiving of all software and hardware components and do such procedures include the following: | —— | —— | —— | 543.8(g)(1) (i)(B) | |
| | Certification in accordance with 25 CFR part 547 (as applicable)?  (N/A and YES answers only)  (Inquiry and review SICS) | | | | | |
| 94. | Does notification from the supplier to the TGRA, or the gaming operation as approved by the TGRA, of the shipping date and expected date of delivery include the following: | —— | —— | —— | 543.8(g)(1) (i)(C)(1) | |
| | Name and address of the supplier?  (Inquiry and | | | | | |

Vialpando Dec. Exhibit No. 2

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | review supporting documentation) | | | | | |
| 95. | Does notification from the supplier to the TGRA, or the gaming operation as approved by the TGRA, of the shipping date and expected date of delivery include the following: | —— | —— | —— | 543.8(g)(1)(i)(C)(2) | |
| | Description of shipment?  (Inquiry and review supporting documentation) | | | | | |
| 96. | Does notification from the supplier to the TGRA, or the gaming operation as approved by the TGRA, of the shipping date and expected date of delivery include the following: | —— | —— | —— | 543.8(g)(1)(i)(C)(3) | |
| | For player interfaces: a serial number?  (Inquiry and review supporting documentation) | | | | | |
| 97. | Does notification from the supplier to the TGRA, or the gaming operation as approved by the TGRA, of the shipping date and expected date of delivery include the following: | —— | —— | —— | 543.8(g)(1)(i)(C)(4) | |
| | For software: software version and description of software?  (Inquiry and review supporting documentation) | | | | | |
| 98. | Does notification from the supplier to the TGRA, or the gaming operation as approved by the TGRA, of the shipping date and expected date of delivery include the following: | —— | —— | —— | 543.8(g)(1)(i)(C)(5) | |
| | Method of shipment?  (Inquiry and review supporting documentation) | | | | | |
| 99. | Does notification from the supplier to the TGRA, or the gaming operation as approved by the TGRA, of the shipping date and expected date of delivery include the following: | —— | —— | —— | 543.8(g)(1)(i)(C)(6) | |
| | Expected date of delivery?  (Inquiry and review supporting documentation) | | | | | |
| 100. | Are procedures implemented for the exchange of Class II gaming system components for maintenance and replacement?  (Inquiry and review SICS) | —— | —— | —— | 543.8(g)(1)(ii) | |
| 101. | Are Class II gaming system components shipped in a secure manner to deter unauthorized access? | —— | —— | —— | 543.8(g)(1)(iii) | |

Vialpando Dec. Exhibit No. 2

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | (Inquiry, observation, and review supporting documentation) | | | | | |
| 102. | Does the TGRA, or its designee, receive all Class II gaming system components and game play software packages, and verify the contents against the shipping notification?  (Inquiry and review supporting documentation) | ⎯⎯ | ⎯⎯ | ⎯⎯ | 543.8(g)(1)(iv) | |
| 103. | Access credential control methods – Are controls established to restrict access to the Class II gaming system components, as set forth in § 543.20, Information and Technology (as applicable)?  (N/A and YES answers only)  (Inquiry) | ⎯⎯ | ⎯⎯ | ⎯⎯ | 543.8(g)(2)(i) | |
| 104. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following:<br><br>Date placed into service?  (Inquiry and review supporting documentation) | ⎯⎯ | ⎯⎯ | ⎯⎯ | 543.8(g)(3)(i)(A) | |
| 105. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following:<br><br>Date made available for play?  (Inquiry and review supporting documentation) | ⎯⎯ | ⎯⎯ | ⎯⎯ | 543.8(g)(3)(i)(B) | |
| 106. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following:<br><br>Supplier?  (Inquiry and review supporting documentation) | ⎯⎯ | ⎯⎯ | ⎯⎯ | 543.8(g)(3)(i)(C) | |
| 107. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following:<br><br>Software version?  (Inquiry and review supporting documentation) | ⎯⎯ | ⎯⎯ | ⎯⎯ | 543.8(g)(3)(i)(D) | |
| 108. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, | ⎯⎯ | ⎯⎯ | ⎯⎯ | 543.8(g)(3)(i)(E) | |

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | related to installed game servers and player interfaces for the following: | | | | | |
| | Serial number?  (Inquiry and review supporting documentation) | | | | | |
| 109. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following: | —— | —— | —— | 543.8(g)(3)(i)(F) | |
| | Game title?  (Inquiry and review supporting documentation) | | | | | |
| 110. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following: | —— | —— | —— | 543.8(g)(3)(i)(G) | |
| | Asset and/or location number?  (Inquiry and review supporting documentation) | | | | | |
| 111. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following: | —— | —— | —— | 543.8(g)(3)(i)(H) | |
| | Seal number?  (Inquiry and review supporting documentation) | | | | | |
| 112. | Recordkeeping and audit processes - Does the gaming operation maintain records, as applicable, related to installed game servers and player interfaces for the following: | —— | —— | —— | 543.8(g)(3)(i)(I) | |
| | Initial meter reading?  (Inquiry and review supporting documentation) | | | | | |
| 113. | System software signature verification - Are procedures implemented for system software verifications and do the procedures include the following: | —— | —— | —— | 543.8(g)(4)(i) | |
| | Comparing signatures generated by the verification programs required by 25 CFR 547.8, to the signatures provided in the independent test laboratory letter for the software version?  (Review supporting documentation) | | | | | |

Vialpando Dec. Exhibit No. 2

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| 114. | Does an agent independent of the bingo operation perform system software signature verification(s) to verify that only approved software is installed? (Review supporting documentation) | —— | —— | —— | 543.8(g)(4)(ii) | |
| 115. | Are procedures implemented for investigating and resolving any software verification variances? (Review supporting documentation) | —— | —— | —— | 543.8(g)(4)(iii) | |
| 116. | Installation testing – Is testing completed during the installation process to verify that the player interface has been properly installed? (Review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i) | |
| 117. | Does installation testing include the following, as applicable: Communication with the Class II gaming system? (Inquiry) | —— | —— | —— | 543.8(g)(5)(i)(A) | |
| 118. | Does installation testing include the following, as applicable: Communication with the accounting system? (Inquiry) | —— | —— | —— | 543.8(g)(5)(i)(B) | |
| 119. | Does installation testing include the following, as applicable: Communication with the player tracking system? (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i)(C) | |
| 120. | Does installation testing include the following, as applicable: Currency and vouchers to bill acceptor? (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i)(D) | |
| 121. | Does installation testing include the following, as applicable: Voucher printing? (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i)(E) | |
| 122. | Does installation testing include the following, as applicable: Meter incrementation? (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i)(F) | |

Vialpando Dec. Exhibit No. 2

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| 123. | Does installation testing include the following, as applicable:<br><br>Pay table, for verification?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i)(G) | |
| 124. | Does installation testing include the following, as applicable:<br><br>Player interface denomination, for verification? (Inquiry and observation) | —— | —— | —— | 543.8(g)(5)(i)(H) | |
| 125. | Does installation testing include the following, as applicable:<br><br>All buttons, to ensure that all are operational and programmed appropriately?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i)(I) | |
| 126. | Does installation testing include the following, as applicable:<br><br>System components, to ensure that they are safely installed at location?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(5)(i)(J) | |
| 127. | Does installation testing include the following, as applicable:<br><br>Locks, to ensure that they are secure and functioning?  (Inquiry and observation) | —— | —— | —— | 543.8(g)(5)(i)(K) | |
| 128. | Does the TGRA or the operation verify that all game rules and disclaimers are displayed at all times or made readily available to the player upon request, as required by 25 CFR part 547?  (Inquiry and review SICS) | —— | —— | —— | 543.8(g)(6) | |
| 129. | Does the TGRA approve all technologic aids before they are offered for play?  (Review TGRA approval) | —— | —— | —— | 543.8(g)(7) | |
| 130. | Does all Class II gaming equipment comply with 25 CFR part 547, Minimum Technical Standards for Gaming Equipment Used With the Play of Class II Games?  (Inquiry and review supporting documentation) | —— | —— | —— | 543.8(g)(8) | |
| 131. | Has the TGRA or the operation established and implemented procedures for dispute resolution? | —— | —— | —— | 543.8(g)(9) | |

Vialpando Dec. Exhibit No. 2

## NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
## BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | (Inquiry and review SICS) | | | | | |
| **(h)** | **Operations** | | | | | |
| 132. | Malfunctions – Are procedures implemented to investigate, document and resolve malfunctions? (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(h)(1) | |
| 133. | Do the malfunction procedures address the following:<br><br>Determination of the event causing the malfunction? (Review supporting documentation) | ____ | ____ | ____ | 543.8(h)(1)(i) | |
| 134. | Do the malfunction procedures address the following:<br><br>Review of relevant records, game recall, reports, logs, and surveillance records? (Review supporting documentation) | ____ | ____ | ____ | 543.8(h)(1)(ii) | |
| 135. | Do the malfunction procedures address the following:<br><br>Repair or replacement of the Class II gaming component? (Review supporting documentation) | ____ | ____ | ____ | 543.8(h)(1)(iii) | |
| 136. | Do the malfunction procedures address the following:<br><br>Verification of the integrity of the Class II gaming component before restoring it to operation? (Review supporting documentation) | ____ | ____ | ____ | 543.8(h)(1)(iv) | |
| 137. | Removal, retirement and/or destruction – Are procedures implemented to retire or remove any or all associated components of a Class II gaming system from operation? (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(h)(2) | |
| 138. | Removal, retirement and/or destruction – For player interfaces and components that accept cash or cash equivalents, do the removal, retirement and/or destruction procedures include the following:<br><br>Coordinate with the drop team to perform a final drop? (Inquiry and review SICS) | ____ | ____ | ____ | 543.8(h)(2)(i)(A) | |
| 139. | Removal, retirement and/or destruction – For | ____ | ____ | ____ | 543.8(h)(2)(i)(B) | |

Page E23

Page 20 of 24

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | player interfaces and components that accept cash or cash equivalents, do the removal, retirement and/or destruction procedures include the following: | | | | | |
| | Collection of the final accounting information such as meter readings, drop and payouts? (Inquiry and review SICS) | | | | | |
| 140. | Removal, retirement and/or destruction – For player interfaces and components that accept cash or cash equivalents, do the removal, retirement and/or destruction procedures include the following: | — | — | — | 543.8(h)(2)(i)(C) | |
| | Removal and/or securing any or all associated equipment such as locks, card reader, or ticket printer from the retired or removed component? (Inquiry and observation) | | | | | |
| 141. | Removal, retirement and/or destruction – For player interfaces and components that accept cash or cash equivalents, do the removal, retirement and/or destruction procedures include the following: | — | — | — | 543.8(h)(2)(i)(D) | |
| | Document removal, retirement, and/or destruction? (Inquiry and observation) | | | | | |
| 142. | Removal, retirement and/or destruction – For removal of software components, do procedures include the following: | — | — | — | 543.8(h)(2)(ii)(A) | |
| | Purge and/or return the software to the license holder? (Inquiry and review SICS) | | | | | |
| 143. | Removal, retirement and/or destruction – For removal of software components, do procedures include the following: | — | — | — | 543.8(h)(2)(ii)(B) | |
| | Document the removal? (Inquiry and review supporting documentation) | | | | | |
| 144. | Removal, retirement and/or destruction – For removal of other related equipment such as blowers, cards, interface cards, do procedures include the following: | — | — | — | 543.8(h)(2)(iii)(A) | |
| | Remove and/or secure equipment? (Inquiry and observation) | | | | | |
| 145. | Removal, retirement and/or destruction – For removal of other related equipment such as | — | — | — | 543.8(h)(2)(iii)(B) | |

