1  LAURA E. DUFFY
   United States Attorney
2  GLEN F. DORGAN (CBN 160502)
   Assistant United States Attorney
3  Office of the U.S. Attorney
   880 Front Street, Room 6293
4  San Diego, California 92101
   Tel: (619) 546-7665  Fax:  (619) 546-7751
5  Email:  glen.dorgan@usdoj.gov

6  Attorneys for Plaintiff UNITED STATES

7

8              IN THE UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10

11 STATE OF CALIFORNIA,                    CASE NO.  3:14-cv-02724-AJB-NLS

12              Plaintiff,                 CASE NO.  3:14-cv-02855-AJB-NLS

13 v.                                      **PLAINTIFF UNITED STATES' REPLY
                                           BRIEF IN SUPPORT OF MOTION FOR
14 IIPAY NATION, *et al.*,                 SUMMARY JUDGMENT**

15              Defendants.                **[FRCP RULE 56, 65]**

16

17 UNITED STATES OF AMERICA,               Date:    June 27, 2016
                                           Time:    3:00 p.m.
18              Plaintiff,                  Courtroom:  3B
                                           Hon. Anthony J. Battaglia
19 v.

20 IIPAY NATION, *et al.*,

21              Defendants.

22

23

24 **I.     Introduction**

25         In support of its motion for summary judgment, the United States has presented

26 undisputed evidence establishing each of the following elements necessary for injunctive

27 relief under UIGEA:  (1) DRB patrons place "bet[s] or wager[s]" as that term is defined

28 by UIGEA; (2) the means by which DRB patrons place their bets or wagers involves the

*United States' Reply Brief in Support of Motion for*
*Summary Judgment*                              1

Internet; (3) when DRB patrons place their bets or wagers, they are located off Iipay Indian lands and within the State of California, where such gambling activity is unlawful; (4) the Tribal Defendants are "person[s] engaged in the business of betting or wagering;" (5) the Tribal Defendants accept restricted transactions in connection with the DRB patrons' unlawful gambling; (6) the Tribal Defendants will continue to violate UIGEA absent injunctive relief; and (7) in view of the rule of construction codified at 31 U.S.C. § 5365(b)(3)(B) ("No provision of this section shall be construed as altering, superseding, or otherwise affecting the application of the Indian Gaming Regulatory Act"), injunctive relief in this case does not conflict with IGRA.

In opposing the United States' motion, the Tribal Defendants concede that the evidence produced by the United States is undisputed. *See* Chart, Ex. "A" to Dorgan Reply Decl. [1] Moreover, by failing to rebut (or even address) the majority of legal arguments presented by the United States, the Tribal Defendants concede that this undisputed evidence establishes the first six elements of the United States' claims. Indeed, the *only* issue raised by the Tribal Defendants' opposition brief concerns the seventh element, namely whether the injunctive relief sought by the United States is predicated on an interpretation of UIGEA that somehow alters, supersedes or affects the application of IGRA. As to this element, the Tribal Defendants make a bold claim; they contend that IGRA permits Indian tribes to offer Internet gambling to off-site patrons in all instances and regardless of any applicable anti-gambling laws in the States where the patrons access the Internet gaming, provided the servers that run the game are located on Indian lands. Stated another way, the Tribal Defendants propose an interpretation of

---

[1] Rather than responding to each of the separately-numbered facts set forth in the United States' separate statement ("USSUF"), the Tribal Defendants prepared their own separate statement ("TDSUF"), thereby requiring the parties and this Court to compare the documents side-by-side to determine if any conflict exists. As detailed in the accompanying Reply Declaration of Glen F. Dorgan, however, such a comparison reveals that the Tribal Defendants either concede the United States' evidentiary claims or, in very few instances, simply ignore the United States' evidentiary claim thereby failing to establish any genuine dispute in compliance with Fed. R. Civ. Proc. 56(c)(1)(A).

*United States' Reply Brief in Support of Motion for Summary Judgment*

2

1  IGRA that is so broad that UIGEA could never be applied to an Indian tribe without

2  running afoul of the rule of construction at 31 U.S.C. § 5365(b)(3)(B).