Vialpando Dec. Exhibit No. 2

# NATIONAL INDIAN GAMING COMMISSION
## MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | blowers, cards, interface cards, do procedures include the following: | | | | | |
| | Document the removal or securing of equipment? (Inquiry and review supporting documentation) | | | | | |
| 146. | Removal, retirement and/or destruction – Do the removal procedures for all components include the following: | | | | | |
| | Verify that unique identifiers and descriptions of removed/retired components are recorded as part of the retirement documentation? (Inquiry and review SICS) | ___ | ___ | ___ | 543.8(h)(2)(iv)(A) | |
| 147. | Removal, retirement and/or destruction – Do the removal procedures for all components include the following: | | | | | |
| | Coordination with the accounting department to properly retire the component in the system records? (Inquiry and review SICS) | ___ | ___ | ___ | 543.8(h)(2)(iv)(B) | |
| 148. | Removal, retirement and/or destruction – If the TGRA authorizes destruction of any Class II gaming system components, are procedures developed to destroy such components, and do such procedures include the following: | | | | | |
| | Methods of destruction? (Inquiry and review SICS) | ___ | ___ | ___ | 543.8(h)(2)(v)(A) | |
| 149. | Removal, retirement and/or destruction – If the TGRA authorizes destruction of any Class II gaming system components, are procedures developed to destroy such components, and do such procedures include the following: | | | | | |
| | Witness or surveillance of destruction? (Inquiry and review SICS) | ___ | ___ | ___ | 543.8(h)(2)(v)(B) | |
| 150. | Removal, retirement and/or destruction – If the TGRA authorizes destruction of any Class II gaming system components, are procedures developed to destroy such components, and do such procedures include the following: | | | | | |
| | Documentation of all components destroyed? (Inquiry and review SICS) | ___ | ___ | ___ | 543.8(h)(2)(v)(C) | |

Page E25

### NATIONAL INDIAN GAMING COMMISSION
### MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| 151. | Removal, retirement and/or destruction – If the TGRA authorizes destruction of any Class II gaming system components, are procedures developed to destroy such components, and do such procedures include the following: | —— | —— | —— | 543.8(h)(2)(v)(D) | |
| | Signatures of agent(s) destroying components attesting to destruction?  (Inquiry and review SICS) | | | | | |
| **(i)** | **Vouchers** | | | | | |
| 152. | Are controls established and procedures implemented for the following: | —— | —— | —— | 543.8(i)(1)(i) | |
| | Verification of the authenticity of each voucher redeemed?  (Inquiry and review SICS) | | | | | |
| 153. | Are controls established and procedures implemented for the following: | —— | —— | —— | 543.8(i)(1)(ii) | |
| | If the voucher is valid, verification that the patron is paid the appropriate amount?  (Inquiry and review SICS) | | | | | |
| 154. | Are controls established and procedures implemented for the following: | —— | —— | —— | 543.8(i)(1)(iii) | |
| | Documenting the payment of a claim on a voucher that is not physically available or a voucher that cannot be validated such as a mutilated, expired, lost, or stolen voucher? (Inquiry and review SICS) | | | | | |
| 155. | Are controls established and procedures implemented for the following: | —— | —— | —— | 543.8(i)(1)(iv) | |
| | Retention of the payment documentation for reconciliation purposes?  (Inquiry and review SICS) | | | | | |
| 156. | Are controls established and procedures implemented for the following: | —— | —— | —— | 543.8(i)(1)(v) | |
| | For manual payment of a voucher of $500 or more, requirement that a supervisory employee verify the validity of the voucher prior to payment?  (Inquiry and review SICS) | | | | | |
| 157. | Are vouchers paid during a period while the | —— | —— | —— | 543.8(i)(2) | |

Vialpando Dec. Exhibit No. 2

### NATIONAL INDIAN GAMING COMMISSION
### MICS CLASS II - AUDIT CHECKLIST
### BINGO (BI)

| # | MICS QUESTION | YES | NO | W/P REF | MICS | COMMENT |
|---|---|---|---|---|---|---|
| | voucher system is temporarily out of operation marked ''paid'' by the cashier?  (Inquiry and observation) | | | | | |
| 158. | Are vouchers redeemed when the voucher system was temporarily out of operation validated as expeditiously as possible upon restored operation of the voucher system?  (Inquiry and observation) | ____ | ____ | ____ | 543.8(i)(3) | |
| 159. | Are paid vouchers maintained in the cashier's accountability for reconciliation purposes? (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(i)(4) | |
| 160. | Are unredeemed vouchers voided in the voucher system by only supervisory employees?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(i)(5) | |
| 161. | Does the accounting department maintain the voided voucher, if available?  (Inquiry and review supporting documentation) | ____ | ____ | ____ | 543.8(i)(5) | |
| **(l)** | **Variances** | | | | | |
| 162. | Has the gaming operation established a threshold level at which a variance, including deviations from the mathematical expectations required by 25 CFR 547.4, must be reviewed?  (Inquiry)  State the type(s) of variance(s) and threshold level(s) or percentage(s) : _____ | ____ | ____ | ____ | 543.8(l) | |
| 163. | Has the gaming operation received TGRA approval for the variance threshold(s)? (Review TGRA approval) | ____ | ____ | ____ | 543.8(l) | |
| 164. | Are reviews of variances exceeding the established threshold(s) documented?  (Review supporting documentation) | ____ | ____ | ____ | 543.8(l) | |

Vialpando Dec. Exhibit No. 2

**Tech Aid Component Stack For**
**Virtual Private Network Assisted Play System (VPNAPS)**
**[joining legal framework with tech design]**

**Stack #3**

**Communication Link/Security Technology Set**

Features:   Software and hardware components that: (1) facilitate communication link between account holders and both the gaming facility (where game play servers are located) and the proxy engagement station, each located on Indian land, (2) allow account holders to use Internet to electronically enter onto tribal lands and to access proxy engagement station via a secure gateway, (3) enhance the access security features of standard class II server-client architecture, and (4) create closed loop network for math and game management servers located in gaming facility on Tribe's Indian lands.  *See Illustrations #3(a) – (e)*

Authority:   SY "Tribal Transaction Location" Law
SYGC Regulation 14-I010, § 3.0
SYGC Regulation 14-I011, §§ 2.0(o), (p) & (r) and 14.0(d)(7)
SYGC Regulation 14-I009, §§ 3.0 and 5.0(d)(3)
NIGC Bulletin 2009-03
September 24, 2009 Casino Gateway Network Advisory Letter
SYGC October 24, 2014 Classification Determination
Foley Game Play Opinion & Foley Gaming System Opinion (and 9th Cir. Coeur d'Alene Lottery decision noted therein)
IGRA Senate Report #100-446 re: "max flexibility" for tech advancements with Class II bingo gaming

**Stack #2**

**Proxy Play Technology Set**

Features:   Software and hardware components to assist account holder to engage designated agent proxy (located on site) via proxy engagement station.
Auto-daub (electronic bingo card minder) functionality via software and hardware components to assist account holder's designated agent proxy (located on site) to play (on behalf of account holder) a bingo game using digital-format system with functionality like standard server-client architecture of electronic-linked bingo gaming systems.
Software and hardware components to assist designated agent proxy to report on time delayed basis to account holder results of bingo game played on account holder's behalf.
*See Illustrations #2(a) –(e)*

Authority:   SYGC Regulation 14-I011 §§ 11.0 & 14.0(d)(7)
SYGC Regulation 14-I009, §§ 3.0 & 5.0(d)(3)
SYGC October 24, 2014 Classification Determination
House Rules for DRB gaming
July 26, 1995 NIGC Chairman Declaration re: "Proxy Play"
November 14, 2000 NIGC Advisory Letter re: National Indian Bingo
June 27, 2014 NIGC Advisory Letter re: Bingo Nation Game
Foley Game Play Opinion & Foley Gaming System Opinion
IGRA Senate Report #100-446 re: "max flexibility" for tech advancements with Class II bingo gaming

**Stack #1**

**Current Class II Server-Based Electronic Bingo Gaming Systems**
**(Standard for electronic-linked bingo gaming systems operated in Indian country since mid-1990s)**

Features:   Server-client architecture with game play server located in back room electronically linked to terminal boxes with entertaining video display screens which are located in public space of the gaming facility – i.e. "wholly-electronic format." *See Illustration #1*

Authority:   Cabazon (Supreme Court 1987)
IGRA §2703(7)(A), 2710(a)(1), 2710(b)(1) & 25 CFR §502.3
103 Electronic Gambling Devices (9th Cir. 2000)
162 MegaMania Gambling Devices (10th Cir. 2000)
Revised 25 CFR §502.7 (67 Fed. Reg. 41166, 41171)(June 17, 2002)
Santee Sioux (8th Cir. 2003)
Seneca-Cayuga (10th Cir. 2003)
NIGC "linked bingo system" advisory letters (2003-2005)
25 CFR 547.2 definition of "Class II gaming system" (2012)
NIGC "One Touch Bingo" pronouncement re: "auto-daub" features – 78 Fed. Reg. 37998 (June 25, 2013)
IGRA Senate Report #100-446 re: "max flexibility" for tech advancements with Class II bingo gaming

Page E28

Vialpando Dec. Exhibit No. 3



*Illustration # 1*

Vialpando Dec. Exhibit No. 3



*Illustration # 2(a) – engagement of proxy agent*



Vialpando Dec. Exhibit No. 3



Illustration #2(b) - proxy request to game action



*Illustration #2(c) – game action play*

Vialpando Dec. Exhibit No. 3



*Illustration #2(d) – game action results*

Vialpando Dec. Exhibit No. 3

*Illustration #2(e) - game action results revealed & reported*



Vialpando Dec. Exhibit No. 3

*Illustration # 3(a) - Indian lands*

Non-Indian Lands

SANTA YSABEL INDIAN LANDS

ELIGIBLE FOR GAMING

UNDER

IGRA

Page E35

Vialpando Dec. Exhibit No. 3

*Illustration # 3(b) – DRB facility*



Desert Rose Bingo Gaming Facility

Vialpando Dec. Exhibit No. 3



*Illustration # 3(c) - VPNAPS*

Vialpando Dec. Exhibit No. 3



*Illustration # 3(d) - registration booth*

VPNAPS

Closed loop intranet system with private IP address;

Includes hardware (servers) and software components

Virtual registration booth

browser access link

browser-enabled device

Vialpando Dec. Exhibit No. 3

Page E38



Illustration # 3(e) - account holder department

Vialpando Dec. Exhibit No. 3

*Description:* This class exemption exempts from the prohibited transaction provisions of ERISA, certain transactions involving an employee benefit plan's purchase of securities which may aid the issuer of the securities to reduce or retire indebtedness to a party in interest.

*Agency:* Pension Welfare Benefits Administration.

*Title:* Prohibited Transaction Exemption 75–1.

*OMB Number:* 1210–0092 (reinstatement).

*Frequency:* On Occasion.

*Affected Public:* Individuals or households; Business or other for-profit; Not-for-profit institutions.

*Number of Respondents:* 750.

*Estimated Time Per Respondent:* .08 seconds.

*Total Burden Hours:* 1.

*Total Annualized capital/startup costs:* 0.

*Total annual costs (operating/ maintaining systems or purchasing services):* 0.

*Description:* This class exemption from the prohibited transaction of ERISA permits banks, registered broker-dealers and reporting dealers in Government Securities who are parties in interest to engage in certain kinds of securities transaction with plans.

*Agency:* Pension Welfare Benefits Administration.

*Title:* Prohibited Transaction Exemption 88–59.

*OMB Number:* 1210–0095 (reinstatement).

*Frequency:* On occasion.

*Affected Public:* Individuals or households; Business or other for-profit; Not-for-profit institutions.

*Number of Respondents:* 185.

*Estimated Time Per Respondent:* .32 seconds.

*Total Burden Hours:* 1.

*Total Annualized capital/startup costs:* 0.

*Total annual costs (operating/ maintaining systems or purchasing services):* 0.

*Description:* This class exemption exempts from the prohibited transaction provisions of ERISA, certain transactions involving residential financing arrangements.