3       To support their contention, the Tribal Defendants begin with the unsupported

4  assertion that the resolution of any conflict between UIGEA and IGRA must be made

5  through an "IGRA focused lens—i.e., considering only those legal precedents and

6  principles applicable to IGRA, and without regard to any statutory language related to

7  UIGEA."  Opposition [Doc. #67], 2:6-9.  As explained below, the Tribal Defendants'

8  assertion violates basic rules of statutory construction.

9       Next, the Tribal Defendants ask this Court to interpret IGRA in a manner that

10  sanctions the use of the Internet as an "off-reservation means of access."  Opposition

11  [Doc. #67], 20:13-35:20.  The Tribal Defendants do not—and cannot—cite to any

12  express provisions of IGRA to support this interpretation.  Indeed, they must concede that

13  IGRA, by its terms, only regulates gaming conducted on Indian lands.  *See id.*, 19:14-16,

14  25-27; *see also Michigan v. Bay Mills Indian Community* ("*Bay Mills*"), 134 S.Ct. 2024,

15  2034 (2014) ("Everything—literally everything—in IGRA affords tools . . . to regulate

16  gaming on Indian lands, and nowhere else").  Instead, their assertion is predicated

17  primarily on an arbitration decision with no precedential value and a misreading of *AT&T*

18  *Corporation v. Coeur d' Alene Tribe*, 295 F.3d 899 (9th Cir. 2002).[2]

19

20  _____

21  [2] Their assertion is also predicated on the contention that DRB is a "class II" game, rather than a "class III" game under IGRA, and the Tribal Defendants devote a large portion of their brief to this issue.  While the United States takes issue with the Tribal Defendants' classification argument, the United States does not raise this issue in its underlying motion or in this reply, because the *definition* of "class II" gaming is not dependent on whether the game is conducted on Indian lands; only the *regulation* of class II gaming depends on whether it is conducted on Indian lands.  *See, e.g.,* 25 U.S.C. §§ 2703(7)(A) (defining "class II" gaming), 2710(b)(1) ("An Indian tribe may . . . regulate[] class II gaming on Indian lands . . . .").  Because DRB patrons gamble unlawfully off of Indian lands, UIGEA relief is available whether or not DRB is a game that would otherwise fall within the definition of class II gaming.  31 U.S.C. § 5362(10)(A).  Nevertheless, the United States objects to the opinion testimony on the issue of the game classification submitted in the declaration of David Vialpando on the grounds that (1) the Tribal Defendants failed to designate Mr. Vialpando as an expert witness pursuant to Rule 26 of the Federal Rules of Civil Procedure, and (2) Mr. Vialpando's opinions represent inadmissible legal conclusions.  *See* Vialpando Decl. [Doc. #67-8], ¶¶ 23-25, 30-76.

*United States' Reply Brief in Support of Motion for Summary Judgment*

Finally, as an alternative basis for their theory that injunctive relief under UIGEA will somehow affect their IGRA rights, the Tribal Defendants argue that any communication by patrons over the Internet with DRB is a "step removed from any actual 'gaming activity'" which they contend is only conducted by proxies using the servers on Indian lands. Opposition [Doc. #67], 36:1-44:19. In making this argument, the Tribal Defendant do not attempt to challenge the United States' contention that DRB patrons are engaged in unlawful activity off Indian lands when they gamble through DRB; they simply ignore the evidence and the law. The United States, therefore, is entitled to summary judgment.

## II.     IGRA And UIGEA Must Be Read Together

"Courts assume that a legislature always has in mind previous statutes relating to the same subject when it enacts a new provision. In the absence of any express repeal or amendment, the new provision is presumed to accord with the legislative policy embodied in those prior statutes, and they all should be construed together . . . if possible, giv[ing] effect to every provision in both." Sands, *Sutherland Statutory Construction* § 51.2 (7th ed. 2015), cited with approval in *Boudette v. Barnette*, 923 F.2d 754 (9th Cir. 1991).