**Theresa M. O'Malley,**

*Departmental Clearance Officer.*

[FR Doc. 97–27251 Filed 10–14–97; 8:45 am]

**BILLING CODE 4510–29–M**

## NATIONAL GAMBLING IMPACT STUDY COMMISSION

### Meeting

**AGENCY:** National Gambling Impact Study Commission.

*Time and Date:* Friday, October 31, 1997, 9:30 a.m. to 3:00 p.m.

*Place:* The meeting site will be: The Grand Ballroom, Washington Dulles Airport Hilton, 13869 Park Center Road, Herndon, VA 20171.

*Status:* The meeting will be open to the public from 9:30 a.m. to 3:00 p.m., except that the meeting will be closed to the public from 11:00 a.m. to 12:00 p.m. for the purposes of considering internal personnel rules and practices and to allow for discussion of information of a personal nature during the consideration of hiring staff. Accordingly, it has been determined that this portion of the meeting will concern matters within sections 552b(c)(2) and (6) of Title 5, United States Code, and will be duly closed to public participation.

*Notice:* At its third public meeting, the National Gambling Impact Study Commission, established under Public Law 104–169, dated August 3, 1996, will hear presentations from the National Research Council and the Advisory Commission on Intergovernmental Relations; receive an update from the Research Subcommittee; discuss the workplan; consider any nominee(s) for executive director; discuss the rules of operation; and review rules for upcoming public comment.

*Contact Persons:* For further information, contact Amy Ricketts at (202) 523–8217 or write to 800 North Capitol Street, N.W., Suite 450, Washington, D.C. 20002.

**Kay C. James,**

*Chair.*

[FR Doc. 97–27226 Filed 10–14–97; 8:45 am]

**BILLING CODE 6820–ET–P**

## NATIONAL INDIAN GAMING COMMISSION

### Notice of Public Hearing and Call for Public Comment

**ACTION:** Notice of public hearing and call for comment.

**SUMMARY:** The National Indian Gaming Commission (NIGC) announces a public hearing on the effect of the Indian Gaming Regulatory Act (IGRA) and NIGC regulations on Internet gambling conducted by Indian Tribes.

**DATE:** The public hearing will be held on Friday, November 14, from 9:00 a.m. to 4:00 p.m. in Washington, D.C. An open forum for public participation will be held from 2:00 p.m. until 4:00 p.m.

**ADDRESS:** The public hearing will be held at the Department of Interior, Main Auditorium, 1849 C Street, Washington, DC.

**WRITTEN SUBMISSIONS:** Interested parties are invited to submit comments and materials to the NIGC. Such submissions should be sent to Tina Bloomquist, NIGC, 1441 L Street, NW, Suite 9100, Washington, DC 20005. The comment period closes December 5, 1997.

**FOR FURTHER INFORMATION CONTACT:** Tina Bloomquist, NIGC (see **ADDRESS** section) at (202) 632–7003.

**SUPPLEMENTARY INFORMATION:**

### I. Public Hearing

The NIGC will hear presentations from invited panelists representing Federal, State, Tribal and Corporate interests. There will be an open forum session of approximately two hours for the public to address the NIGC on issues relevant to the topic. Anyone wishing to make an oral presentation at the hearing should submit a request, in writing, to Tina Bloomquist at the NIGC address listed above, no later than October 30, 1997. Open forum participants should provide their name, organization (if any), address and phone number. Oral presentations will be limited to five minutes per speaker. Witnesses and panelists should prepare their remarks in writing and submit those remarks to the NIGC prior to the hearing. Written remarks should be limited to 5 pages, single spaced. Witnesses and panelists should bring 10 copies of their written remarks to the hearing. Such remarks will become part of the public comment materials avaialble for inspection.

### II. Written Submissions

Comments may be submitted by facsimile transmission to Tina Bloomquist at (202) 632–7066. Comments may be filed before, during or after the hearing, but no later than December 5, 1997.

Written comments should include the following information:

1. Name and affiliation of the individual responding;
2. If applicable, information on the submitter's organization, including the type of organization (e.g., business, trade group, university, or non-profit organization) and the respondent's position.

### III. Background

The NIGC was created by the Indian Gaming Regulatory Act of 1988. 25 U.S.C. § 2701 *et seq.* The NIGC is responsible for the regulation of most forms of gaming on Indian lands. Several Indian tribes currently offer gambling opportunities over the Internet, and others have expressed interest in doing so. A significant

amount of controversy exists over the legality of the use of the Internet by Indian Tribes as a means of offering gaming. Of particular note is the requirement of the IGRA that gaming by Indian Tribes be conducted "on Indian lands." 25 U.S.C. § 2710(b)(1), § 2710(d)(1) and 25 U.S.C. § 2703(4).

Particpants in the hearing, and those submitting written comments are asked to consider the following questions:

1. How does the requirement under IGRA that tribal gaming be conducted "on Indian lands" affect the ability of the tribes to engage legally in Internet gambling?

2. What is the effect of other federal gambling statutes on tribal Internet gambling?

3. What is the scope of available Internet gambling offered by Indian tribes today?

4. What, if any, legislative or regulatory changes are required to clarify the effect of the IGRA on tribal Internet gambling?

5. What are the challenges implicit in regulating Internet gaming on Indian lands?

**Philip N. Hogen,**

*Commissioner, National Indian Gaming Commission.*

[FR Doc. 97–27274 Filed 10–14–97; 8:45 am]

**BILLING CODE 7567–01–M**

---

## NATIONAL SCIENCE FOUNDATION

**Agency Information Collection Activities: Comment Request; Submission for OMB Review; Title of Collection: NSF Survey of Scientific and Engineering Research Facilities at Colleges and Universities**

**AGENCY:** National Science Foundation.

**ACTION:** Notice.

1. SUMMARY: Under the Paperwork Reduction Act of 1995, Pub. L. 104–13 (44 U.S.C. 3501 *et seq.*), and as part of its continuing effort to reduce paperwork and respondent burden, the National Science Foundation (NSF) is inviting the general public and other Federal agencies to comment on this proposed continuing information collection. This is the second notice for public comment, the first was published on July 31, 1997, in the **Federal Register** at 62 FR 147, 41093–41094. We received comments from two sources and after due consideration sent replies to the commenters. NSF is forwarding the proposed renewal submission, the comments with our responses, to OMB for clearance simultaneously with the publication of this second notice

2. DATES: The Office of Management and Budget (OMB) should receive written comments on or before November 14, 1997.

3. ADDRESSES: Submit comments to Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for National Science Foundation, 725–17th Street, N.W, Room 10235, Washington, D.C. 20503. Please include the current OMB Control Number 3145–0101 with your comments.

4. SUPPLEMENTARY INFORMATION:

(a) *Abstract*. In 1995 OMB approved both the 1996 and 1998 survey cycles of the NSF Survey of Scientific and Engineering Research Facilities at Colleges and Universities (OMB No. 3145–0101). The survey collects information on the science and engineering (S&E) research facilities at the nation's higher education institutions. The minor modifications to the approved 1998 questionnaire make the data of more use to Federal agencies and policy makers.

(b) Proposed Modifications to the OMB-Approved 1998 Survey

◆ *Sample size.* As requested by NIH, NSF, and OMB, we are requesting that the 1998 survey sample be increased from 315 to 365 to allow analyses by Carnegie classification, by minority serving institutions and institutions within the EPSCoR States for policy makers.

◆ *Items to be modified in the 1998 survey.*

√ *GSF* (gross square feet) in addition to the currently collected NASF (net assignable square feet). Institutions already have the GSF of a project to calculate the NASF of that project.

√ *Proportion of repair/renovation or new construction project cost,* in addition to the currently collected repair/renovation or new construction cost as a total, including non-fixed equipment over $1 million. This data are readily available to the institutions and should add very little burden.

√ *Percentage of institutional funds,* in addition to the currently collected proportion of construction and repair/renovation cost attributable to institutional funds. The question will be posed in two parts: one asking if the institution has ready access to these data; and second, if data are available, asking the institution to supply that data. This way of posing the question assures minimal burden to the respondent.

√ *Percentage of total animal research* NASF assigned to levels of restricted-use laboratories, in addition to the total NASF or animal laboratories, This is information readily available to the

institutions and would be of minimal burden.

(c) *Item to be dropped from the 1998 survey.* We plan to omit the status of institutions relative to the cap on tax-exempt bonds (modification request by NIH and NSF).

**5. Use of the Information**

The information from this survey will be used by Federal policy makers, planners, and budget analysts in making policy decisions, as well as by academic officials, the S&E establishment, and State agencies that funds universities and colleges. The survey will provide updated data on the status of and trends in scientific and engineering research facilities to help policy makers with decisions about the health of academic S&E research, funding, regulations, and reporting guidelines.

Specifically, data will be used in:

◆ A separate report of the findings for Congress;

◆ A special report for NIH on the Status of Biomedical Research Facilities;

◆ Other NSF compilations such as National Patterns of R&D Resources and Science and Engineering Indicators;

◆ Special reports for other Federal agencies on an as-needed basis; and

◆ A public release file of collected data in aggregate form made available to researchers on the World Wide Web

**6. Expected Respondents**

The sample size for the 1998 survey is planned to be increased from 315 to 365 of the nation's higher education institutions, selected to provide nationally representative data for both undergraduate and graduate degree-granting schools. The respondents will have the option to complete the survey on disk. With the improvements in the computer-aid survey 60% of the institutions are expected to respond through this method in 1998.

**7. Burden on the Public**

The average completion time for the survey by academic institutions was reduced (from 43 to 24 hours) between 1988 and 1994. In 1996, with the continued improvements in institutional databases and the introduction of the option to complete the survey on disk, completion time was further reduced by one hour, bringing the 1996 average completion time for the survey by academic institutions to 23 hours.

Much of the data noted in the proposed modification are readily available to the respondents. It is expected that the proposed modifications to the questionnaire will cause little or no change in burden

Vialpando Dec. Exhibit No. 4

**INTERNET GAMING DISPUTE REFERRED TO BINDING ARBITRATION BY THE IOWA TRIBE OF OKLAHOMA AND THE STATE OF OKLAHOMA**

*In the Matter of the Referral to Binding Arbitration by the Iowa Tribe of Oklahoma and the State of Oklahoma of Disputes Under and/or Arising From the Iowa Tribe—State Gaming Compact*

*November 24, 2015*

*Oklahoma City, Oklahoma*

**ARBITRATION AWARD**

Charles S. Chapel, Sole Arbitrator
Riggs, Abney, Neal, Turpen, Orbison & Lewis P.C.
528 NW 12th Street
Oklahoma City, OK 73103
405-843-9909 (o)
405-842-2913 (f)

EXHIBIT 1

Vialpando Dec. Exhibit No. 5

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

I. INTRODUCTION ............................................................................................... 1

II. BACKGROUND ................................................................................................. 2
  A.   Indian Gaming Regulatory Act, Tribal-State Gaming Act, Tribal
       Gaming Ordinance, and the Compact ....................................................... 2
  B.   Previous Tribal Internet Gaming Proposals in Oklahoma ................. 4
  C.   Iowa Tribe of Oklahoma's Intent to Conduct Internet Gaming ........ 6

III. THE DISPUTE ................................................................................................ 7

IV. THE ISSUES .................................................................................................... 8
  A.   IGRA and Internet Gaming ...................................................................... 12
  B.   The Compact and Internet Gaming ......................................................... 16
  C.   Is Internet gaming as contemplated by the Tribe unlawful under
       State or Federal law? .................................................................................. 20
    1.  Federal Law .............................................................................................. 21
      a.  Wire Act .......................................................................................... 22
      b.  The Unlawful Internet Gaming Enforcement Act ..................... 23
      c.  Travel Act & Illegal Gaming Business Act ............................... 23
    2.  Tribal Law ................................................................................................. 23
    3.  State Law ................................................................................................... 24

V. FINDINGS AND CONCLUSIONS ................................................................. 24
  A.   Summary of Findings and Conclusions ................................................... 24
  B.   Specific Findings and Conclusions ........................................................... 27

i

Vialpando Dec. Exhibit No. 5

# I.
# INTRODUCTION

This Arbitration Award ("Award") is the final and binding Award resolving a Dispute referred to me on October 14, 2015, as Sole Arbitrator, by the Iowa Tribe of Oklahoma ("Tribe") and the State of Oklahoma ("State"), collectively referred to as the "Parties."[1] The Dispute[2] involves whether or not the use of the Internet to conduct a covered game with players physically located in international markets, where such gaming is not unlawful, is authorized under the Iowa Tribe of Oklahoma and State of Oklahoma Gaming Compact ("Compact" or "Tribal-State Compact," interchangeably),[3] as construed in light of controlling State and Federal law.