Here it is clear that Congress had in mind the scope and impact of IGRA when it enacted UIGEA. Not only does UIGEA include a rule of construction that references IGRA, but it also includes certain exceptions to the definition of "unlawful Internet gambling" that recognize the limited instances in which Indian tribes may operate gambling through the Internet in a manner that complies with both IGRA and UIGEA. For example, "unlawful Internet gambling" is defined to exclude "intratribal transactions" where bets or wagers are, among other factors, "initiated *and* received . . . between the Indian lands of 2 or more Indian tribes to the extent that intertribal gaming is authorized by the Indian Gaming Regulatory Act." 31 U.S.C. § 5362(10)(C) (emphasis added). This exception ensures that Indian tribes may continue to operate gaming systems like MegaMania, which involve an "interlinked . . . network of individual

computer terminals located *at tribal gaming facilities* throughout the country."  *See U.S. v. 103 Electronic Gambling Devices*, 223 F.3d 1091 (9th Cir. 2000) (emphasis added).

If, as the Tribal Defendants suggest, the scope of IGRA must be construed broadly through an "IGRA focused lens" to permit Indian tribes to operate Internet gaming regardless of where bets or wagers are initiated or received, the effect would be to render meaningless the limited exceptions contained within UIGEA that apply to Indian gaming. Instead, UIGEA and IGRA must be read together, giving effect to every provision in both.  Applying this rule of construction in this case allows only one conclusion:  through UIGEA and IGRA, Congress intended Indian tribes to operate Internet-based gaming only in limited, defined instances.  Because DRB is an Internet-based game that permits patrons to gamble off of Indian lands where such conduct is unlawful, it does not qualify for any exceptions under UIGEA and is afforded no protection under IGRA.

**III.   IGRA Does Not Protect "Off Reservation Means of Access"**

The Tribal Defendants' arguments regarding "off reservation means of access" begins with numerous references to the proceedings in an Oklahoma district court case captioned *Iowa Tribe of Oklahoma v. State of Oklahoma*, Case No. 5:15-cv-01379-R (W.D. Okla., April 18, 2016) ("*Iowa Tribe*").  Notably, the Tribal Defendants do not rely on any court decision issued in *Iowa Tribe*, because the district court in *Iowa Tribe* merely confirmed an arbitration award without any substantive comment or analysis. Instead, the Tribal Defendants cite to the underlying arbitration award itself as support for the proposition that "the use of the Internet to connect remote game players to the game servers located on . . . Indian lands [is] not contrary to IGRA nor prohibited by UIGEA." Opposition [Doc. #67], 22:7-10.  Their reliance on the arbitration award, however, is misplaced for several reasons.

First and foremost, decisions rendered in arbitration proceedings have no precedential value. *See Gonce v. Veterans Administration*, 872 F.2d 995, 998-999 (Fed. Cir. 1989); *Westinghouse Elevators of Puerto Rico, Inc. v. S.I.U. de Puerto Rico*, 583

///

F.2d 1184, 1187 (1st Cir. 1978) (arbitration awards are not accorded "the weight of judicial authority" in determining future controversies").

Second, the Tribal Defendants read the arbitration decision too broadly. The gaming at issue in the arbitration is very different from DRB, because the Iowa Tribe proposed to use the Internet to conduct gaming using servers on its lands that could only be accessed by international patrons located outside of the United States where gambling *is* lawful. *See* Arbitration Award, Ex. "5" to Vialpando Dec., pp. E49-50. Accordingly, when the arbitrator concludes that "IGRA does not prohibit Internet gaming" (a general comment that is not inconsistent with the construction of UIGEA and IGRA together to permit Indian tribes to operate Internet-based gaming only in limited, defined instances), this conclusion cannot be extrapolated to apply to all types of Internet-based Indian gaming.[3]   In stark contrast to the facts before the arbitrator, for example, the Tribal Defendants in this case admit that patrons violate California law when they place bets through DRB. *See, e.g.,* TDSUF [Doc. #67-1], Nos. 119 (admitting that DRB is a percentage game), 84-100, 111, 118 (admitting that DRB patrons play the percentage game with "device[s]" for money); *see also* Cal. Penal Code § 330 ("every person who plays" any "percentage game played with . . . any device, for money . . . is guilty of a misdemeanor"). Under these facts, the Internet gaming is prohibited by UIGEA and afforded no protection under IGRA.