The Parties have agreed to the submission of this dispute on the basis of a paper Record and without a hearing or the taking of in-person testimony. I concur in the Parties' shared judgment that submission of this Dispute, and the necessarily-related issues regarding controlling extrinsic law, are susceptible to accurate resolution on the Record without personal testimony.

With consent of the Parties, I established a Scheduling Order for this Arbitration. In conformity with that Order, the Tribe timely submitted its Opening Brief with thirty-five Exhibits and all Joint Exhibits on October 27, 2015; the State timely submitted its Response Brief with ten Exhibits on November 5, 2015; and the Tribe submitted its Reply Brief with two Exhibits on November 9, 2015. All submitted Exhibits have been admitted into evidence and considered by me in this Arbitration.

In providing the Findings and Conclusions enumerated in Section V, I am mindful of the fact that subject only to the review contemplated by Part 12 ("Dispute Resolution") in Sections 2-3 of the Compact (and if and only if such is requested by a Party), the Parties intend that this Award be binding and promptly enforced.

---

[1] *See* Engagement Letter.
[2] *See* Statement of Dispute.
[3] Iowa Tribe-State Gaming Compact executed pursuant to the State-Tribal Gaming Act, 3A O.S. § 281.

1

Vialpando Dec. Exhibit No. 5

## II.
## BACKGROUND

The Iowa Tribe of Oklahoma is a federally recognized Indian tribe that currently operates three casinos on its lands in the State of Oklahoma.[4]  On September 23, 2015, the Tribe notified the State of Oklahoma's Gaming Compliance Unit of its intent to operate[5] Internet gaming from their tribal land consistent with the Compact.[6]  On September 30, 2015, the State responded with a letter expressing its concern as to whether Internet gaming either expanded or restricted the rights of a tribe operating under the Model Tribal Gaming Compact, while also acknowledging that the State had previously entered into a settlement agreement with the Cheyenne & Arapaho Tribes ("C&A"), a federally recognized united tribe in Oklahoma acknowledging its right to conduct Internet gaming pursuant to their compact.[7]  Pursuant to Part 12 ("Dispute Resolution") of the Compact, the Tribe and State agreed to refer this matter to arbitration to interpret the Compact[8] and applicable federal and state laws and to determine whether or not Internet gaming such as that intended by the Tribe is permissible.

### A. Indian Gaming Regulatory Act, Tribal-State Gaming Act, Tribal Gaming Ordinance, and the Compact

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA") for the purpose of providing "a statutory basis for the operation of gaming by Indian tribes as a

---

[4] Cimarron Casino (821 W Freeman, Perkins, OK), Ioway Casino (338445 E. Highway, Chandler, OK 74834), and Iowa Travel Plaza (S.H. 177 south of Perkins, OK).

[5] The Indian Gaming Regulatory Act, the Oklahoma Tribal-State Gaming Act, and the Compact use the words "conduct" and "operate" in various places. The words are synonymous. *See* Merriam-Webster Thesaurus 111-12 and 396-97 (1989). Whenever they are used in this arbitration, I interpret both words to be verbs and both to mean the acts of controlling, managing, directing, or regulating an activity—in this case, Indian gaming.

[6] *See* Letter from Bobby Walkup, Chairman, Iowa Tribe of Oklahoma, to Jeffery Cartmell, Deputy Director and Counsel, State of Oklahoma's Gaming Compliance Unit (Sept. 23, 2015) (Joint Exhibit 9).

[7] *See* Letter from Jeffery Cartmell, Deputy Director and Counsel, State of Oklahoma's Gaming Compliance Unit, to Bobby Walkup, Chairman, Iowa Tribe of Oklahoma (Sept. 30, 2015) (Joint Exhibit 10).

[8] 3A O.S. § 281 Part 12 (Joint Exhibit 2).

2

Vialpando Dec. Exhibit No. 5

means of promoting tribal economic development, self-sufficiency, and strong tribal governments."[9]  IGRA categorized games into three classes: class I, class II, and class III. Class III games are "all forms of gaming that are not class I gaming or class II gaming,"[10] that are "authorized by an ordinance or resolution,"[11] and that conform with the tribe's Tribal-State Compact.[12]

On November 2, 2004, the people of the State of Oklahoma approved State Question No. 712, the State-Tribal Gaming Act ("Gaming Act"), a referendum,[13] which included a Model Tribal Gaming Compact ("Model Compact") in the form of an offer by the State to all federally recognized tribes within Oklahoma.[14]  Acceptance of that offer by a Tribe results in a contract between the Tribe and the State.[15]  Currently, thirty-four federally recognized tribes have executed a Model Compact with the State of Oklahoma and all have been either formally approved or considered deemed approved.[16]  The Iowa Tribe of Oklahoma, therefore, conducts gaming in Oklahoma pursuant to an approved compact and an approved Tribal Gaming Ordinance, which are both currently in effect.

On December 18, 1995, the National Indian Gaming Commission ("NIGC") approved the Iowa Tribe's Gaming Ordinance.[17]  This ordinance defined class III gaming to be "as defined in accordance with [IGRA], 25 U.S.C § 2703(8),"[18] and provided that "[a]ny Compact entered into between the Tribe and a State which is subsequently approved by the Secretary of the Interior and published in the Federal Register is

---

[9] 25 U.S.C § 2702.
[10] 25 U.S.C § 2703(8).
[11] *Id.* § 2710(d)(1)(A).
[12] *Id.* § 2710(d)(1)(C).
[13] *See* Oklahoma State Senate Legislative Brief June 2004 (Tribe Exhibit 4).
[14] 3A O.S. § 281 Part 4(A) (Joint Exhibit 2).
[15] *Id.* at 280.
[16] *See* US Department of the Interior Indian Affairs, http://www.bia.gov/WhoWeAre/AS-IA/OIG/Compacts/index.htm#Oklahoma (last visited Nov. 18, 2015).
[17] *See* Letter from Harold A. Monteau, Chairman, NIGC, to Lawrence Murray, Chairman, Iowa Tribe of Oklahoma (Dec. 18, 1995) (Tribe Exhibit 3).
[18] *See* Iowa Tribe of Oklahoma Tribal Gaming, Ordinance § 3, (Nov. 12, 2006) (Tribe Exhibit 3).

Vialpando Dec. Exhibit No. 5

hereby incorporated within and enacted as an integral part of this Ordinance with respect to all forms of Class III gaming."[19]

On January 28, 2005, the Iowa Tribe of Oklahoma executed the Model Compact and submitted it to the Department of the Interior ("DOI") for approval on February 2, 2005.[20] The Compact was deemed approved by the Secretary of the Interior.[21] On June 1, 2005, the Secretary published notice of the approved Tribal-State Compact between the Iowa Tribe of Oklahoma and the State of Oklahoma in the Federal Register.[22]

**B.  Previous Tribal Internet Gaming Proposals in Oklahoma**

In June 2012, the C&A launched a website offering qualified individuals a forum to engage in free and money play for certain specified games.  Upon notification from the State that it believed the website materially violated the C&A's Gaming Compact, the C&A and the State entered into negotiations over the issues, which resulted in a Settlement Agreement and then a subsequent Amended Settlement Agreement dated April 5, 2013 and September 13, 2013, respectively.[23]

On August 1, 2013, Kevin Washburn, the Assistant Secretary-Indian Affairs from the Department of the Interior, in a letter addressed to Honorable Chief Janice Prairie Chief-Boswell, stated that "the [Settlement] Agreement constitutes an amendment to the Tribe's existing Class III compact."[24]  The letter also indicated that the C&A and State's revenue share increases from 10% to 20% paid to the State was not justified by any "meaningful concession" from the State.

---

[19] *Id.* § 4 (Joint Exhibit 3). *See infra* footnote 59.
[20] *See* Letter from George T. Skibine, Acting Deputy Assistant Secretary, US Department of Interior's Policy and Economic Development, to Emily Bernadette Huber, Chairperson, Iowa Tribe of Oklahoma (Jan. 6, 2005) (State Exhibit 3).
[21] 25 U.S.C. § 2710(d)(8)(C) (2012).
[22] 70 Fed. Reg. 31499 (June 1, 2005) (Joint Exhibit 4).
[23] *See* Settlement Agreement Between the State of Oklahoma and the Cheyenne-Arapaho Tribes (Joint Exhibit 5) and First Amended Settlement Agreement Between the State of Oklahoma and the Cheyenne-Arapaho Tribes (Joint Exhibit 6).
[24] *See* Letter from Kevin Washburn, Assistant Secretary-Indian Affairs, US Department of the Interior, to Janice Prairie Chief-Boswell, Governor, Cheyenne-Arapaho Tribes of Oklahoma (August 1, 2013) (Joint Exhibit 7).

4

On November 6, 2013, Washburn sent a subsequent letter to the C&A regarding the C&A and State's First Amended Settlement Agreement stating "we assume, without deciding, that the Tribes may operate [I]nternet gaming, and may include that gaming in the scope of the Compact, to the extent that [I]nternet gaming may be permitted under IGRA" but that "[t]he Agreement modifies the existing Compact by expanding the scope of games the Tribe is currently operating to include [I]nternet gaming as a part of the Compact's covered Games."[25] The letter further stated that "IGRA prohibits the imposition of a tax, fee, charge, or other assessment on Indian gaming except to defray the state's costs of regulating Class III gaming activities" and that the State cannot offer a "meaningful concession" because it cannot control or offer exclusive access to website's international patrons.[26] Washburn therefore concluded that the State's concession to the C&A is "illusory" making the revenue sharing requirement an "impermissible tax" in violation of IGRA.[27] It was this letter from Washburn dated November 6, 2013, raising the foregoing issues that resulted in the State seeking this Arbitration to resolve whether it could agree with the Tribe that Internet gaming could be conducted on tribal land or whether to do so would violate, expand, restrict, or amend the Compact.[28] Those issues now become the issues raised by the Dispute, which is the subject of this Arbitration.

On December 9, 2013, the C&A received a letter from the State[29] asserting that it disagreed with Assistant Secretary Washburn's position as set forth in his letter dated August 1, 2013, and stated that "the State Tribal Gaming Act of 2004 prescribing the terms of Class III Compact (Compact) between the Tribes and the State fully authorizes

---

[25] *See* Letter from Kevin Washburn, Assistant Secretary-Indian Affairs, US Department of the Interior, to Janice Prairie Chief-Bosswell, Governor, Cheyenne-Arapaho Tribes of Oklahoma (Nov. 6, 2013) (State Exhibit 7).
[26] *Id.*
[27] *Id.*
[28] *See* Letter from Jeffery Cartmell, Deputy Director and Counsel, State of Oklahoma's Gaming Compliance Unit, to Bobby Walkup, Chairman, Iowa Tribe of Oklahoma (Sept. 30, 2015) (Joint Exhibit 10).
[29] *See* Letter from Steven K. Mullins, General Counsel, Office of Governor Mary Fallin, to Janice Prairie-Chief Boswell, Governor, Cheyenne and Arapaho Tribes of Oklahoma (December 9, 2013) (Joint Exhibit 8).