Third, the arbitration award cited by the Tribal Defendants is the product of the parties' underlying agreement. Not only did the parties agree at the outset that the Iowa Tribe was "permitted [or rather, not prohibited] pursuant to IGRA . . . to offer and conduct covered games through the use of the Internet," *see* Arbitration Award, Ex. "5" to Vialpando Dec., p. E50, both parties also agreed that the gaming was conducted on Indian lands, *see id.* at p. E59, and the gaming was not "unlawful" under any other

---

[3] Nor can this comment be extrapolated to support a contention that Internet gaming is always conducted on Indian lands, a necessary prerequisite for protection under IGRA.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

federal law, *see id*., p. E63.  As a result, the arbitrator's analysis is cursory at best.  For example, the arbitrator concludes that "IGRA does not prohibit Internet gaming" in part because "the Internet is not specifically mentioned in IGRA," and then the arbitrator makes a leap of logic that "unlawful Internet gambling" under UIGEA "does not include a bet or wager where the bet or wager does not violate any provision of . . . the Indian Gaming Regulatory Act."  *Id.* at pp. E58, E66.  For support, the arbitrator cites 31 U.S.C. § 5362(10)(B)(iii).  Yet, this provision does not eliminate transactions from the definition of "unlawful Internet gambling" solely based on a finding that the bet or wager does not violate IGRA; this provision also requires a finding that the bet or wager is made exclusively within a single State and the bet or wager is "expressly authorized by and placed in accordance with the laws of such State."  31 U.S.C. § 5362(10)(B)(i)-(ii).  Reading 31 U.S.C. § 5362(10)(B)(iii) in context, it is clear that Congress contemplated instances where Internet bets or wagers would not violate IGRA (or, stated another way, would be outside the scope of IGRA), but would still be unlawful as a result of State gambling laws.[4]  Accordingly, there is simply no analytical value in the arbitrator's conclusions regarding IGRA and UIGEA.

17
18
19
20
21
22
23
24
25

In addition to the *Iowa Tribe* arbitration decision, the Tribal Defendants cite *AT&T Corporation v. Coeur d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002) as "guidance" in support of the proposition that IGRA permits "off-reservation means of access" to gaming activities.  Opposition [Doc. #67], 26:1-27:23.  While their theory is not entirely clear, they appear to argue that IGRA somehow protects Indian tribes from government interference with patrons traveling to and accessing gaming conducted on Indian lands, and the Internet is somehow one of the accepted "means of access" for this purpose.  *See* Opposition [Doc. #67], 39:9-11 ("IGRA generally permits a tribal patron to directly

26
27
28

[4] The arbitrator's analysis as to whether the Internet gambling occurred on Indian lands is also cursory as a result of the parties' underlying agreement.  Indeed, the arbitrator admits that he concluded that the gaming is conducted entirely on Indian lands in order to avoid difficult issues and to honor the parties' underlying agreement.  *See* Arbitration Award, Ex. "5" to Vialpando Dec., p. E59.

*United States' Reply Brief in Support of Motion for Summary Judgment*          7

1  participate in the tribe's Class II bingo gaming activities through the use of 'off-
2  reservation means of access' like the Internet") (emphasis omitted).  Yet, neither the term
3  "off-reservation means of access" nor any variation thereof appears anywhere within the
4  text of IGRA, and the Ninth Circuit's decision in *AT&T Corporation* does not support the
5  Tribal Defendants' theory.

6        *AT&T Corporation* arose out of the operation of a lottery by the Coeur d'Alene
7  tribe in Idaho.  Although the tribe intended to administer the lottery "entirely" on Indian
8  lands, it also intended to permit off-reservation participants to purchase tickets by
9  telephone.  *AT&T Corporation*, 295 F.3d at 901-902.  Accordingly, the tribe sought and
10  obtained NIGC approval of a management contract that included notice of the tribe's
11  intention to permit customers to purchase tickets over the telephone as an "off-reservation
12  means of access" to the lottery.  *Id*. at 902, 908.  The tribe then entered into a contract
13  with AT&T to provide toll-free phone service to its customers.  *Id*.  However, when
14  several state Attorneys General warned AT&T that the lottery was illegal, AT&T brought
15  suit to void the contract.  *Id*. at 903.  In reversing the district court's decision in favor of
16  AT&T, the Ninth Circuit held that the NIGC's approval of the management contract was
17  a final agency decision that "indicated that the Lottery is legal until and unless the
18  NIGC's decision is overturned," and AT&T lacked the requisite standing to challenge the
19  matter.  *Id*. at 906-909.  Notably, in reaching its decision, the Ninth Circuit did not
20  undertake to analyze whether "off-reservation means of access" are in fact authorized by
21  IGRA.  Instead, the Court's analysis focused only on the deference due final agency
22  decisions.  Accordingly, *AT&T Corporation* offers no assistance to the Tribal Defendants
23  in their efforts to broaden the scope of IGRA.  *See id*. at 910 n.12 ("This Court draws no
24  conclusions as to how the Lottery might fare when properly challenged").