Page E48

Vialpando Dec. Exhibit No. 5

the Amended Settlement and igaming directed to an international market contemplated by the parties."

On December 26, 2013, the C&A filed a Complaint in the United States District Court for the Western District of Oklahoma against Sally Jewell, Secretary of the Department of the Interior, and Kevin Washburn, Assistant Secretary—Indian Affairs, for declaratory and injunctive relief.[30] The Complaint requested the Court "[d]eclare, adjudge and decree that final agency action taken by the U.S. Department of the Interior to interfere with or obstruct operation of pokertribes.com and any similar online C&A website offered to qualified players outside the United States and its territories is arbitrary and capricious, an abuse of discretion and otherwise contrary to law."[31] However, on March 14, 2014, the C&A voluntarily dismissed the Complaint after a change in the tribe's leadership based on a "shift in business and tribal strategy and philosophy."[32] The C&A has, thereafter, not further pursued its efforts to conduct Internet gaming.

## C. Iowa Tribe of Oklahoma's Intent to Conduct Internet Gaming

After the C&A ceased its efforts to conduct Internet gaming in Oklahoma, the Iowa Tribe of Oklahoma became interested in offering Internet gaming. The Tribe, aware of the C&A effort, approached the State's Gaming Compliance Unit to discuss the matter and the issues. No specific written agreement between the Tribe and the State has been provided to me. When I refer in this Award to the "agreement" between the Parties concerning Internet gaming pursuant to the Compact, I am referring to what they have expressly stated in their Briefs and Exhibits.

The Tribe states in its Brief[33] that it intends: (i) to use the Internet to conduct gaming on its lands pursuant to its Compact and the law; (ii) agrees that it would only

---

[30] *See* Complaint, Cheyenne Arapaho Tribes of Oklahoma v. Jewell, et al., Case No. CIV-13-1355 (W.D. OK) (Tribe Exhibit 13).
[31] *Id.*, at 20.
[32] *See* Jennifer Palmer, *Oklahoma tribe folds poker website that cost $9.5 million*, News OK (2/15/2014), http://newsok.com/oklahoma-tribe-folds-poker-website-that-cost-9.5-million/article/3934330/?page=2 (Tribe Exhibit 15).
[33] *See* Claimant Iowa Tribe of Oklahoma's Opening Brief, p. 1.

6

Vialpando Dec. Exhibit No. 5

offer to and allow players located outside the boundaries of the State of Oklahoma and the United States to play covered games; (iii) that the servers controlling the covered game would be located on its tribal lands.

The State agrees in its Brief[34] that the Tribal-State Gaming Act and the Tribe's Compact permits the Tribe to use the Internet to offer covered games provided: (i) that the Tribe may permit a player physically located outside the boundaries of Oklahoma and the United States to play covered games in jurisdictions where it is lawful to do so; (ii) that the Tribe's computer server, which controls the covered game, must be physically located on the Tribe's lands; and (iii) that the Tribe will not allow a player physically located in Oklahoma to play covered games using the Internet unless such player is physically located on Indian lands as defined by IGRA.

This Arbitration involves only the question of whether or not the Tribe is permitted pursuant to IGRA, the Tribal-State Gaming Act, the Iowa Tribal Gaming Ordinance, and the Compact to offer and conduct covered games through the use of the Internet using computer servers located on Tribal lands to players located outside the boundaries of Oklahoma and the United States where such gaming is lawful. Both parties agree that the Tribe may do so. The Parties do not intend that their agreement shall change, amend, modify, or alter in any way any term or provision in the Compact. Rather, they agree that the Compact permits the Tribe to conduct Internet gaming of a covered game and that all provisions of the Compact are applicable to such gaming.

### III.
### THE DISPUTE

The Parties have submitted a joint Statement of Dispute setting forth the issue to be resolved:

> *Whether the use of the Internet (worldwide web) to conduct a "covered game" (for free and real money play), when the players are located outside the boundaries of*

---

[34] *See* Respondent's Response Brief to Claimant's Opening Brief, p.10.

Vialpando Dec. Exhibit No. 5

*the State of Oklahoma/United States and its territories during the entirety of the gaming transaction, is authorized under the Compact.*[35]

I have been engaged to resolve the Dispute and the issues, which have arisen related to the statutes and contract in accordance with "controlling State and Federal law." Thus, I am required to use federal standards of statutory interpretation and Oklahoma standards of statutory and contract interpretation. I do so in all instances in my analysis set forth below in accordance with the principles set forth by the Untied States Supreme Court[36] in my interpretation of federal statutes and regulations; and as to state statutes and contracts, the Oklahoma Supreme Court's decisions and state statutes.[37]

In every instance, I have looked at the words of the statutes and the Compact involved in this mater.  I have considered the intent of the legislation; and in the case of the Compact, the intent of the parties; and have attempted to interpret it so as to be lawful. In determining the intent of the legislation, I looked to the legislative history, the purpose of the legislation, and agency interpretation.  In determining the intent of the parties to a contract, I looked at the words of the contract, the statutes involved, the Parties' interpretation of the contract, and its legality.

## IV.
## THE ISSUES

This Arbitration raises several issues, which raise ancillary legal and factual issues, all of which must be addressed in order to resolve the Dispute.  Those issues are as follows: (i) Is the proposed Internet gaming permissible on tribal lands under IGRA; (ii) Is the proposed Internet gaming permissible under the State-Tribal Gaming Act, the Tribal Gaming Ordinance, and the Compact; (iii) Is Internet gaming as contemplated by the Tribe unlawful under State and Federal law?

---

[35] *See* Statement of Dispute, p.2.

[36] *See eg Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980); *Food and Drug Administration v. Brown & Williams Tobacco Corporation,* 529 U.S. 120, 133 (2000).

[37] *See eg Boston Avenue Management, Inc. v. Associated Resources, Inc.,* 2007 OK 5, 11, 152 P.3d 880, 885; 15 O.S. §§ 151-178; 25 O.S. § 1 et seq.

8

Vialpando Dec. Exhibit No. 5

Is a game, which is expressly authorized by an approved tribal-state compact and an approved Tribal Gaming Ordinance being played by players physically located off Indian land on a computer connected via the Internet to a computer located on Indian land being conducted in accordance with IGRA, the State-Tribal Gaming Act, and the Compact?  That question is the ultimate issue.  As IGRA and the Internet (and Internet gaming) are central to the Dispute, it is necessary to set forth my understanding of the development of their history, purposes, limitations, and provisions in order to set the basis for my resolution of this Dispute.

It is likely that some form of gaming has been conducted on Indian lands for many years.  Wagering on traditional games evolved into church fundraising bingo games, pull tabs, and then finally commercial gaming on tribal lands.  As this evolution progressed, tension began to develop between the tribes and state governments as to who had authority to regulate such gaming.  In the late 1980's California attempted to enforce its criminal laws, which prohibited the operation of bingo games offering prizes over two hundred fifty dollars against the Cabazon Band of Mission Indians, which was operating such bingo games on its Indian lands.

California's enforcement action resulted in the 1987 United States Supreme Court landmark decision in *California v. Cabazon Band of Mission Indians*.[38] There the Court held that a state cannot enforce its criminal laws related to gaming on Indian lands unless the gaming violates the state's public policy.  Therefore, if gaming is regulated as opposed to prohibited, the state's criminal laws as to such gaming cannot be enforced on Indian lands.  *Cabazon* was decided on sovereignty grounds with the Court reiterating that Indian tribes retain "attributes of sovereignty over both their members and their territory" and that "tribal sovereignty is dependent on and subordinate to only the Federal Government, not the States."[39]

The following year in 1988, Congress enacted IGRA in response to *Cabazon* and stated that "*Indian tribes have the exclusive right to regulate gaming activity on Indian*

---

[38] *California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987).
[39] *Id.* at 206 citing *United States v. Mazurie,* 419 US 544, 557 (1975); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 US 134, 154 (1980).

Page E52

Vialpando Dec. Exhibit No. 5

*lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity.*[40] IGRA establishes a framework for Indian gaming to "promote economic development, tribal self-sufficiency, and strong tribal government,"[41] governs the "conduct of gaming on Indian lands,"[42] and classifies gaming activity into three categories of games. Class I games are "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with tribal ceremonies or celebrations." Class II games are bingo ("whether or not electronic, computer, or other technological aids are used") and card games, which are not banked by the house. Class III games are "all forms of gaming that are not class I or class II."[43] A tribe may only conduct class III gaming pursuant to both a compact that is in effect and an approved Tribal Gaming Ordinance.[44] IGRA is, therefore, game specific, which means that it limits the games the Tribe may conduct to those authorized by the Act.

Before beginning my analysis of IGRA and its provisions, what is meant by the terms "Internet" and "Internet gaming" must be addressed in order to determine whether its use is permitted under that Act. The Internet is a global "network of networks" comprised of government, academic, and business-related networks that

---

[40] 25 U.S.C. § 2701(5) (Emphasis added).
[41] *Id.* at (4).
[42] The term "Indian lands" means:
    (A) All lands within the limits of any Indian reservation; and
    (B) Any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.
    25 U.S.C. § 2703(4).

    The Parties are in agreement that the proposed gaming will be conducted on Indian lands as defined by the Act.
[43] 25 U.S.C. § 2703(6)-(8).
[44] 25 U.S.C. § 2710(d).

Vialpando Dec. Exhibit No. 5

allow users at various locations around the world to communicate,[45] which includes the use of electronic mail and the World Wide Web. Billions of devices are interconnected through the Internet's protocol suite (TCP/IP) allowing these devices to specify how data is transmitted and received at its destination.[46] In order to gain access to the Internet, users will typically subscribe to an Internet service provider (ISP) and connect through a phone line or broadband connection.[47] Since 2000, the number of Internet users has increased from 738 million to 3.2 billion in 2015,[48] primarily due to the fact that it has become more affordable. Most electronic devices that people use today are connected to the Internet including desktop computers, laptops, game consoles, cell phones, portable media players, and e-readers.

In the instance of Internet gaming, the qualified user will access the Tribe's gambling website through the World Wide Web. The Tribe's website will be hosted on a computer server on its Indian lands connected to the Internet. The user will be prompted to open an account so that he or she can play the games offered.[49] The user, wherever he or she may be physically located, will be prompted on his or her screen as to how to proceed. The user responds by clicking on keys on a keyboard. Such a response results in the users input information being sent from his or her computer to a server, which may be physically located anywhere in the world, which processes the information. The server, based on information received by it from the user, controls, processes, and records every aspect of the transaction and the game including: (i) the

---

[45] Odgers, Pattie and B. Lewis Keeling, Administrative Office Management 289 (12th ed. Cincinnati: South-Western Educational Publishing 2000); *See also* Oklahoma statutory definition of the Internet at 17 OS § 139.102(11), which is essentially the same.
[46] R. Braden, ed., *Requirements for Internet Hosts -- Communication Layers,* p. 6, https://tools.ietf.org/html/rfc1122.
[47] *What is an Internet Service Provider (ISP)?* http://windows.microsoft.com/en-us/windows/what-is-Internet-service-provider (last visited Nov. 20, 2015)
[48] *Here's How May Internet Users There Are* (May 26, 2015) http://time.com/money/3896219/Internet-users-worldwide/ (last visited Nov. 20, 2015); *see also* ICT Facts and Figures, *The World in 2015,* http://www.itu.int/en/ITU-D/Statistics/Pages/facts/default.aspx (last visited Nov. 20, 2015).
[49] GamblingSites.com, Depositing at Online Gambling Sites, http://www.gamblingsites.com/beginners/depositing/ (last visited Nov. 20, 2015).