25  **IV.    DRB Patrons Are Engaged in Unlawful Gaming Activity**

26        As noted above, the Tribal Defendants admit to facts that demonstrate that patrons
27  violate California law when they place bets through DRB.  *See, e.g.,* TDSUF [Doc. #67-
28  1], Nos. 119 (admitting that DRB is a percentage game), 84-100, 111, 118 (admitting that

DRB patrons play the percentage game with "device[s]" for money); *see also* Cal. Penal Code § 330 ("every person who plays" any "percentage game played with . . . any device, for money . . . is guilty of a misdemeanor").

Additionally, the Tribal Defendants admit to facts that reveal their "proxy" arrangement for what it really is:  an elaborate sleight-of-hand.  They admit, for example, that—except for the physical act of a DRB patron in logging on to the website, funding an account, selecting a card and clicking "Submit Request!"—DRB is fully automated. *See* TDSUF [Doc. #67-1], Nos. 47-55, 63-69, 84-99, 110.  While certain employees are given the title of "proxy" (or some variation thereof), they admit that these employees merely monitor the server operations and report system failures.  *Id*., Nos. 68-69.  They also admit that the references to a "proxy" in the on-line, game-status messages are simply another word for the patrons themselves.  *Id*., No. 104.

Yet, against this backdrop, they continue to assert that "bingo game play is only commenced when the proxy participant initiates play by sending a request to the game management server," "the proxy participant will . . . play the bingo game using technologic aids," and "[b]ecause the patron's designated agent proxy is located on Indian lands during the time this is happening, the bingo game is actually played on Indian lands."  Opposition [Doc. #67], 41:22-26, 43:3-6, 43:22-24.  There is simply no evidentiary or legal support for these conclusions.

Instead, the Supreme Court's decision in *Bay Mills* teaches that "gaming activity" for purposes of IGRA "means just what it sounds like." *Bay Mills*, 134 S.Ct. at 2032.  It is "the gambling," "the roll of the dice," the "spin of the wheel," and, in this case, logging on to the website, funding an account, selecting a card and clicking "Submit Request!" *See id*. at 2032-33.  This activity necessarily occurs *off Indian lands* where the patrons are located.  *See* TDSUF [Doc. #67-1], Nos. 56-47; USSUF [Doc. #62], No. 21.

In *Bay Mills,* Justice Kagan suggested that the State of Michigan, "[s]tymied" by its inability to seek IGRA remedies for off-reservation gambling, might consider "resort[ing] to its criminal law, prosecuting anyone who maintains—or even frequents—

an unlawful gambling establishment," because "a State, on its own lands, has many other powers over tribal gaming that it does not possess (absent consent) in Indian territory." *Bay Mills*, 134 S.Ct. at 2034-35. Similarly, if the State of California chose to do so, it could criminally prosecute DRB patrons for playing a percentage game off Indian lands. And the State's right to exercise such power illustrates the true nature of the Tribal Defendants' end game: they seek to use IGRA as a shield to protect their ability to collect the proceeds of *off-site illegal gaming*. UIGEA provides otherwise. Accordingly, the Court should grant the United States' motion for summary judgment and issue a permanent injunction prohibiting the Tribal Defendants from accepting restricted transactions associated with DRB.

## V.    CONCLUSION

For each of the foregoing reasons, the United States respectfully requests that the Court issue an order granting summary judgment.

Date: June 3, 2016

Respectfully submitted,
LAURA E. DUFFY
United States Attorney

By */s/ Glen F. Dorgan*
GLEN F. DORGAN
Assistant United States Attorney
Attorneys for the United States