Page E54

Vialpando Dec. Exhibit No. 5

language, location (and legality of play in that location), qualifications (age of player) to play the games, and the rules of the game; (ii) the opening of and funding an account; (iii) every aspect of the play of the game including the decision by a player to play, the placing of a bet, the win or loss decision, and resulting collection from or payout to a player's account. In Internet gaming, the server functions as the casino official who conducts games where the player is physically located at the place where the game is being played.[50] There, a player will offer to place a bet, the official will decide to accept it and the game will proceed with the official making decisions to the point of payout or collection.

The Internet is not a game. The Internet is modern technology used to play games. However, IGRA classifies two classes of gaming (class I and class II) by reference to specific games and includes descriptions as to how the games may or may not be played.[51] Class III gaming "means all forms of gaming that are not class I or class II."[52] Class III gaming would, therefore, include any game irrespective of how it is played or what devices are or are not used to play the game if it is authorized by a Tribal-State Compact. Thus, as the parties have agreed, the games the Tribe intends to conduct are class III games pursuant to IGRA and may be conducted if they are authorized under the Compact. That requires me to consider whether or not the intended Internet gaming is "conducted on Indian lands" as that term is used in IGRA as required by the Compact.

**A. IGRA and Internet Gaming**

The term "on Indian lands," as Justice Kagan pointed out in *Bay Mills*, appears in IGRA "some two dozen times."[53] IGRA defines "Indian lands,"[54] but it does not expressly

---

[50] The description of how the Internet is used as technology to play gambling games is taken from the Technical Standards for Internet Gaming Systems Utilized in International (non USA) Markets Where Gaming is Not Illegal (Nov. 4, 2015) (Tribe Exhibit 35-1).
[51] 25 USC §§ 2703 (6) & (8).
[52] *Id.* at (8).
[53] *Michigan v. Bay Mills Indian Community*, 572 U.S. __ 2014 and 134 S.Ct 2024, 2032 (2014) (language appears in the first paragraph).
[54] 25 U.S.C. § 2703(4).

Vialpando Dec. Exhibit No. 5

state what is meant by the term "conducted on Indian lands."[55] This question was raised and considered in the very early stage of development of Internet gaming by several federal courts.[56] The question arises because in Internet gaming players (or a player) may be physically located off Indian lands while playing a game being operated by a computer server, which electronically controls the game, is located on Indian lands. To date this issue has never been finally resolved by the courts.

The DOI, the National Indian Gaming Commission ("NIGC"), the State of New Jersey, and other jurisdictions have considered the "conducted on Indian lands" issue, or in the case of New Jersey and other jurisdictions, variations of the same question. It is a difficult question involving complex issues of sovereignty, contract and statutory interpretation, and jurisdiction among others.

The DOI and the NIGC have struggled with the issue. Both have regulatory responsibilities under IGRA. The DOI approves Tribal-State Compacts and NIGC approves the Tribal Gaming Ordinances, both of which may permit a tribe to conduct Internet gaming on Indian lands if Internet gaming is legal in the state. The DOI to this date remains coy about the issue (in the case of the State of Oklahoma and the Cheyenne-Arapaho Tribe's effort to begin Internet gaming, the DOI "assume[d], without deciding that the Tribes may operate internet gaming, and may include that gaming in the scope of a Compact, to the extent that [I]nternet gaming may be permitted under IGRA."[57] However, it is clear that the DOI has approved Tribal-State Compacts with language in them permitting Internet gaming if it is lawful in the state.[58] In this case, the State agrees that Internet gaming of covered games where players are located outside

---

[55] 25 U.S.C. § 2701(3).

[56] *See AT&T Corporation v. Coeur D'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002); *Missouri v. Coeur D'Alene Tribe,* 164 F.3d 1102 (8th Cir. 1999).

[57] *See* Letter from Kevin Washburn, Assistant Secretary Indian Affairs, Department of the Interior, to Janice Prairie Chief-Boswell, Governor, Cheyenne-Arapaho Tribes (Nov. 6, 2013) (State Exhibit 7).

[58] *See* US Department of the Interior Indian Affairs State of Massachusetts' compact with Mashpee Wampanoag Tribe, State of California's compact with Iipay Tribe, and State of Arizona's compacts with various tribes at http://www.indianaffairs.gov/WhoWeAre/AS-IA/OIG/Compacts/index.htm (last visited Nov. 20, 2015).

Vialpando Dec. Exhibit No. 5

the United States is not unlawful in Oklahoma if it is conducted on a computer server located on tribal land.

Similarly, the NIGC in its early consideration of whether or not Internet gaming was permissible issued several letters on the subject of Internet gaming. First, in *Coeur d'Alene*,[59] the NIGC sent a letter saying the gaming in that case (Internet and telephonic gaming on Indian lands) was permitted and then in the same matter sent a letter saying it was not permitted. Further, the NIGC's general counsel's office has in the past issued several letters simply concluding with very little analysis that the "use of the Internet…would constitute off reservation gaming."[60]

It is impossible to know exactly why the DOI and NIGC were as inconsistent and reticent as they appear to have been on Internet gaming issues. However, it may be simply a matter of things evolving over time and advancements in computer science.[61] The Parties agree and the evidence in this Arbitration shows that a computer server located on Indian lands can control and operate all aspects of a covered game authorized by the Compact even though a person playing the game may physically be located off tribal lands.

New Jersey is one of three states that has enacted statutes authorizing intra-state Internet gaming. New Jersey legislators faced an issue very similar to the "conducted on Indian lands" issue. The New Jersey state constitution prohibits gaming outside of Atlantic City. Intrastate Internet gaming would involve players being physically located outside of Atlantic City. The state legislature determined that the constitutional prohibition would be not be violated if the gaming is conducted by computer servers

---

[59] *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997). I reiterate here that the Iowa Tribe's gaming ordinance incorporates and authorizes "all forms of class III gaming" authorized by the DOI in any approved tribal compact. *See* pp. 4 & 5 supra.
[60] *See* eg Letter from Kevin Washburn, General Counsel, NIGC, to Joseph M. Speck (March 13, 2001), p. 3 (on file at http://www.nigc.gov/images/uploads/game-opinions/WIN%20Sports%20Betting%20Game%20Class%20III.pdf).
[61] For doing so, the Agency incurred the wrath of the 9th Circuit in its decision in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997).

Page E57

Vialpando Dec. Exhibit No. 5

located in Atlantic City that controlled and operated the games.[62] In other words, the gaming is "conducted" where the computer server controlling the game is located.

While the Internet is not specifically mentioned in IGRA, as it was in the early stages of development in 1988, I am persuaded that the "conducted on Indian lands" language appearing in IGRA does not prohibit Internet gaming as I am convinced by the expressed legislative history that in enacting IGRA, Congress intended that tribes should and could by that Act take every opportunity to use and take advantage of modern technology to promote participation among players and thereby increase tribal revenues for their people.[63]  The Internet is modern technology that does precisely that.[64]

Moreover, the recent *Bay Mills*[65] decision requires some consideration to sovereignty issues related to the "conducted off or on" Indian lands issue.  The United States Supreme Court could not be any more clear on this issue. Indian tribes are sovereign nations and as such enjoy the right of self-governance, and immunity from suit by states for commercial activity occurring within a state off tribal lands.[66] Congress can abrogate tribal immunity, but if it does so the legislation must

---

[62] *See* New Jersey P.L. 2013, c27(5:12-95.17(1)(j)). Found online at:
http://www.njleg.state.nj.us/2012/Bills/PL13/27 .HTM.
[63] *See* Rep. No. 100-446, 100th Cong., 2nd Sess., at 9. I am aware that the specific reference quoted refers to language relating to class II games. But the principles, ideas, and statements apply as well to class III games, especially since the use of similar technology converts what would otherwise be class II games to class III games. *See also* S.Rep. No. 446, 100th Cong., 2d Sess. 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071. Senator Evans, a sponsor of the Act, stated, "I wish to make it very clear that the committee has only provided for a mechanism to permit the transfer of limited State jurisdiction over Indian lands where an Indian tribe requests such a transfer as part of a tribal-State gaming compact for class III gaming. We intend that the two sovereigns—the tribes and the States—will sit down together in negotiations on equal terms and come up with a recommended methodology for regulating class III gaming on Indian lands. Permitting the States even in this limited say in matters that are usually in the exclusive domain of tribal government has been permitted only with extreme reluctance.
[64] *See* 25 C.F.R. §§ 502.4, 502.7 & 502.8.
[65] *Michigan v. Bay Mills Indian Community*, 572 U.S. __ 2014 and 134 S.Ct 2024 (2014).
[66] *Id.*

Page E58

Vialpando Dec. Exhibit No. 5

"unequivocally express" that intent.[67] IGRA by its words only partially abrogates tribal immunity for the conduct of gaming on Indian lands pursuant to a compact. IGRA does not abrogate a tribe's immunity for the conduct of commercial activities off of Indian lands.[68] Resolving where the intended Internet gaming involved in this Arbitration is to be conducted under IGRA allows three possibilities: (i) on Indian lands; (ii) off Indian lands; or (iii) partially on and partially off Indian lands. Only the first option eliminates the myriad of problems and issues that would result from either of the other two options.[69] The *Bay Mills* Court and IGRA[70] encourage states and tribes to resolve their differences about such issues as the one before me now through by negotiating a resolution.[71] That is exactly what the Tribe and State have done in this case.

**B. The Compact and Internet Gaming**

In Oklahoma, gaming is regulated pursuant to the Oklahoma Horse Racing Act,[72] the Interstate Compact on Licensure of Participants in Live Horse Racing with Pari-mutuel Wagering,[73] and the State-Tribal Gaming Act.[74] Unregulated gaming is unlawful,[75] but subject to Tribal common-law sovereignty rights to the extent not abrogated by IGRA.[76]

The Tribe conducts gaming in Oklahoma pursuant to an approved Tribal-State Compact and its Tribal Gaming Ordinance. In Oklahoma, the State does not separately

---

[67] *Id.,* at 2034 <u>citing</u> *C&L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Oklahoma,* 532 U.S. 411, 418 (2001).

[68] *Id.,* at 2032

[69] The US District Judge in *California v. Iipay Nation of Santa Ysabel,* 2015 WL 2449527 (S.D.Cal.,2015) decided for preliminary injunction purposes only that the gaming at issue was conducted off of Indian lands because it allowed a player to play the game by use of the Internet while off Indian lands. That Judge is now faced with a pending Motion to Dismiss based on *Bay Hill's* holding that tribes retain tribal sovereignty for commercial activity conducted off tribal lands.

[70] 25 U.S.C. § 2710(d)(5).

[71] *See* footnote 63 supra.

[72] 3A O.S. § 200 et seq.

[73] *Id.* § 240 et seq.

[74] *Id.* § 281 et seq.

[75] 21 O.S. §§ 941-988.

[76] *See Michigan v. Bay Mills Indian Community,* 572 U.S. __ 2014 and 134 S.Ct 2024 (2014).

Vialpando Dec. Exhibit No. 5

negotiate compacts with individual Tribes.  Rather, the State adopted a Model Compact, which was included as an "offer" in legislation adopted by a referendum vote of the people on November 2, 2004, and which is codified as the "State-Tribal Gaming Act."[77] To date, thirty-four Oklahoma Tribes, including the Iowa Tribe of Oklahoma, have executed the compact offered in the State-Tribal Gaming Act.

The Oklahoma Tribal-State Compact is said to be "game specific"[78] meaning that a tribe may only conduct games, which are specifically authorized by the Tribal-State Gaming Act.  Authorized games are referred to as "covered games" and are defined as follows:

> *An electronic bonanza-style bingo game, an electronic amusement game, an electronic instant bingo game, nonhouse-banked card games; any other game, if the operation of such game by a tribe would require a compact and if such game has been: (i) approved by the Oklahoma Horse Racing Commission for use by an organizational licensee, (ii) approved by state legislation for use by any person or entity, or (iii) approved by amendment of the State-Tribal Gaming Act; and upon election by the tribe by written supplement to this Compact, any Class II game in use by the tribe, provided that no exclusivity payments shall be required for the operation of such Class II game.*[79]

The Compact also provides that the Tribe is only authorized to conduct class III covered games in accordance with its terms.[80]  The Tribal-State Gaming Act specifically exempts the conduct of and participation in such gaming from the application of state criminal

---

[77] 3A O.S. §§ 261-282.
[78] *Id.*, at § 262(H).
[79] 3A O.S. § 281 Part 3(5) (Joint Exhibit 2). I do note that the Iowa Tribe of Oklahoma's Compact at Part 3(5) and Part 3(23) refers to "the standards applicable, set forth in sections 10-17 of the State Tribal Gaming Act" where as the Act refers to standards set forth in "sections 10-18." It appears that this discrepancy is a scrivener type error as in the Act Section 18 relates to requirements for cashless transactions systems and the Compact at Part 3(23) specifically refers to requirements for cashless transaction systems.
[80] 3A O.S. § 281 Part 4(A) (Joint Exhibit 2).

17

Vialpando Dec. Exhibit No. 5

laws prohibiting gambling.[81]   The Tribal Gaming Ordinance authorizes gaming operations in accordance with the Compact.

Thus, the Compact authorizes the Tribe to conduct four specific games on its lands in accordance with the standards set forth in Sections 10-18 of the State-Tribal Gaming Act.   Those sections of the Act set forth the definitions of terms and requirements for "Player terminals" used for electronic amusement games, "Minimum standards for games" relating to electronic amusement games, standards for the play of "Bonanza-style games," standards for "Instant bingo games," and "standards for player terminals" used in connection with all electronic games, "Electronic accounting systems," and standards for cashless transaction systems.[82]

Before beginning to operate any one of the four specified authorized games, the Tribe must obtain certification from an independent testing laboratory that the game meets the standards set forth in the above-mentioned Sections 10-18.[83] The tribe must also certify that the games meet the standards.  When these two steps are completed, the tribe is authorized to conduct such covered games on its lands.

The Tribe has adopted a Resolution approving technical standards for games it intends to operate through the use of the Internet.[84]  The Technical Standards have not, as of the date of the filling of the Tribe's Reply Brief (November 9, 2015), been certified by an Independent Testing Laboratory that they meet the standards for the Tribe to conduct one or more of the four games authorized by the Compact.  The Tribe expects that such certification will occur.   Thereafter, the State has the right to object as provided by the Compact.

The Compact does not specifically reference Internet gaming. However, it is noted that the State-Tribal Gaming Act, which includes the Model Compact was enacted in 2004, a time when Internet gaming was being conducted throughout the world and

---

[81] *Id.*, at § 280.
[82] *Id.*, at §§ 269-277.
[83] *Id.*, at § 281 Part 4(B).
[84] *See* Iowa Tribe of Oklahoma Gaming Commission, Resolution ITOGC-15-03, approved November 4, 2015 (Tribe Exhibit 35).

18

Vialpando Dec. Exhibit No. 5

that the Act does not prohibit Internet gaming. The State agrees with the Tribe that Internet gaming of covered games is permitted by the Compact, if the games are certified pursuant to the Compact as being complaint with the Act, and if the central computer server is located on tribal lands as the server is effectively where the gaming is conducted. The computer server, according to the State's Brief, is "where the actual conduct will take place" and if the server is located on Tribal lands the game is "compliant with the location requirement of the Compact."[85]

In Section IV(A) of this Award, I discussed and determined that gaming using Internet technology would meet the IGRA requirement that the games authorized by that Act be conducted on Indian lands provided that the computer server controlling the operation of the game is located on Tribal lands. Thus, I agree with the State and find that if the server that controls the authorized covered games the Tribe intends to conduct is located on Tribal lands, the games would meet any requirement of the compact as to the location of the gaming.

The Compact in Part 3 ("Definitions") sets forth definitions of words "as to their use" in that document, and there is a specific definition provided for the word "patron." The word "patron" appears in Parts 5, 6, and 7 and its specified definition applies to the use of the word in that context. That definition does not limit the operation of covered games through the use of the Internet if those games are authorized by the Compact and the games are operated "in facilities on Indian lands as defined by IGRA," and I so find.

---

[85] *See* Respondent's Brief, p. 7-8 It is noted that the State of Oklahoma's position in this respect is the same as the position adopted by the State of New Jersey. In solving the State Constitutional problem that limited gambling to Atlantic City in legislation permitting intrastate Internet gaming.

"Internet gaming in this State shall be subject to the provisions of, and preempted and superseded by, any applicable federal law. Internet gaming in this State shall be deemed to take place where a casino's computer server is located in Atlantic City regardless of the player's physical location within this State." *See* New Jersey P.L. 2013, c27(5:12-95.20). Found online at http://www.njleg.state.nj.us/2012/Bills/PL13/27 .HTM.

Vialpando Dec. Exhibit No. 5

Does the agreement by the State and the Tribe to allow Internet gaming amend the Compact, thereby requiring the Tribe to seek the Department of Interior's approval to offer covered games over the Internet? I find it does not. Part 4 ("Authorization of Covered Games") of the Compact authorizes the Tribe to conduct covered class III games. The Compact specifically defines four class III games and indicates that an amendment to the Compact is required to offer any other class III games. Here the Tribe does not seek to offer any game not specifically authorized as a covered game; it seeks only to offer specific covered games by a modern method not specifically mentioned in the Compact.

The agreement of the parties contemplates that all provisions of the Compact will remain in force unamended and that their agreement relates only to the use of the Internet to conduct covered games involving only international players physically located outside Oklahoma and the United States and in a country where such gaming is lawful. The Compact does not change or alter the scope[86] of authorized games, nor does it change or alter the shared revenues authorized under my interpretation of the Compact. The use of the Internet is simply a method of offering authorized covered games.

The Compact provides that in the event they disagree as to the interpretation of the Compact, the Parties should attempt to meet and resolve the dispute among themselves.[87] The decision by the United States Supreme Court in *Bay Mills* suggests the same. That is precisely what the State and the Tribe did with respect to the issues involved in this Arbitration.

## C. Is Internet gaming as contemplated by the Tribe unlawful under State or Federal law?

The stated Dispute was drafted narrowly by the Parties. However, the Briefs of both Parties addressed the lawfulness of the intended Internet gaming. Therefore, I deem the lawfulness of the proposed conduct of such gaming to be an issue that requires resolution. Both Parties contend the conduct would not be unlawful.

---

[86] 25 CFR 501.2 et seq.
[87] 3A O.S. § 281 Part 12(1) (Joint Exhibit 2).

Vialpando Dec. Exhibit No. 5

## 1. Federal Law

Internet gaming, as such, is not expressly prohibited in the United States. Three states[88] have enacted statutes specifically permitting Internet gaming intrastate. Other states have enacted legislation permitting the use of the Internet in intrastate and interstate lotteries. Indeed, the persuasiveness of lotteries and how they are played today combined with modern technology, computer science, and the Internet results in Internet gaming in virtually every state whether or not it is recognized as such. That problem essentially explains the DOJ Memorandum reinterpreting the Wire Act discussed below. Gambling and gaming in the United States has historically been viewed as a state concern within the police power of the states and is for the most part authorized, prohibited, and regulated at the state and local level.[89] Federal laws affecting gambling, again for the most part, are designed to aid the states in the enforcement of their laws and usually require a predicate state offense for prosecution.[90]

I have identified four federal statutes that may in one way or another be affected by Internet gaming such as that contemplated by the Tribe and not specifically exempted by IGRA: (i) the Wire Act;[91] (ii) the Unlawful Internet Gaming Enforcement Act;[92] (iii) the Travel Act;[93] and (iv) the Illegal Gaming Business Act.[94]

---

[88] New Jersey, Delaware, and Nevada.
[89] I. Nelson & Rebecca Bolin, Game On for Internet Gambling: With Federal Approval, States Line Up to Place Their Bets, 44 ConnLR 653, 657. Found online at: http://connecticutlawreview.org/articles/game-on-for-internet-gambling-with-federal-approval-states-line-up-to-place-their-bets/.
[90] IGRA specifically exempts gaming by tribes pursuant to a compact from the federal anti-lottery states at 25 U.S.C. § 2720.
[91] 18 U.S.C. § 1084.
[92] 31 U.S.C. § 5361 et seq.
[93] 18 U.S.C. § 1952.
[94] 18 U.S.C. § 1955.

21

Vialpando Dec. Exhibit No. 5

### a. Wire Act

The Wire Act, adopted in 1961, was the first federal attempt to regulate gambling since late in the 19th century.[95] The Act prohibits the use of wire communication to transmit bets or wagers in interstate and foreign commerce.[96] Bets across state lines are prohibited and the Act would apply to Internet gaming as that technology would most certainly come within its definitions of "wire communications."[97] The Act was interpreted from 1961 to 2011 to cover and include all forms of gambling. A split developed in the federal courts as to the scope of the Act, with most courts concluding that the Act covered only betting on sporting events or contests, and others concluding it applied to all forms of gambling.[98] In addition, Congress enacted the Unlawful Internet Gaming Enforcement Act[99] in 2006 and that Act in several ways conflicted with the Wire Act. As a result of this confusion, in 2011 the US Department of Justice issued a Memorandum styled "Whether Proposals By Illinois and New York to use the Internet and Out of State Transaction Processors to Sell Lottery Tickets to In-State Adults Violate the Wire Act."[100]  In that Memorandum, the DOJ concluded that "interstate transmissions of wire communications that do not relate to a sporting event or contest....fall outside the reach of the Wire Act." Since 2012, the Wire Act has been so interpreted.

---

[95] I. Nelson & Rebecca Bolin, Game On for Internet Gambling: With Federal Approval, States Line Up to Place Their Bets, 44 ConnLR 653. Found online at: law review article: http://connecticutlawreview.org/articles/game-on-for-internet-gambling-with-federal-approval-states-line-up-to-place-their-bets/.
[96] 18 U.S.C. § 1084.
[97] I. Nelson & Rebecca Bolin, Game On for Internet Gambling: With Federal Approval, States Line Up to Place Their Bets, 44 ConnLR 653. Found online at: http://cyber.law.harvard.edu/media/uploads/72/2/KERR-78 N Y U L Rev 1596-edit.pdf.
[98] See United States v. Lyons, 740 F.3d 249 (1st Cir. 2014) (holding that the Wire Act prohibits sports betting) and United States v. Lombardo, 639 F. Supp.2d 1271, 1281 (D. Utah 2007) (holding that the Wire Act applies to sports and other forms of gambling).
[99] 31 U.S.C. § 5361 et seq.
[100] Whether Proposals By Illinois And New York To Use The Internet And Out-Of-State Transaction Processors To Sell Lottery Tickets To In-State Adults Violate The Wire Act, 35 Op. Att'y Gen (2011), found online at: http://www.justice.gov/sites/default/files/olc/opinions/2011/09/31/state-lotteries-opinion.pdf (last visited 11/19/2015).

Page E65

Vialpando Dec. Exhibit No. 5

Case 3:14-cv-02724-AJB-NLS   Document 67-8   Filed 05/27/16   PageID.2307   Page 103 of
109
Case 5:15-cv-01379-R   Document 1-1   Filed 12/23/15   Page 25 of 31

The class III covered games, which the Tribe intend to conduct, do not involve gambling on a sporting event or contest. Therefore, I conclude the Wire Act does not prohibit Internet gaming on Tribal lands conducted pursuant to a Tribal-State compact.

### b. The Unlawful Internet Gaming Enforcement Act

The Unlawful Internet Gaming Enforcement Act ("UIGEA") was enacted in 2006. UIGEA was not intended, nor does it regulate gambling, but rather, it prohibits certain financial transactions related to unlawful gambling. UIGEA specifically provides that "unlawful Internet gambling does not include a bet or wager where the bet or wager does not violate any provision of...the Indian Gaming Regulatory Act."[101] UIGEA also provides that "[n]o provision of that Act shall be construed as altering, limiting, or extending any Federal or State Law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States."[102] I, therefore, conclude that UIGEA does not prohibit lawful Internet gaming conducted on Tribal lands pursuant to a Tribal-State compact.

### c. Travel Act & Illegal Gaming Business Act

The Travel Act[103] and Illegal Gaming Business Act[104] were both enacted to address organized crimes and both require a violation of an underlying state law as a predicate offense. I therefore conclude that the Acts would not be applicable to Internet gaming conducted on Tribal lands pursuant to a Tribal-State compact, which does not violate state law.

### 2. Tribal Law

The Tribe has adopted a comprehensive Tribal Gaming Ordinance[105] governing its gaming operations, which authorizes the conduct of covered games pursuant to the Compact, and has adopted a specific resolution "Approving Technical Standards for Internet Gaming Systems Utilized in International (Non USA) Markets Where Internet

---

[101] 31 U.S.C. § 5362(10)(B)(iii).
[102] *Id.* at § 5361(b).
[103] 18 U.S.C. § 1952.
[104] 18 U.S.C. § 1955.
[105] *See* Iowa Tribe of Oklahoma Tribal Gaming Ordinance, Approved Nov. 12, 2006 (Tribe Exhibit 3).

23

Vialpando Dec. Exhibit No. 5

Gaming is Not Illegal." Therefore, I conclude that Tribal law authorizes the conduct of such gaming.

### 3. State Law

The Constitution of the State of Oklahoma does not mention gambling. The State legislature has enacted statutes prohibiting virtually all forms of gambling and activities related to gambling.[106] However, the State-Tribal Gaming Act exempts Tribal gaming on Indian lands and gaming conducted by "Organizational Licensees" off Tribal lands from the application of state statutes that would otherwise make such conduct a criminal offense. Thus, Oklahoma does not prohibit gambling, rather, it regulates gambling off Indian lands, and Tribes regulate gaming on Indian lands pursuant to compacts, which specify that Tribes may conduct any game authorized by their compact.[107] Therefore, I conclude that the laws of the State of Oklahoma do not prohibit or make unlawful the conduct of Internet gaming such as that the Tribe and the State contemplate as described in these proceedings.

**V.**

**FINDINGS AND CONCLUSIONS**

### A. Summary of Findings and Conclusions

IGRA, as previously noted, is game specific, meaning that it limits the games that a Tribe may conduct to those authorized by the Act. This Arbitration involves only class III games. As to such games IGRA provides:

*(1) Class III gaming activities shall be lawful on Indian lands only if such activities are—*

*(A) authorized by an ordinance or resolution that—*

*(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,*

*(ii) meets the requirements of subsection (b), and*

---

[106] 21 O.S. §§ 941-988.
[107] 3A O.S. § 280 (Joint Exhibit 1).

24

Vialpando Dec. Exhibit No. 5

> *(iii) is approved by the Chairman,*
>
> *(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and*
>
> *(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) is in effect*[108]

and that the Tribal-State Compact may include "standards for the operation of such...activity."[109]

The evidence in this proceeding proves that the Tribe has: (i) adopted a Tribal Gaming Ordinance authorizing the conduct on its lands class III gaming activities, which meets the requirements of IGRA, and which has been approved by the Chairman of the NIGC;[110] (ii) Oklahoma permits such gaming activities to be conducted by other entities (Organizational Licensees) under regulations, which are no less stringent or inconsistent than those regulations imposed upon the Tribe by the Compact; (iii) such gaming is conducted pursuant to an approved Compact entered into by the Tribe and the State of Oklahoma that is in effect.[111] The evidence also proves that the Compact includes detailed standards, which must be met by the games the Tribe desires to offer and those standards include player terminals, electronic player devices, and cashless transaction systems, among other and all of which is used in Internet gaming. Before the Tribe begins to operate any game, the Compact requires the Tribe to obtain from an independent qualified testing laboratory a certification hat the game meets all of the standards set forth in the Compact.[112] After a lab certifies that the game meets all

---

[108] 25 U.S.C. § 2710(d).

[109] 25 U.S.C. § 2710(d)(3)(C)(6).

[110] *See* Letter from Harold A. Monteau, Chairman, NIGC, to Lawrence Murray, Chairman, Iowa Tribe of Oklahoma (Dec. 18, 1995) (Tribe Exhibit 3).

[111] *See* 25 U.S.C § 2710(d)(4) and State-Tribal Gaming Act, 3A O.S. § 261, et seq.

[112] *See* Letter from George T. Skibine, Acting Deputy Assistant Secretary, US Department of Interior's Policy and Economic Development, to Emily Bernadette Huber, Chairperson, Iowa Tribe of Oklahoma (Jan. 6, 2005) (State Exhibit 3), which approves Compact.

Page E68

Vialpando Dec. Exhibit No. 5

Case 3:14-cv-02724-AJB-NLS   Document 67-8   Filed 05/27/16   PageID.2310   Page 106 of
109
Case 5:15-cv-01379-R   Document 1-1   Filed 12/23/15   Page 28 of 31

standards required, the Tribe must certify that the game meets the standards. Only then may the Tribe begin to conduct a class III game authorized by the Compact.[113]

Under the Oklahoma State-Tribal Compact statutory scheme, nothing more is required for the Tribe to conduct gaming. If an authorized "covered game"[114] is properly certified for operation as an Internet game the Tribe may conduct the game on its lands, and I so find.

To be clear, my interpretation and findings do not mean that I am approving the specific games the Tribe intends to conduct. The Tribe has yet to obtain all of the necessary certifications of the standards necessary under the Compact. My interpretations and findings do mean that if such certifications are received, filed, and if the State does not object pursuant to its right under the Compact, the Tribe would be authorized to conduct the Internet games.[115]

The rationale for my findings is that IGRA plainly and clearly sets forth the procedures States and Tribes are to follow in regulating class III gaming. The Tribal Gaming Ordinance and Compact was submitted to the NIGC and DOI for approval, and the Tribe complied with those procedures. The DOI and the NIGC by those procedures were put on notice that gaming authorized by IGRA would be conducted on tribal lands consisting of "covered games," which included standards that can be interpreted to expressly permit Internet gaming. As a result of the NIGC's approval, there currently exists a final agency order. The NIGC approved the Tribe's Gaming Ordinance and its

---

[113] If the State disagrees and believes the game is not authorized by the Compact, it has the right to object to its operation. *See* Compact Part 8 (Joint Exhibit 3).
[114] Under the Oklahoma Compact, an authorized game is referred to as a "covered game." *See* 3A O.S. 281 Part4 (B) (Joint Exhibit 2).
[115] I have read the Technical Standards for Internet Gaming Systems Utilized in International (Non USA) Markets Where Internet Gaming is Not Illegal (dated November 4, 2015) prepared by Eclipse Compliance Testing, a game-testing laboratory (Tribe's Exhibit 35-1). After reading it, I have no idea as to whether they meet the standards required by the State-Tribal Gaming Act. The Standards and the Tribe's Exhibit are extremely complex and quite simply far beyond my knowledge and expertise. Only an expert in computer science could possibly understand these Standards. The Tribe has the responsibility to assure that they meet the requirements set forth in the Compact. If they do not meet the standards for the conduct of the games, the State has the right to object to the conducted games.

Vialpando Dec. Exhibit No. 5

Page E69

final order authorizing the conduct of covered games on its lands, which effectively means that such gaming complies with IGRA.

In making my findings as set forth above, I am aware that the Compact in its definitions section contains definitions of the words "patron" and "Facility" that can be construed out of context in such a way as to limit the Tribe's right to conduct covered games over the Internet. I find that they do not, as I find that the definition section of the Compact defines words only in relation to the context of their use in the Compact.

IGRA authorizes the "conduct of gaming on Indian lands," but does not define that term and as a result there has been some controversy as to its meaning, which has reached the courts with respect to compacts in other states. The courts have never resolved that issue. My resolution of this issue as it arises in the context of this Dispute over the interpretation of the Oklahoma Tribal-State Compact does the following: (i) it gives effect to the words of IGRA, its expressed purpose, and its legislative history; (ii) it eliminates complex sovereignty issues that would result from any alternative resolutions; (iii) it gives effect to the words of the state statute and is consistent with the intent and purposes of state law; (iv) it is consistent with the words of the compact and the way the Parties interpret it; (v) it eliminates issues related to the legality of Internet gaming on Tribal lands.

**B. Specific Findings and Conclusions**

1. To the extent that Sections I, II, III, and IV of this document reflect findings and/or conclusions not repeated in this Section V, Sections I, II, III, and IV are incorporated into this Section V.

2. The Iowa Tribe of Oklahoma is a federally recognized Indian tribe.

3. The Tribe conducts gaming on its lands in the State of Oklahoma pursuant to an approved Tribal-State Class III gaming compact and an approved Tribal Gaming Ordinance, both of which are in effect.

4. Pursuant to the Compact, the Tribe partially ceded its sovereign immunity as to the conduct of class III gaming on its lands in exchange for specified exclusivity rights defined therein.

Vialpando Dec. Exhibit No. 5

5. The Compact is game specific and allows the Tribe to conduct four types of games in accordance with its terms as "covered games."

6. The words "Patron" and "Facility" as defined in Part 3 (Definitions) of the Compact do not limit or prohibit the play of covered games through the use of the Internet to conduct covered games if the computer server controlling the game is located on Tribal lands.

7. Prior to operating any covered game, the Tribe must obtain from an independent testing laboratory certification that the game meets the standards set forth in 3A O.S. §§ 11-18, and the Tribe must certify that the game meets those standards.

8. IGRA defines the term "Indian Lands"[116] by reference to a location but does not define the term "conducted on Indian Lands."

9. The Internet is not a game, rather it is a way or method of playing a game through the use of modern technology. The use of the Internet to conduct covered games is permissible under IGRA and the Compact.

10. If a covered game is certified by an independent laboratory and by the Tribe as meeting the standards as set forth in the Compact and if the game while being played is controlled and operated by a computer server located on Indian lands of the Tribe that game is conducted on Indian lands pursuant to IGRA and the Compact.

11. The use of Internet to play properly authorized covered games as agreed by the Parties does not violate IGRA, the Tribal Gaming Ordinance, or the Compact, nor does the use of the Internet to conduct covered games extend or restrict the scope of the games authorized by the Compact. The scope of the games was agreed upon as provided in the Compact and approved by the DOI. The use of the Internet is merely using technology to play covered games as a way to increase Tribal revenues. It does not extend or restrict the scope of the games and does not amend the Compact in any way. The Compact and all its terms shall remain in force. Using the Internet to conduct authorized covered games under the

---

[116] 25 U.S.C. § 2703(4).

Page E71

Vialpando Dec. Exhibit No. 5

Compact is permitted as it currently exists. Therefore, no amendment is necessary or required.

12. The conduct of authorized covered games by the Tribe pursuant to the Compact through the use of the internet with players located outside of Oklahoma is not unlawful under Federal, State, or Tribal law.

Therefore, I conclude that the conduct by the Tribe of authorized covered games pursuant to the Compact whereby a player or players of those games is, or are, physically located outside the boundaries of the State of Oklahoma and the United States and in a place where Internet gaming is lawful when his or her computer is connected to a computer server which operates the games is located on Tribal lands is authorized by the Compact, the Tribal Gaming Ordinance, IGRA, and the State Tribal Gaming Act.

The foregoing resolution of the Dispute as set forth herein shall be binding upon the Parties immediately upon the issuance of this award.

Charles S. Chapel, Sole Arbitrator
Riggs, Abney, Neal, Turpen, Orbison & Lewis P.C.
528 NW 12th Street
Oklahoma City, OK 73103
405-843-9909 (o)
405-842-2913 (f)

29

Page E72

Vialpando Dec. Exhibit No. 5